# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **TEXARKANA INDEPENDENT SCHOOL DIST.,** | § | |
| **IRVING INDEPENDENT SCHOOL DISTRICT,** | § | |
| **SOCORRO INDEPENDENT SCHOOL DISTRICT,** | § | |
| **DOWNEY UNIFIED SCHOOL DISTRICT,** | § | |
| **KERN HIGH SCHOOL DISTRICT,** | § | **CIVIL ACTION NO._____** |
| **WAUKEGAN COMMUNITY UNIT SCHOOL** | § | |
| **DISTRICT,** | § | **JURY TRIAL DEMANDED** |
| **BIBB COUNTY SCHOOL DISTRICT,** | § | |
| **SOUTH BEND COMMUNITY SCHOOL CORP.,** | § | |
| **MESA COUNTY VALLEY SCHOOL** | § | |
| **DISTRICT 51,** | § | |
| **ELK GROVE UNIFIED SCHOOL DIST.,** | § | |
| **SMITH-GREEN COMMUNITY SCHOOLS,** | § | |
| **SCHOOL CITY OF MISHAWAKA,** | § | |
| **CITY OF MISHAWAKA, IN,** | § | |
| **CITY OF HILLVIEW, KY,** | § | |
| **CITY OF SHEPHERDSVILLE, KY,** | § | |
| **CITY OF MT. WASHINGTON, KY,** | § | |
| **PENN-HARRIS-MADISON SCHOOL CORP. and** | § | |
| **FORT WAYNE COMMUNITY SCHOOLS,** | § | |
| | § | |
| **PLAINTIFFS** | § | |
| **vs.** | § | |
| | § | |
| **ABBVIE, INC.,** | § | |
| **KNOLL PHARMACEUTICAL COMPANY,** | § | |
| **ALLERGAN, PLC f/k/a ACTAVIS, PLC,** | § | |
| **ALLERGAN FINANCE, LLC f/k/a** | § | |
| **ACTAVIS, INC. f/k/a WATSON** | § | |
| **PHARMACEUTICALS, INC.,** | § | |
| **ALLERGAN SALES, LLC,** | § | |
| **ALLERGAN USA, INC.,** | § | |
| **WATSON LABORATORIES, INC.,** | § | |
| **WARNER CHILCOTT COMPANY, LLC** | § | |
| **ACTAVIS, LLC,** | § | |
| **ACTAVIS PHARMA, INC. f/k/a** | § | |
| **WATSON PHARMA, INC.,** | § | |
| **ACTAVIS LABORATORIES UT, INC. f/k/a** | § | |
| **WATSON LABORATORIES, INC.,** | § | |
| **ACTAVIS SOUTH ATLANTIC, LLC,** | § | |
| **ACTAVIS ELIZABETH, LLC,** | § | |
| **ACTAVIS MID ATLANTIC, LLC,** | § | |
| **ACTAVIS TOTOWA, LLC,** | § | |

1

ACTAVIS KADIAN, LLC,                                        §
ACTAVIS LABORATORIES FL, INC.,                             §
ASSERTIO THERAPEUTICS, INC. f/k/a                          §
    DEPOMED, INC.,                              §
ENDO HEALTH SOLUTIONS, INC.,                               §
ENDO PHARMACEUTICALS, INC.,                                §
PAR PHARMACEUTICAL, INC.,                                  §
PAR PHARMACEUTICAL COMPANIES, INC.                         §
    f/k/a PAR PHARMACEUTICAL                     §
    HOLDINGS, INC.                               §
JANSSEN PHARMACEUTICALS, INC. f/k/a                        §
    ORTHO-MCNEIL-JANSSEN                          §
    PHARMACEUTICALS, INC. f/k/a JANSSEN           §
    PHARMACEUTICA, INC.,                         §
JOHNSON & JOHNSON,                                         §
NORAMCO, INC.,                                             §
MYLAN, INC.,                                               §
MYLAN INSTITUTIONAL, INC.,                                 §
MYLAN PHARMACEUTICALS, INC.,                               §
MYLAN SPECIALTY, L.P.,                                     §
MYLAN BERTEK PHARMACEUTICALS, INC.,                        §
TEVA PHARMACEUTICAL INDUSTRIES, LTD.,                      §
TEVA PHARMACEUTICALS USA, INC.,                            §
CEPHALON, INC.,                                            §
AMNEAL PHARMACEUTICALS, LLC,                               §
AMNEAL PHARMACEUTICALS, INC.,                              §
IMPAX LABORATORIES, LLC,                                   §
AMNEAL PHARMACEUTICALS OF                                  §
    NEW YORK, LLC,                               §
AMERISOURCEBERGEN COPORATION,                              §
AMERISOURCEBERGEN DRUG CORP.,                              §
CARDINAL HEALTH, INC.,                                     §
CARDINAL HEALTH 110, LLC,                                  §
MCKESSON CORPORATION, and                                  §
MCKESSON MEDICAL-SURGICAL, INC.,                           §
                                                   §
      DEFENDANTS                           §

2

## PLANTIFFS' ORIGINAL COMPLAINT AND JURY DEMAND

**TO THE HONORABLE COURT:**

Plaintiffs, by and through the undersigned attorneys, file this Original Complaint and Jury Demand against Defendants AbbVie Inc., Knoll Pharmaceutical Company, Allergan PLC f/k/a Actavis PLC, Allergan Finance, LLC f/k/a Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc., Warner Chilcott Company, LLC,  Allergan Sales, LLC, Allergan USA Inc., Watson Laboratories, Inc., Actavis LLC, Actavis Pharma Inc. f/k/a Watson Pharma, Inc., Actavis Laboratories UT, Inc. f/k/a Watson Laboratories, Inc., Actavis South Atlantic, LLC, Actavis Elizabeth, LLC, Actavis Misd Atlantic, LLC, Actavis Totowa, LLC, Actavis Kadian, LLC, Actavis Laboratories FL, Inc., Assertio Therapeutics, Inc. f/k/a Depomed, Inc., Endo Health Solutions Inc., Endo Pharmaceuticals, Inc., Par Pharmaceutical, Inc., Par Pharmaceutical Companies, Inc., Janssen Pharmaceuticals, Inc. f/k/o Ortho-McNeil-Janssen Pharmaceuticals, Inc. f/k/a Janssen Pharmaceutica, Inc., Johnson & Johnson, Noramco, Inc., Mylan Inc., Mylan Institutional Inc., Mylan Pharmaceuticals Inc., Mylan Specialty L.P., Mylan Bertek Pharmaceuticals Inc., Teva Pharmaceutical Industries, LTD., Teva Pharmaceuticals USA, Inc., Cephalon, Inc., Amneal Pharmaceuticals, LLC, Amneal Pharmaceuticals, Inc., Impax Laboratories, LLC, Amneal Pharmaceuticals of New York, LLC, AmerisourceBergen Corporation, AmerisourceBergen Drug Corporation, Cardinal Health, Inc., Cardinal Health 110, LLC, McKesson Corporation, and McKesson Medical-Surgical Inc. (collectively "Defendants"), and respectfully show the following:

## INTRODUCTION

1.      Defendants are manufacturers and distributors of opioids. Since 1990, the number of Americans who have died annually from drug overdoses has increased by more than 650%—68% of which involved opioids. The number of opioid overdose deaths in 2017 alone surpassed the number of deaths in the AIDS epidemic at its peak. In fact, the Center for Disease Control and Prevention (CDC) reports that "[o]n average, 130 Americans die every day from an opioid overdose."

2.      Defendants created the opioid overdose epidemic in the United States by conspiring to push their drugs onto vulnerable Americans, leaving families and local governments—such as Plaintiffs—to clean up the mess. Defendants consciously and intentionally created a climate in which opioids, despite their danger and addictiveness, are widely and easily available. The resulting opioid overdose epidemic is the worst in the history of the United States.

3.      Before the 1990s, it was widely accepted within pharmaceutical and medical communities that opioids should be used only for short-term acute pain. But Defendants envisioned a bigger market for their products. So, in the mid-1990s, Defendants unleashed a massive false and misleading marketing campaign, distorting scientific studies and tainting virtually every source of medical information on which doctors and the public relied with misinformation touting the safety and effectiveness of opioids for a wide range of common, chronic pain conditions.

4.      Through sustained marketing campaigns and front organizations targeting doctors with a campaign of misinformation, Defendants changed the culture around and perception of prescription opioids throughout the United States. Opioid manufacturers successfully persuaded

doctors and patients that opioids are not addictive, opioids are safe for long-term use, and that the compassionate treatment of pain *required* opioids. Defendants' increased sales of opioids spread across the country like a wildfire, ravaging the country, robbing parents of children and children of parents. The number of deaths attributed to prescription drugs now surpasses those for cocaine and heroin combined.

5.      Plaintiffs have suffered (and will continue to suffer) injury, harm, and damages as a direct, proximate, and/or foreseeable result of Defendants' above-referenced knowing, intentional, and deceptive wrongful conduct. Plaintiffs assert claims and causes of action against Defendants for public nuisance, negligence, gross negligence, fraud, unjust enrichment, and civil conspiracy. Plaintiffs seek to recover damages and equitable relief from Defendants in the form of, *inter alia*: (i) expenses for providing medical care and various treatments and programs for individuals suffering from opioid-related addiction or disease, including overdose and death; (ii) expenses for treatment, counseling, and rehabilitation services for opioid-addicted patients and their families; (iii) expenses for treatment of infants with opioid-related medical conditions; (iv) expenses for patient counseling for pain management necessitated by use of medically-unnecessary prescription opioids; (v) expenses for social service programs for vulnerable populations, such as youths and the elderly; (vi) expenses for emergency services and public safety; (vii) expenses for training additional staff in the proper treatment of opioid overdoses; and (viii) expenses for community outreach and preventative public education programs pertaining to the opioid epidemic.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over Plaintiffs' claims and causes of action under 28 U.S.C. § 1332(a)(1) because the matter in controversy as to each named

5

Plaintiff exceeds the sum of $75,000, exclusive of interest and costs, and the controversy is between citizens of different states (diversity jurisdiction).

7.      This Court has *in personam* jurisdiction over Defendants because at all relevant times, Defendants resided, were found, had agents, and/or conducted business in the Eastern District of Texas (and continue to do so). This Court also has *in personam* jurisdiction over Defendants because they consensually submitted to the jurisdiction of the Eastern District of Texas when obtaining a manufacturer or distributor license, and they have the requisite minimum contacts with the Eastern District of Texas necessary to constitutionally permit the Court to exercise jurisdiction.

8.      At all relevant times, Defendants, directly and/or through their agents and representatives, resided, were found, and/or conducted business in the Eastern District of Texas (and continue to do so). A substantial part, if not all, of the events giving rise to Plaintiffs' claims and causes of action occurred in the Eastern District of Texas. Accordingly, venue is proper in the Eastern District of Texas under 28 U.S.C § 1391(b)(1) and (b)(2).

## PARTIES

### Plaintiffs

9.      Plaintiff Texarkana Independent School District is an independent school district located in Texarkana, Texas, with a total district enrollment of over 8,200 students. Plaintiff Texarkana Independent School District has standing to bring this action because it has suffered (and will continue to suffer) injury, damages, and other harm caused by Defendants' misconduct described herein, including, *inter alia*, (i) decreased funding due to the diversion of funds to other public services addressing the opioid epidemic, (ii) costs to train school nurses, resource officers, and others in the proper treatment of drug overdoses, (iii) costs to provide academic,

socio-emotional, school attendance/truancy, medical, and mental health and support services, including treatment, counseling, rehabilitation services, and social services to victims and their families, and (iv) costs for increased law enforcement and school security to prevent the distribution of opioids in the schools.

10.     Plaintiff Irving Independent School District is an independent school district located in Irving, Texas, with a total district enrollment of over 33,000 students. Plaintiff Irving Independent School District has standing to bring this action because it has suffered (and will continue to suffer) injury, damages, and other harm caused by Defendants' misconduct described herein, including, *inter alia*, (i) decreased funding due to the diversion of funds to other public services addressing the opioid epidemic, (ii) costs to train school nurses, resource officers, and others in the proper treatment of drug overdoses, (iii) costs to provide academic, socio-emotional, school attendance/truancy, medical, and mental health and support services, including treatment, counseling, rehabilitation services, and social services to victims and their families, and (iv) costs for increased law enforcement and school security to prevent the distribution of opioids in the schools.

11.     Plaintiff Socorro Independent School District is an independent school district located in El Paso, Texas, with a total district enrollment of over 47,000 students. Plaintiff Socorro Independent School District has standing to bring this action because it has suffered (and will continue to suffer) injury, damages, and other harm caused by Defendants' misconduct described herein, including, *inter alia*, (i) decreased funding due to the diversion of funds to other public services addressing the opioid epidemic, (ii) costs to train school nurses, resource officers, and others in the proper treatment of drug overdoses, (iii) costs to provide academic, socio-emotional, school attendance/truancy, medical, and mental health and support services,

including treatment, counseling, rehabilitation services, and social services to victims and their families, and (iv) costs for increased law enforcement and school security to prevent the distribution of opioids in the schools.

12.     Plaintiff Downey Unified School District is a unified school district located in Downey, California, with a total district enrollment of over 22,000 students. Plaintiff Downey Unified School District has standing to bring this action because it has suffered (and will continue to suffer) injury, damages, and other harm caused by Defendants' misconduct described herein, including, *inter alia*, (i) decreased funding due to the diversion of funds to other public services addressing the opioid epidemic, (ii) costs to train school nurses, resource officers, and others in the proper treatment of drug overdoses, (iii) costs to provide academic, socio-emotional, school attendance/truancy, medical, and mental health and support services, including treatment, counseling, rehabilitation services, and social services to victims and their families, and (iv) costs for increased law enforcement and school security to prevent the distribution of opioids in the schools.

13.     Plaintiff Kern High School District is a school district located in Bakersfield, California, with a total district enrollment of over 35,000 students. Plaintiff Kern High School District has standing to bring this action because it has suffered (and will continue to suffer) injury, damages, and other harm caused by Defendants' misconduct described herein, including, *inter alia*, (i) decreased funding due to the diversion of funds to other public services addressing the opioid epidemic, (ii) costs to train school nurses, resource officers, and others in the proper treatment of drug overdoses, (iii) costs to provide academic, socio-emotional, school attendance/truancy, medical, and mental health and support services, including treatment, counseling, rehabilitation services, and social services to victims and their families, and (iv) costs

8

for increased law enforcement and school security to prevent the distribution of opioids in the schools.

14.     Plaintiff Waukegan Community Unit School District is a unified school district located in Waukegan, Illinois, with a total district enrollment of over 16,000 students. Plaintiff Waukegan Community Unified School District has standing to bring this action because it has suffered (and will continue to suffer) injury, damages, and other harm caused by Defendants' misconduct described herein, including, *inter alia*, (i) decreased funding due to the diversion of funds to other public services addressing the opioid epidemic, (ii) costs to train school nurses, resource officers, and others in the proper treatment of drug overdoses, (iii) costs to provide academic, socio-emotional, school attendance/truancy, medical, and mental health and support services, including treatment, counseling, rehabilitation services, and social services to victims and their families, and (iv) costs for increased law enforcement and school security to prevent the distribution of opioids in the schools.

15.     Plaintiff Bibb County School District is a public-school district located in Macon, Georgia, with a total district enrollment of over 24,000 students. Plaintiff Bibb County School District has standing to bring this action because it has suffered (and will continue to suffer) injury, damages, and other harm caused by Defendants' misconduct described herein, including, *inter alia*, (i) decreased funding due to the diversion of funds to other public services addressing the opioid epidemic, (ii) costs to train school nurses, resource officers, and others in the proper treatment of drug overdoses, (iii) costs to provide academic, socio-emotional, school attendance/truancy, medical, and mental health and support services, including treatment, counseling, rehabilitation services, and social services to victims and their families, and (iv) costs

for increased law enforcement and school security to prevent the distribution of opioids in the schools.

16.     Plaintiff South Bend Community School Corporation is a school district located in South Bend, Indiana, with a total district enrollment of over 18,000 students. Plaintiff South Bend Community School Corporation has standing to bring this action because it has suffered (and will continue to suffer) injury, damages, and other harm caused by Defendants' misconduct described herein, including, *inter alia*, (i) decreased funding due to the diversion of funds to other public services addressing the opioid epidemic, (ii) costs to train school nurses, resource officers, and others in the proper treatment of drug overdoses, (iii) costs to provide academic, socio-emotional, school attendance/truancy, medical, and mental health and support services, including treatment, counseling, rehabilitation services, and social services to victims and their families, and (iv) costs for increased law enforcement and school security to prevent the distribution of opioids in the schools.

17.     Plaintiff Mesa County Valley School District 51 is a school district located in Grand Junction, Colorado, with a total district enrollment of over 22,000 students. Plaintiff Mesa County Valley School District 51 has standing to bring this action because it has suffered (and will continue to suffer) injury, damages, and other harm caused by Defendants' misconduct described herein, including, *inter alia*, (i) decreased funding due to the diversion of funds to other public services addressing the opioid epidemic, (ii) costs to train school nurses, resource officers, and others in the proper treatment of drug overdoses, (iii) costs to provide academic, socio-emotional, school attendance/truancy, medical, and mental health and support services, including treatment, counseling, rehabilitation services, and social services to victims and their

families, and (iv) costs for increased law enforcement and school security to prevent the distribution of opioids in the schools.

18.     Plaintiff Elk Grove Unified School District is a unified school district located in Elk Grove, California, with a total district enrollment of over 63,000 students. Plaintiff Elk Grove Unified School District has standing to bring this action because it has suffered (and will continue to suffer) injury, damages, and other harm caused by Defendants' misconduct described herein, including, *inter alia*, (i) decreased funding due to the diversion of funds to other public services addressing the opioid epidemic, (ii) costs to train school nurses, resource officers, and others in the proper treatment of drug overdoses, (iii) costs to provide academic, socio-emotional, school attendance/truancy, medical, and mental health and support services, including treatment, counseling, rehabilitation services, and social services to victims and their families, and (iv) costs for increased law enforcement and school security to prevent the distribution of opioids in the schools.

19.     Plaintiff Smith-Green Community Schools is a public school district serving the town of Churubusco, Indiana with a total district enrollment of approximately 1200 students. Plaintiff Smith-Green Community Schools has standing to bring this action because it has suffered (and will continue to suffer) injury, damages, and other harm caused by Defendants' misconduct described herein, including, *inter alia*, (i) decreased funding due to the diversion of funds to other public services addressing the opioid epidemic, (ii) costs to train school nurses, resource officers, and others in the proper treatment of drug overdoses, (iii) costs to provide academic, socio-emotional, school attendance/truancy, medical, and mental health and support services, including treatment, counseling, rehabilitation services, and social services to victims

11

and their families, and (iv) costs for increased law enforcement and school security to prevent the distribution of opioids in the schools.

20.     Plaintiff School City of Mishawaka is a school district located in Mishawaka, Indiana, with a total district enrollment of approximately 5000 students. Plaintiff School City of Mishawaka has standing to bring this action because it has suffered (and will continue to suffer) injury, damages, and other harm caused by Defendants' misconduct described herein, including, *inter alia*, (i) decreased funding due to the diversion of funds to other public services addressing the opioid epidemic, (ii) costs to train school nurses, resource officers, and others in the proper treatment of drug overdoses, (iii) costs to provide academic, socio-emotional, school attendance/truancy, medical, and mental health and support services, including treatment, counseling, rehabilitation services, and social services to victims and their families, and (iv) costs for increased law enforcement and school security to prevent the distribution of opioids in the schools.

21.     Plaintiff City of Mishawaka is an Indiana city, which as of 2010, had a population of 48,252 residents. Plaintiff City of Mishawaka provides a variety of services to its residents, including, without limitation, programs for families and children, public health, public assistance, law enforcement, public safety, corrections, judicial services, emergency care, and health benefits to its employees. Plaintiff City of Mishawaka has standing to bring this action because it has suffered (and will continue to suffer) injury, damages, and other harm caused by Defendants' misconduct described herein, including, *inter alia*, (i) decreased funding available for public services for which funding was lost because it was diverted to other public services designed to address the opioid epidemic, (ii) costs to provide first responders with Naloxone, an opioid antagonist used to block the deadly effects of opioid overdoses, and (iii) an increased

12

burden its judicial system, including costs for increased security, costs for increased staff, and the increased cost of adjudicating criminal matters due to the increase in crime directly resulting from opioid addiction.

22.     Plaintiff City of Hillview is a Kentucky city, which as of 2010, had a population of 8,172 residents. Plaintiff City of Hillview provides a variety of services to its residents, including, without limitation, programs for families and children, public health, public assistance, law enforcement, public safety, corrections, judicial services, emergency care, and health benefits to its employees. Plaintiff City of Hillview has standing to bring this action because it has suffered (and will continue to suffer) injury, damages, and other harm caused by Defendants' misconduct described herein, including, *inter alia*, (i) decreased funding available for public services for which funding was lost because it was diverted to other public services designed to address the opioid epidemic, (ii) costs to provide first responders with Naloxone, an opioid antagonist used to block the deadly effects of opioid overdoses, and (iii) an increased burden its judicial system, including costs for increased security, costs for increased staff, and the increased cost of adjudicating criminal matters due to the increase in crime directly resulting from opioid addiction.

23.     Plaintiff City of Shepherdsville is a Kentucky city, which as of 2010, had a population of 11,222 residents. Plaintiff City of Shepherdsville provides a variety of services to its residents, including, without limitation, programs for families and children, public health, public assistance, law enforcement, public safety, corrections, judicial services, emergency care, and health benefits to its employees. Plaintiff City of Shepherdsville has standing to bring this action because it has suffered (and will continue to suffer) injury, damages, and other harm caused by Defendants' misconduct described herein, including, *inter alia*, (i) decreased funding

available for public services for which funding was lost because it was diverted to other public services designed to address the opioid epidemic, (ii) costs to provide first responders with Naloxone, an opioid antagonist used to block the deadly effects of opioid overdoses, and (iii) an increased burden its judicial system, including costs for increased security, costs for increased staff, and the increased cost of adjudicating criminal matters due to the increase in crime directly resulting from opioid addiction.

24. Plaintiff City of Mt. Washington is a Kentucky city, which as of 2010, had a population of 9,117 residents. Plaintiff City of Mt. Washington provides a variety of services to its residents, including, without limitation, programs for families and children, public health, public assistance, law enforcement, public safety, corrections, judicial services, emergency care, and health benefits to its employees. Plaintiff City of Mt. Washington has standing to bring this action because it has suffered (and will continue to suffer) injury, damages, and other harm caused by Defendants' misconduct described herein, including, *inter alia*, (i) decreased funding available for public services for which funding was lost because it was diverted to other public services designed to address the opioid epidemic, (ii) costs to provide first responders with Naloxone, an opioid antagonist used to block the deadly effects of opioid overdoses, and (iii) an increased burden its judicial system, including costs for increased security, costs for increased staff, and the increased cost of adjudicating criminal matters due to the increase in crime directly resulting from opioid addiction.

25. Plaintiff Penn-Harris-Madison School Corporation is a school district located in Mishawaka, Indiana with a total district enrollment of over 11,000 students. Plaintiff Penn-Harris-Madison School Corporation has standing to bring this action because it has suffered (and will continue to suffer) injury, damages, and other harm caused by Defendants' misconduct

14

described herein, including, *inter alia*, (i) decreased funding due to the diversion of funds to other public services addressing the opioid epidemic, (ii) costs to train school nurses, resource officers, and others in the proper treatment of drug overdoses, (iii) costs to provide academic, socio-emotional, school attendance/truancy, medical, and mental health and support services, including treatment, counseling, rehabilitation services, and social services to victims and their families, and (iv) costs for increased law enforcement and school security to prevent the distribution of opioids in the schools.

26.     Plaintiff Fort Wayne Community Schools corporation is a school district located in Fort Wayne, Indiana with a total district enrollment of over 30,000 students. Plaintiff Fort Wayne Community Schools has standing to bring this action because it has suffered (and will continue to suffer) injury, damages, and other harm caused by Defendants' misconduct described herein, including, *inter alia*, (i) decreased funding due to the diversion of funds to other public services addressing the opioid epidemic, (ii) costs to train school nurses, resource officers, and others in the proper treatment of drug overdoses, (iii) costs to provide academic, socio-emotional, school attendance/truancy, medical, and mental health and support services, including treatment, counseling, rehabilitation services, and social services to victims and their families, and (iv) costs for increased law enforcement and school security to prevent the distribution of opioids in the schools.

## Manufacturer Defendants

### *"AbbVie"*

27.     Defendant AbbVie, Inc. is a Delaware corporation with its principal place of business in North Chicago, Illinois. AbbVie, Inc. was created in January 2013 when Abbott Laboratories spun off its pharmaceutical business. AbbVie, Inc. is licensed in the State of Texas

as a bulk active pharmaceutical ingredient manufacturer and wholesale prescription drug distributor. AbbVie, Inc. may be served with process through its registered agent, Corporate Creations Network, Inc., 5444 Westheimer #1000, Houston, Texas 77056 USA.

28.     Defendant Knoll Pharmaceutical Company is a New Jersey corporation with its principal place of business in Mt. Olive, New Jersey. Knoll Pharmaceutical Company is a wholly owned subsidiary of AbbVie Inc. Knoll Pharmaceutical Company may be served with process through its registered agent, AbbVie Inc.: Tax Division, 1 N. Waukegan Road, AP34, 3rd Floor Chicago, Illinois 60064. At all times relevant hereto, Knoll irresponsibly marketed narcotics, including Vicodin, in the Eastern District of Texas and Plaintiffs' geographic areas. It engaged in such conduct to boost sales of its opioid products. Knoll took advantage of the fact that, for a number of years, Vicodin was not regulated as a Schedule II controlled substance. It marketed Vicodin in the Eastern District of Texas and Plaintiffs' geographic areas as "The Highest Potency Pain Relief You Can Still Phone In." Knoll used such advertising on trinkets and toys, such as fanny packs and water bottles bearing the name "Vicodin," to promote increased sales. To the detriment of Plaintiffs, Knoll's reckless marketing of Vicodin caused physicians and consumers to believe Vicodin was safer than it actually was.

29.     At all times relevant hereto, AbbVie, Inc. and Knoll Pharmaceutical Company have been unified in ownership and interest and have acted jointly and in concert regarding the activities at issue in this case. AbbVie, Inc. exercises control over Knoll Pharmaceutical Company marketing and sales efforts and profits from the sale of Knoll Pharmaceutical Company's products ultimately inure to its benefit. These entities are alter-egos of each other, and they have collectively been run as a single business enterprise without regard for corporate formalities. Thus, these entities are jointly and severally liable for their tortious conduct set forth

herein. AbbVie, Inc. and Knoll Pharmaceutical Company hereafter are referred to together as "AbbVie."

30.    AbbVie manufactured, developed, promoted, marketed and sold the opioid drugs Vicodin (hydrocodone bitartrate and acetaminophen) and Vicoprofen (hydrocodone bitartrate and ibuprofen) in the U.S. and within the Eastern District of Texas and Plaintiffs' geographic areas. AbbVie aggressively marketed Vicodin and continues to do so as of the time this First Amended Petition was filed.

### *"Actavis"*

31.    Defendant Allergan, PLC f/k/a Actavis, PLC is an Irish public limited company organized and existing under the laws of Ireland with its principal office in Dublin, Ireland.  In 2016, Teva Pharmaceutical Industries, Ltd. acquired Allergan, PLC's global generics business and certain other assets of Allergan, PLC, including all of the equity interests of certain Allergan, PLC subsidiaries and all of the assets, property, and rights of Allergan, PLC and its affiliates that were primarily in connection with its global generics business.[1]

32.    Defendant Allergan Finance, LLC f/k/a Actavis Inc. f/k/a Watson Pharmaceuticals, Inc. is a Nevada limited liability company with its principal place of business in Parsippany, New Jersey. On information and belief, Allergan Finance, LLC operates as a subsidiary of Allergan, PLC. Allergan Finance, LLC may be served with process through its registered agent, CT Corporation System, 701 South Carson Street, Suite 200, Carson City, Nevada 89701.

---

[1]    As a result of the acquisition, Allergan, PLC holds equity in Teva Pharmaceutical Industries, Ltd. and purchases products manufactured by Teva for sale in its U.S. General Medicine segment as part of ongoing transitional service and contract manufacturing agreements.

33.     Defendant Allergan Sales, LLC is a Delaware limited liability company with its principal place of business in Irvine, California. Allergan Sales, LLC is licensed in the State of Texas as a prescription drug manufacturer. Allergan Sales, LLC transacts business in Texas under the assumed name "Allergan." On information and belief, Allergan Sales, LLC operates as a subsidiary of Allergan PLC. Allergan Sales, LLC may be served with process through its registered agent, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 752013136.

34.     Defendant Allergan USA, Inc. is a Delaware corporation with its principal place of business in Irvine, California. Allergan USA Inc. is licensed in the State of Texas as a prescription drug manufacturer and wholesale prescription drug distributor with offices and facilities in Lewisville and Denton, Texas. On information and belief, Allergan USA, Inc. operates as a subsidiary of Allergan, PLC. Allergan USA, Inc. may be served with process through its registered agent, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3136.

35.     Defendant Watson Laboratories, Inc. is a Nevada corporation with its principal place of business in Corona, California. On information and belief, Watson Laboratories, Inc. is as a subsidiary of Teva Pharmaceutical Industries, Ltd. Watson Laboratories, Inc. may be served with process through its registered agent, Corporate Creations Network, Inc., 8275 South Eastern Avenue #200, Las Vegas, Nevada 89123.

36.     Defendant Warner Chilcott Company, LLC is a Puerto Rico limited liability company. Since 2015, Warner Chilcott Company, LLC has manufactured Norco. Warner Chilcott Company, LLC was a subsidiary of Warner Chilcott plc until Warner Chilcott plc became a wholly owned subsidiary of Allergan plc in 2013. Warner Chilcott Company, LLC was

18

then sold to Teva Pharmaceutical Industries, Inc. as part of Allergan plc's sale of its generic business to Teva in 2016. Warner Chilcott Company, LLC may be served with process through its registered agent, C.T. Corporation System, 361 San Francisco Street, Penthouse, Old San Juan, Puerto Rico 00901.

37.     Defendant Actavis, LLC is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey. On information and belief, Actavis, LLC is as a subsidiary of Teva Pharmaceutical Industries, Ltd. Actavis, LLC may be served with process through its registered agent, Corporate Creations Network, Inc., 3411 Silverside Road, Tatnall Building, Suite 104, Wilmington, Delaware 19810.

38.     Defendant Actavis Pharma, Inc. f/k/a Watson Pharma Inc. is a Delaware corporation with its principal place of business in Parsippany, New Jersey. On information and belief, Actavis Pharma, Inc. is as a subsidiary of Teva Pharmaceutical Industries, Ltd. Actavis Pharma, Inc. may be served with process through its registered agent, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

39.     Defendant Actavis Laboratories UT, Inc. f/k/a Watson Laboratories, Inc. is a Delaware corporation with its principal place of business in Salt Lake City, Utah. Actavis Laboratories UT, Inc. is licensed in the State of Texas as a prescription drug manufacturer and wholesale distributor. On information and belief, Actavis Laboratories UT, Inc. f/k/a Watson Laboratories, Inc. is an indirect wholly owned subsidiary of Teva Pharmaceutical Industries, Ltd. and acts at the direction of and under the control of, and for the benefit of Teva Pharmaceutical Industries, Ltd. On information and belief, Actavis Laboratories UT, Inc., Teva Pharmaceutical Industries, Ltd., and Teva Pharmaceuticals USA, Inc. work in active concert with respect to the development, regulatory approval, importing, marketing, sale, and distribution of opioid products

in the Eastern District of Texas and Plaintiffs' geographic areas. Actavis Laboratories UT, Inc. f/k/a Watson Laboratories, Inc. may be served with process through its registered agent Corporate Creations Network Inc., 3411 Silverside Road, Tatnall Building, Suite 104, Wilmington, Delaware 19810.

40.     Defendant Actavis South Atlantic, LLC is a Delaware limited liability company with its principal place of business in Sunrise, Florida. Actavis South Atlantic LLC was listed as the ANDA holder for oxymorphone and fentanyl transdermal. Actavis South Atlantic LLC was sold to Teva Pharmaceutical Industries Ltd. as part of Allergan plc's sale of its generic businesses to Teva in 2016. Actavis South Atlantic, Inc. may be served with process through its registered agent, Corporate Creations Network Inc., 801 US Highway 1, North Palm Beach, Florida, 33408.

41.     Defendant Actavis Elizabeth, LLC is a Delaware limited liability company with its principal place of business in Elizabeth, New Jersey. From December 19, 2005, until it purchased the medication in December 2008, Actavis Elizabeth, LLC was the contract manufacturer of Kadian for Alpharma and held the NDA for Kadian from 2008 to 2013. Actavis Elizabeth LLC also was the holder of ANDAs for the following Schedule II opioid products: oxycodone/acetaminophen; homatropine; methylbromide/hydrocodone bitartrate; morphine sulfate capsule; morphine sulfate tablet; oxycodone/hydrochloride tablet; oxycodone/ibuprofen; and oxymorphone tablet. Actavis Elizabeth LLC was sold to Teva Pharmaceutical Industries, Ltd. as part of Allergan plc's sale of its generic businesses to Teva in 2016. Actavis Elizabeth, LLC may be served with process through its registered agent, Corporate Creations Network Inc., 3411 Silverside Road, Tatnall Building, Suite 104, Wilmington, Delaware 19810.

42.     Defendant Actavis Mid Atlantic, LLC is a Delaware limited liability company

with its principal place of business in Parsippany, New Jersey. Actavis Mid Atlantic, LLC has held

the ANDA for homatropine methylbromide/hydrocodone bitartrate. Actavis Mid Atlantic, LLC

was sold to Teva Pharmaceutical Industries Ltd. as part of Allergan plc's sale of its generic

businesses to Teva in 2016. Actavis Mid Atlantic LLC may be served with process through its

registered agent, Corporate Creations Network Inc., 3411 Silverside Road, Tatnall Building,

Suite 104, Wilmington, Delaware 19810.

    43.    Defendant Actavis Totowa, LLC is a Delaware limited liability company with its

principal place of business in Parsippany, New Jersey. Actavis Totowa, LLC has held the

ANDAs for the following Schedule II opioid products: oxycodone/acetaminophen; homatropine

methylbromide; and oxycodone/hydrochloride. Actavis Totowa, LLC may be served with

process through its registered agent, Corporate Creations Network Inc., 3411 Silverside Road,

Tatnall Building, Suite 104, Wilmington, Delaware 19810.

    44.    Defendant Actavis Kadian, LLC is a Delaware limited liability company with its

principal place of business in Morristown, New Jersey. Actavis Kadian, LLC has been identified

on its label as a manufacturer and/or distributor of Kadian. Actavis Kadian, LLC was sold to

Teva Pharmaceutical Industries, Ltd. as part of Allergan plc's sale of its generic businesses to

Teva in 2016. Actavis Kadian, LLC may be served with process through its registered agent,

Corporate Creations Network Inc., 3411 Silverside Road, Tatnall Building, Suite 104,

Wilmington, Delaware 19810.

    45.    Defendant Actavis Laboratories FL, Inc. (f/k/a Watson Laboratories, Inc.-Florida)

is a Florida limited liability company with its principal place of business in Davie, Florida.

Actavis Laboratories FL, Inc. was a Norco ANDA holder in 2015 and the ANDA holder of the

following Schedule II opioid products: hydrocodone/ibuprofen; oxycodone/aspirin; and

hydromorphone tablet. Actavis Laboratories FL, Inc. was sold to Teva Pharmaceutical

Industries, Ltd. as part of Allergan plc's sale of its generic businesses to Teva in 2016. Prior to

the sale, Actavis Laboratories FL, Inc. was a direct subsidiary of Andrx Corporation, which was a

direct subsidiary of Actavis, Inc. (n/k/a Allergan Finance, LLC). Andrx Corporation was

transferred to Teva as part of the 2016 sale. Actavis Laboratories FL, Inc. may be served with

process through its registered agent, Corporate Creations Network Inc., 801 US Highway 1,

North Palm Beach, Florida 33408.

**46.**　　At all times relevant hereto, Allergan, PLC f/k/a Actavis PLC, Allergan Finance,

LLC f/k/a Actavis Inc. f/k/a Watson Pharmaceuticals, Inc., Allergan Sales, LLC, Allergan USA

Inc., Watson Laboratories, Inc., Warner Chilcott Company, LLC, Actavis, LLC, Actavis Pharma,

Inc. f/k/a Watson Pharma, Inc., Actavis Laboratories UT, Inc. f/k/a Watson Laboratories, Inc.,

Actavis South Atlantic, LLC,  Actavis Elizabeth, LLC, Actavis Mid Atlantic, LLC, Actavis

Totowa, LLC, Actavis Kadian, LLC, and Actavis Laboratories FL, Inc. have been unified in

ownership and interest and have acted jointly and in concert regarding the activities at issue in

this case.  Allergan, PLC controls the sale and development of Allergan Finance, LLC f/k/a

Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc., Allergan Sales, LLC, Allergan USA, Inc.,

Watson Laboratories, Inc., Warner Chilcott Company, LLC, Actavis LLC, Actavis Pharma, Inc.

f/k/a Watson Pharma, Inc., Actavis Laboratories UT, Inc. f/k/a Watson Laboratories, Inc.,

Actavis Elizabeth, LLC, Actavis Mid Atlantic, LLC, Actavis Totowa, LLC, Actavis Kadian,

LLC, and Actavis Laboratories FL, Inc. drugs and their profits inure to Allergan, PLC's benefit.

These entities are alter-egos of each other and have collectively been run as a single business

enterprise without regard for corporate formalities. Thus, these entities are jointly and severally

liable for their tortious conduct set forth herein. Allergan, PLC f/k/a Actavis, PLC, Allergan

Finance, LLC f/k/a Actavis Inc. f/k/a Watson Pharmaceuticals, Inc., Allergan Sales, LLC, Allergan USA, Inc., Watson Laboratories, Inc., Warner Chilcott Company, LLC, Actavis, LLC, Actavis Pharma, Inc. f/k/a Watson Pharma, Inc., Actavis Laboratories UT, Inc. f/k/a Watson Laboratories, Inc., Actavis Elizabeth, LLC, Actavis Mid Atlantic, LLC, Actavis Totowa, LLC, Actavis Kadian, LLC, and Actavis Laboratories FL, Inc. hereafter are referred to collectively as "Actavis."

47.     Actavis manufactures, markets, promotes, sells, and distributes opioids, including the branded drugs Kadian (morphine sulfate extended release) and Norco (hydrocodone bitartrate and acetaminophen) in the United States, including the Eastern District of Texas and Plaintiffs' geographic areas. Actavis acquired the rights to Kadian from King Pharmaceuticals, Inc. on December 30, 2008 and began marketing Kadian in 2009.  Actavis also manufactures, markets, promotes, sells, and distributes numerous generic opioids.

***"Depomed"***

48.     Defendant Assertio Therapeutics, Inc. f/k/a Depomed, Inc. ("Assertio" or "Depomed") is a Delaware corporation with its principal place of business in Lake Forrest, Illinois. Depomed acquired Nucynta (tapentadol immediate-release oral tablets) and Nucynta ER (tapentadol extended-release tablets) from J&J in April of 2015 and began to manufacture, market, sell and distribute Nucynta® throughout the U.S., including the Eastern District of Texas and in Plaintiffs' geographic areas. Depomed also manufactures, markets, sells and distributes Lazanda (fentanyl). Depomed is licensed in the State of Texas as a prescription drug manufacturer and wholesale distributor. Depomed may be served with process through its registered agent The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

23

49.     On information and belief, Depomed entered a Commercialization Agreement with Collegium Pharmaceutical, Inc. (Collegium) in January of 2018 that granted Collegium the right to commercialize Nucynta and Nucynta ER in the U.S. Collegium assumed all commercialization responsibilities for Nucynta effective January 9, 2018, including sales and marketing. Pursuant to the Commercialization Agreement, Depomed will receive a royalty on all Nucynta and Nucynta ER revenues based on certain net sales thresholds, with a minimum royalty of $135 million per year during the first four years of the agreement. Additionally, Depomed retained certain rights to co-promote Nucynta products.

50.     Depomed actively promoted and continues to promote the sale and use of its opioid products throughout the U.S., including the Eastern District of Texas and in Plaintiffs' geographic areas. In 2015, Depomed paid over $2.11 million to physicians and hospitals across the U.S., including in the Eastern District of Texas, to promote widespread prescribing, sales and use of Nucynta and Nucynta ER. On information and belief, from 2013 through 2015, Depomed paid $1.07 million to physicians and hospitals across the U.S., including the Eastern District of Texas and in Plaintiffs' geographic areas, to the promote the sale and use of Lazanda. Additionally, from 2012 to 2017, Depomed paid $1,071,000 to non-profit patient advocacy groups and medical societies to promote opioid prescribing and enhance the acceptance of opioids for non-cancer pain. Specifically, Depomed made payments to several industry front groups, including the Academy of Integrative Pain Management ($43,491.95), American Academy of Pain Medicine ($332,100.00), AAPM Foundation ($304,605.00), American Chronic Pain Association ($54,670.00), American Pain Society ($288,750.00), American Society of Pain Management Nursing ($25,500.00), and U.S. Pain Foundation ($22,000.00).

51.     Depomed established a training module called the "Depomed Pain Medicine Education Program" with the American Academy of Pain Medicine, which can be found at the American Academy of Pain Medicine (AAPM) Education Center. The training module appears on the AAPM webpage and "was designed to further sales specialists' knowledge of the fundamentals of pain medicine and gain confidence and credibility when interacting with health care clinicians." The Pain Medicine Education Program promotes use of opioids for chronic pain in older adults and has modules entitled: "Strategies for Success with Chronic Opioid Therapy," "Pain Management with Older Adults," and "Pain and Pathways: Understanding Chronic Low Back Pain."

### *"Endo"*

52.     Defendant Endo Health Solutions, Inc. is a Delaware corporation with its principal place of business in Malvern, Pennsylvania. Endo Health Solutions, Inc. may be served with process through its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

53.     Defendant Endo Pharmaceuticals, Inc. is a Delaware corporation with its principal place of business in Malvern, Pennsylvania. Endo Pharmaceuticals Inc. is registered with the Texas Secretary of State (Filing No. 11675706) to transact business in the State of Texas. Endo Pharmaceuticals Inc. is licensed in the State of Texas as a prescription drug manufacturer and wholesale distributor. Endo Pharmaceuticals, Inc. may be served with process through its registered agent, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

54.     Defendant Par Pharmaceutical, Inc. is a New York corporation with its principal place of business in Chestnut Ridge, New York. Par Pharmaceutical, Inc. is a wholly owned subsidiary of Par Pharmaceuticals Companies, Inc.  Par Pharmaceutical, Inc. may be served with

process through its registered agent, CT Corporation System, 28 Liberty Street, New York, New York 10005.

55.     Defendant Par Pharmaceutical Companies, Inc. is a Delaware corporation with its principal place of business in Chestnut Ridge, New York. Par Pharmaceutical, Inc. and Par Pharmaceutical Companies, Inc. (collectively "Par Pharmaceutical") were acquired by Endo International PLC in September 2015 and serve as the operating companies of Endo International, PLC.  Par Pharmaceutical Companies, Inc. may be served with process through its registered agent, the Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

56.     At all times relevant hereto, Endo Health Solutions, Inc., Endo Pharmaceuticals, Inc., and Par Pharmaceutical have been unified in ownership and interest and have acted jointly and in concert regarding the activities at issue in this case. Endo Health Solutions, Inc., exercises control over Endo Pharmaceuticals, Inc. and Par Pharmaceutical, Inc.'s marketing and sales efforts and profits from the sale of Endo Pharmaceuticals, Inc. and Par Pharmaceutical, Inc.'s products ultimately inure to its benefit. These entities are alter-egos of each other, and they have collectively been run as a single business enterprise without regard for corporate formalities. Thus, these entities are jointly and severally liable for their tortious conduct set forth herein. Endo Health Solutions, Inc., Endo Pharmaceuticals, Inc., and Par Pharmaceutical hereafter are referred to collectively as "Endo."

57.     Endo manufactures, promotes, sells, and distributes opioids in the United States, including the Eastern District of Texas and in Plaintiffs' geographic areas, including Opana (oxymorphone hydrochloride), Opana ER (oxymorphone hydrochloride extended release), Zydone (hydrocodone bitartrate and acetaminophen), Percocet (oxycodone hydrochloride and

acetaminophen) and Percodan (oxycodone hydrochloride and aspirin). Endo also manufactures and sells generic opioids in the U.S., including the Eastern District of Texas and in Plaintiffs' geographic areas. directly and through its wholly owned subsidiary, Qualitest Pharmaceuticals, Inc.

58. On information and belief, opioid products made up approximately $403 million of Endo's overall revenues in 2012. Sales of Opana ER generated $1.15 billion in revenue from 2010 through 2013 and accounted for 10 percent of Endo's total revenue in 2012. Endo, by itself and through its wholly owned subsidiary, Qualitest Pharmaceuticals, Inc., also manufactures and sells generic opioid products such as oxycodone, oxymorphone, hydromorphone, and hydrocodone in the United States, including the Eastern District of Texas and in Plaintiffs' geographic areas.

59. At all relevant times, Endo actively promoted the sale and use of its opioid products throughout the U.S., including the Eastern District of Texas and in Plaintiffs' geographic areas. From 2013 through 2015, Endo made almost $1 million in payments to physicians and hospitals to promote widespread prescribing, sales, and use of Opana ER.

*"J&J"*

60. Defendant Johnson & Johnson is a New Jersey corporation with its principal place of business in New Brunswick, New Jersey. On information and belief, Johnson & Johnson is the only company that owns in excess of 10 percent of Janssen Pharmaceuticals, Inc.'s stock. On information and belief, Johnson & Johnson manages and controls the operations of, and derives profits and other benefits from, the development and sale of Janssen Pharmaceuticals, Inc.'s

products. Johnson & Johnson may be served with process through its registered agent, Attention: Legal Department, One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933.

61.    Defendant Janssen Pharmaceuticals, Inc. f/k/a Ortho-McNeil-Janssen Pharmaceuticals, Inc. f/k/a Janssen Pharmaceutica, Inc. is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey. Janssen Pharmaceuticals, Inc. is a wholly owned subsidiary of Johnson & Johnson. Janssen Pharmaceuticals, Inc. is registered with the Texas Secretary of State to transact business in the State of Texas (Filing No. 6626606). Janssen Pharmaceuticals, Inc. may be served with process through its registered agent, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3136.

62.    Defendant Noramco, Inc. is a Delaware corporation with its principal place of business in Wilmington, Delaware. Noramco, Inc. is licensed in the State of Texas as a prescription drug manufacturer and bulk active pharmaceutical ingredient distributor. On information and belief, Noramco, Inc. manufactures controlled substances in bulk for distribution to its customers, including opioid products that contain codeine, dihydromorphine, hydromorphinol, morphine, dihydrocodeine, oxycodone, hydromorphone, hydrocodone, opium extracts, oxymorphone, noroxymorphone and tapentadol. Noramco, Inc. was a wholly owned subsidiary of Johnson & Johnson until July of 2016, after which time Noramco, Inc. was sold to private investment firm, SK Capital.  Noramco, Inc. may be served with process through its registered agent, Jorge Guiloff, 11902 Spears Road, Houston, Texas 77067.

63.    Johnson & Johnson, Janssen Pharmaceuticals, Inc., and Noramco, Inc. have been unified in ownership and interest and have acted jointly and in concert regarding activities at issue in this case. These entities are alter-egos of each other, and they have collectively been run as a single business enterprise without regard for corporate formalities. Johnson & Johnson is the

only company that owns more than 10 percent of Janssen Pharmaceuticals, Inc.'s stock and corresponds with the FDA regarding Janssen Pharmaceuticals, Inc.'s products.  Johnson & Johnson controls the sale and development of Janssen Pharmaceutical, Inc.'s drugs and Janssen Pharmaceutical, Inc.'s profits inure to Johnson & Johnson's benefit.  Thus, these entities are jointly and severally liable for their tortious conduct set forth herein. Johnson & Johnson, Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., Janssen Pharmaceutica, Inc., and Noramco, Inc. hereafter are referred to collectively as "J&J."

64.     J&J manufactures, promotes, sells, and distributes opioids in the United States, including the Eastern District of Texas and in Plaintiffs' geographic areas, including its branded opioid products Duragesic (fentanyl transdermal patch), Nucynta (tapentadol immediate-release oral tablets), and Nucynta ER (tapentadol extended-release tablets). In 2009, Duragesic accounted for at least $1 billion of J&J's annual sales.  J&J developed, marketed, and sold Nucynta from 2008 to 2015 and Nucynta® ER from 2011 to 2015. In 2014, Nucynta and Nucynta ER generated $172 million in sales.

65.     From 1990 to 2016, J&J supplied other opioid manufacturers with active pharmaceutical ingredients ("APIs")[2] as part of its "pain management franchise." *See* Findings of Fact at 5, *Oklahoma ex rel. Hunter v. Purdue Pharma LP et al.,* No. CJ-2017-816 (Okla. Dist. Ct. Aug. 26, 2019). J&J cornered the market on opioid APIs through its two wholly owned subsidiaries Tasmanian Alkaloids Limited and Noramco. Tasmanian Alkaloids Limited ("Tasmanian Alkaloids") "cultivated and processed opium poppy plants to manufacture narcotic

---

[2]   Active pharmaceutical ingredient is the term used to refer to the biologically active component of a drug product. Drug products are usually composed of several components; however, the API is the primary ingredient.

raw materials that were imported to the U.S. to be processed and made into APIs necessary to
manufacture opioid drugs." Id. Defendant Noramco "imported the narcotic raw materials
produced by Tasmanian Alkaloids, [and] processed these materials." *Id.* J&J purportedly
"acquired and formed Tasmanian Alkaloids and Noramco, in order to ensure a reliable source of
narcotic raw materials and security of supply for its Tylenol with Codeine range of pain
medication." *Id*. at 7.

66.     Until 2016, when J&J sold these entities, "Tasmanian Alkaloids and Noramco
were sister companies, as both of them were members of Johnson & Johnson's family of
companies." *Id*. at 6. Testimony from Noramco employees in related litigation shows that they
"did not believe Noramco maintained its own bank accounts, separate from Johnson & Johnson's
treasury." *Id.* Further, Noramco employees "physically worked" in Johnson & Johnson "facilities
in New Jersey from time to time." Moreover, "employees simultaneously held positions at
multiple companies within the Johnson & Johnson Family of Companies at times. *Id.* As the
primary API importer-exporter, Noramco and Tasmanian Alkaloids were key parts of . . .
Janssen's pain management franchise" which included all of their "pain products and was an
important part of Johnson & Johnson's business from the mid-1990s to after 2010." *Id.*

67.     Through these subsidiaries, J&J supplied APIs to other drug manufacturers in the
U.S. including Teva and Purdue. *Id.* In fact, by 2015, J&J had become "the #1 supplier of
Narcotic APIs in the United States." *Id.* J&J's profit-driven efforts to saturate the domestic
market with APIs directly and proximately contributed to cause the opioid epidemic and
Plaintiffs' resulting damages. In fact, following a recent trial, J&J was ordered to pay some $572
million for its role in causing the opioid epidemic in neighboring Oklahoma. The trial court

found that J&J had promulgated "false, misleading, and dangerous marketing campaigns" that had "caused exponentially increasing rates of addiction, overdose deaths" and other injuries. *Id.*

68.     At all times relevant hereto, J&J actively promoted the sale and use of its opioid products throughout the U.S., including the Eastern District of Texas and in Plaintiffs' geographic areas. On information and belief, from 2013 through 2015, J&J made $2.17 million in payments to physicians and hospitals across the U.S., including in the State of Texas, to promote widespread prescribing, sales and use of Nucynta and Nucynta ER. Additionally, from 2012 to 2017, J&J paid $465,000 to non-profit patient advocacy groups and medical societies to promote opioid prescribing and enhance the acceptance of opioids for non-cancer pain. *See Fueling an Epidemic, Exposing the Financial Ties Between Opioid Manufacturers and Third-Party Advocacy Groups*, HSGAC, Minority Staff Report.

### *"Mylan"*

69.     Defendant Mylan, Inc. is a Pennsylvania corporation with its principal place of business in Cannonsburg, Pennsylvania. Myland, Inc. is a global generic and specialty pharmaceutical company. Mylan, Inc. may be served with process through its registered agent, CT Corporation System, 209 West Washington Street, Charleston, West Virginia 25302.

70.     Defendant Mylan Institutional, Inc. is an Illinois corporation with its principal place of business in Rockford, Illinois. Mylan Institutional, Inc. is registered with the Texas Secretary of State (Filing No. 00811948) to transact business in the State of Texas. Mylan Institutional, Inc. is also licensed in the State of Texas as a prescription drug manufacturer, wholesale prescription drug distributor, and bulk active pharmaceutical ingredient manufacturer with facilities throughout the State of Texas. Mylan Institutional, Inc. may be served with

process through its registered agent, CT Corporation System 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3136 USA.

71.     Defendant Mylan Pharmaceuticals, Inc. is a West Virginia corporation with its principal place of business in Canonsburg, Pennsylvania. Mylan Pharmaceuticals, Inc. is registered with the Texas Secretary of State (Filing No. 10910506) to transact business in the State of Texas. Mylan Pharmaceuticals, Inc. is licensed in the State of Texas as a prescription drug manufacturer and wholesale distributor. Mylan Pharmaceuticals, Inc. may be served with process through its registered agent, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3136 USA.

72.     Defendant Mylan Specialty, L.P. is a limited partnership organized and existing under the laws of the State of Delaware with its principal place of business in Baskin Ridge, New Jersey. Mylan Specialty, L.P. is registered with the Texas Secretary of State (Filing No. 7251711) to transact business in the State of Texas. Mylan Specialty, L.P. is licensed in the State of Texas as a prescription drug manufacturer and wholesale distributor. Mylan Specialty, L.P. may be served with process through its registered agent, CT Corporation System, 1999 Bryan Street, Ste. 900, Dallas, Texas, 75201-3136 USA.

73.     At all times relevant hereto, Mylan, Inc., Mylan Institutional, Inc., Mylan Pharmaceuticals, Inc., Mylan Specialty, L.P., and Mylan Bertek Pharmaceuticals, Inc. have been unified in ownership and interest and have acted jointly and in concert regarding the activities at issue in this case. Mylan, Inc. controls the sale and development of Mylan Institutional, Inc., Mylan Pharmaceuticals, Inc., Mylan Specialty, L.P., and Mylan Bertek Pharmaceuticals, Inc.'s drugs and their profits ultimately inure to Mylan, Inc.'s benefit.  These entities are alter-egos of each other, and they have collectively been run as a single business enterprise without regard for corporate formalities. Thus, these entities are jointly and severally liable for their tortious

32

conduct set forth herein. Mylan, Inc., Mylan Institutional, Inc., Mylan Pharmaceuticals, Inc., and Mylan Specialty, L.P. hereafter are referred to collectively as "Mylan."

74. Mylan manufactures, markets, sells, and distributes many brand name and generic opioid products, including, but not limited to, fentanyl, codeine, hydrocodone, morphine, and tramadol. Mylan also manufactures and markets naloxone hydrochloride, an opiate agonist, and buprenorphine, a partial opiate agonist.

75. At all relevant times, Mylan actively promoted the sale and use of its opioid products throughout the Eastern District of Texas and in Plaintiffs' geographic areas. Mylan paid thousands of dollars to physicians to promote widespread prescribing, sales and use of its fentanyl and morphine drugs.

76. Mylan also funded and supported the American Pain Society, a pro-opioid pharmaceutical industry front group promoting opioid prescribing and enhance the acceptance of opioids for non-cancer pain. Mylan's first payment to the American Pain Society ($15,000) was made in March of 2015, the same month Mylan launched intermediate dosage strengths for its fentanyl transdermal system. "In connection with this launch, according to the company, Mylan 'engaged in marketing efforts to educate doctors about the availability of the intermediate strengths.'" *See Fueling an Epidemic, Exposing the Financial Ties Between Opioid Manufacturers and Third-Party Advocacy Groups*, HSGAC, Minority Staff Report.

77. From 2002 through 2018, Mylan spent $20,106,980 on congressional lobbying related to opioid legislation. *See Mylan, Inc*., OPENSECRETS.ORG, https://www.opensecrets org /lobby/clientsumphp?id= D000027765&year=2018. Furthermore, Mylan is a member of the Healthcare Distribution Alliance ("HDA"), the national organization representing pharmaceutical distributors. See Membership, Healthcare Distribution Alliance,

HEALTHCAREDISTRIBUTION.ORG, https://www. healthcaredistribution.org/about/ membership/manufacturer. The HDA spends thousands each year lobbying Congress and contributing to congressional campaigns to influence legislation and policies affecting the sale and regulation of opioid drugs. *See* OPENSECRETS.ORG, supra.

78.     On information and belief, from 2013 through 2015, Mylan paid approximately $170,000 to physicians to promote widespread prescribing, sales, and use of fentanyl and paid approximately $1.44 million to physicians to promote widespread prescribing, sales, and use of its opioid products. Additionally, from 2012 to 2017, Mylan paid $20,250 to non-profit patient advocacy groups and medical societies to promote opioid prescribing and enhance the acceptance of opioids for noncancer pain. Specifically, Mylan has made payments to the American Pain Society every year since 2015, the year it launched intermediate dosage strengths for its fentanyl transdermal system. "In connection with this launch, according to the company, Mylan 'engaged in marketing efforts to educate doctors about the availability of the intermediate strengths.'"

*"Teva"*

79.     Defendant Teva Pharmaceutical Industries, Ltd. is an Israeli multinational corporation with global headquarters located at 5 Basel Street, Petach Tikva 49131, Israel. Teva Pharmaceutical Industries, Ltd. is the largest generic drug manufacturer in the world and one of the 15 largest pharmaceutical companies in the world. Teva Pharmaceutical Industries, Ltd. and its subsidiaries operate as an integrated business. As of 2017, Teva Pharmaceutical Industries, Ltd. is no longer qualified as a foreign private issuer under SEC rules and, accordingly, is subject to the same registration and disclosure requirements applicable to domestic U.S. entities.

80.     Defendant Teva Pharmaceuticals USA, Inc. is a Delaware corporation with its principal place of business in North Wales, Pennsylvania. On information and belief, Teva Pharmaceuticals USA, Inc. is a wholly owned subsidiary of Teva Pharmaceutical Industries, Ltd. and acts at the direction of, under the control of, and for the benefit of Teva Pharmaceutical Industries, Ltd. Upon information and belief, Teva Pharmaceutical Industries, Ltd. and Teva Pharmaceuticals USA, Inc. are agents of each other or work in concert with each other with respect to the development, regulatory approval, marketing, sale, and distribution of products throughout the U.S., including the Eastern District of Texas and in Plaintiffs' geographic areas. Teva Pharmaceuticals USA, Inc. maintains the website www.tevausa.com, which displays Teva Pharmaceutical Industries, Ltd.'s logo. Teva Pharmaceuticals USA, Inc. is licensed in the State of Texas as an out-of-state prescription drug manufacturer and wholesale distributor. Teva Pharmaceuticals USA, Inc. may be served with process through its registered agent, Corporate Creations Network, Inc., 3411 Silverside Road, Tatnall Building, Suite 104, Wilmington, Delaware 19810.

81.     Defendant Cephalon, Inc. is a Delaware corporation with its principal place of business in Frazer, Pennsylvania. Cephalon, Inc. was acquired in 2011 by Israeli-based Teva Pharmaceutical Industries, Ltd. On information and belief, Cephalon, Inc. acts at the direction of, under the control of, and for the benefit of Teva Pharmaceutical Industries, Ltd. On information and belief, since the acquisition, Teva Pharmaceuticals USA, Inc. has conducted Teva Pharmaceutical Industries, Ltd.'s sales and marketing activities for Cephalon, Inc. in the United States and Texas. Cephalon, Inc. may be served with process through its registered agent, Corporate Creations Network, Inc., 3411 Silverside Road, Tatnall Building, Suite 104, Wilmington, Delaware 19810.

82.     Teva Pharmaceutical Industries, Ltd., Teva Pharmaceuticals USA, Inc., and Cephalon, Inc. are unified in ownership and interest and have acted jointly and in concert regarding the activities at issue in this case. These entities are alter-egos of each other and are collectively run as a single integrated business organization without regard for corporate formalities. On information and belief, these entities are agents of each other or work in active concert together to develop, gain regulatory approval, manufacture, distribute, market, offer to sell, and sell pharmaceutical products through the United States, including the Eastern District of Texas and in Plaintiffs' geographic areas. Teva Pharmaceutical Industries, Ltd., Teva Pharmaceuticals USA, Inc. and Cephalon, Inc. share the same employees and corporate officers. Teva Pharmaceutical Industries, Ltd. files a single annual report with the U.S. Securities and Exchange Commission for itself and its subsidiaries. On information and belief, Teva Pharmaceutical Industries, Ltd. manages its assets on a companywide basis, not by segments, as many of its assets are share or commingled. Teva Pharmaceutical Industries, Ltd. exercises control over the development, manufacturing, marketing and sales efforts of Teva Pharmaceuticals USA, Inc. and Cephalon, Inc.  Moreover, profits from the sale of Teva Pharmaceuticals USA, Inc. and Cephalon, Inc. products ultimately inure to Teva Pharmaceuticals Industries, Ltd.'s benefit. Thus, these entities are jointly and severally liable for their tortious conduct set forth herein. Teva Pharmaceutical Industries, Ltd., Teva Pharmaceuticals USA, Inc., and Cephalon, Inc. are referred to collectively as "Teva."

83.     Teva manufactures, promotes, sells, and distributes opioids in the United States, including the Eastern District of Texas and in Plaintiffs' geographic areas, such as Actiq (oral transmucosal fentanyl citrate) and Fentora (fentanyl buccal tablet). Teva also manufactures,

markets, sells, and distributes many generic Schedule II[3] opioid products, including, but not limited to, morphine, codeine, oxycodone, dihydrocodeine, fentanyl, oxymorphone, meperidine, hydromorphone, tramadol, and hydrocodone.

84.     Teva actively promotes the sale and use of its opioid products throughout the U.S., including the Eastern District of Texas and in Plaintiffs' geographic areas. Over the course of several years, Teva paid physicians and hospitals throughout the United States millions of dollars in research payments, speaking and consulting fees, meals, travel and other items and gifts for the purpose of promoting its products, including Fentora, Actiq, hydrocodone and hydrocodone bitartrate/acetaminophen. In 2008, Teva agreed to pay a $425 million settlement for marketing Actiq for uses not approved by the Food and Drug Administration (FDA).

*"Amneal"*

85.     Defendant Amneal Pharmaceuticals, LLC is a Delaware limited liability company with its principal place of business in Bridgewater, New Jersey. Impax laboratories, LLC, formerly known as Impax Laboratories, Inc., is a Delaware limited liability company with its principal place of business in Bridgewater, New Jersey. On information and belief, in May 2018, Impax laboratories, Inc. merged with and into Amneal Pharmaceuticals, LLC to form Defendant Amneal Pharmaceuticals, Inc., a Delaware corporation with its principal place of business in Bridgewater, New Jersey. Defendant Amneal Pharmaceuticals of New York, LLC is a Delaware limited liability company with its principal place of business in Hauppauge, New York. Amneal Pharmaceuticals, Inc., Amneal Pharmaceuticals, LLC, Amneal Pharmaceuticals of New York,

---

[3]     Under the Texas Controlled Substances Act: "The commissioner shall establish and modify the following schedule of controlled substances under this subchapter: Schedule I, Schedule II, Schedule III, Schedule IV, and Schedule V." TEX. HEALTH & SAFETY CODE § 481.032.

LLC, and Impax Laboratories, LLC are collectively referred to as "Amneal." Amneal manufactures, promotes, distributes, and/or sells opioids nationally. Amneal may be served with process through its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE, 19801.

### Distributor Defendants

### *"AmerisourceBergen"*

86.     Defendant AmerisourceBergen Corporation is a Delaware corporation with its principal place of business in Chesterbrook, Pennsylvania. AmerisourceBergen Corporation and its subsidiaries and affiliates distribute pharmaceuticals to retail pharmacies, institutional providers, and customers in all fifty states, including the Eastern District of Texas and in Plaintiffs' geographic areas. AmerisourceBergen Corporation may be served with process through its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

87.     Defendant AmerisourceBergen Drug Corporation is a Delaware corporation with its principal place of business in Chesterbrook, Pennsylvania. AmerisourceBergen Drug Corporation is registered with the Texas Secretary of State (Filing No. 8203706) to transact business in the State of Texas. AmerisourceBergen Drug Corporation is licensed in the State of Texas as a prescription drug distributor and has operations throughout the State of Texas. AmerisourceBergen Drug Corporation may be served with process through its registered agent, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3136.

88.     At all times relevant hereto, AmerisourceBergen Corporation and AmerisourceBergen Drug Corporation have been unified in ownership and interest and have acted jointly and in concert regarding the activities at issue in this case. AmerisourceBergen

Corporation and AmerisourceBergen Drug Corporation are agents of each other or work in concert with each other with respect to the distribution, marketing and sale of opioid products throughout the U.S., including the Eastern District of Texas and in Plaintiffs' geographic areas. AmerisourceBergen Corporation controls the business operations and strategies of AmerisourceBergen Drug Corporation and AmerisourceBergen Drug Corporation's profits ultimately inure to AmerisourceBergen Corporation's benefit. These entities are alter-egos of each other, and they have collectively been run as a single business enterprise without regard for corporate formalities. Thus, these entities are jointly and severally liable for their tortious conduct set forth herein. AmerisourceBergen Corporation and AmerisourceBergen Drug Corporation hereafter are referred to together as "AmerisourceBergen."

89.     AmerisourceBergen is the third largest pharmaceutical distributor and provides 20 percent of all pharmaceuticals sold in the United States. In 2007, AmerisourceBergen was told did not maintain effective controls against diversion of hydrocodone to four internet pharmacies and ordered the company to halt distribution from its Florida facility. *See AmerisourceBergen Receives DEA Order to Temporarily Halt Distribution of Controlled Substances from its Orlando, Florida Facility*, News Release, AMERISOURCEBERGEN, Apr. 24, 2007 http://www.amerisourcebergen.com/investor/ phoenix.zhtml?c=61181&p=irolnewsArticle&ID =989877. In January 2017, AmerisourceBergen agreed to pay $16 million to settle a lawsuit brought by West Virginia's attorney general for failing to submit reports of suspicious pharmacy shipments. *See* Eyre, Eric, *2 drug distributors to pay $36M to settle WV painkiller lawsuits*, CHARLESTON GAZETTE-MAIL, Jan. 9, 2017, http://www.wvgazettemail.com/ news-cops-and-courts/20170109/2-drug-distributors-to-pay-36m-to-settle-wvpainkiller-lawsuits.

*"Cardinal"*

90.     Defendant Cardinal Health, Inc. is an Ohio corporation with its principal place of business in Dublin, Ohio. Cardinal Health, Inc. and its subsidiaries and affiliates service more than 24,000 pharmacies and more than 85 percent of U.S. hospitals. Cardinal Health, Inc. distributes pharmaceuticals to retail pharmacies, institutional providers and customers in all fifty states, including the Eastern District of Texas and in Plaintiffs' geographic areas. Cardinal Health, Inc. may be served with process through its registered agent, CT Corp. System, 4400 Easton Commons Way, Ste. 125, Columbus, Ohio 43219.

91.     Defendant Cardinal Health 110, LLC is a limited liability company organized under the laws of the State of Ohio with its principal place of business in Dublin, Ohio. Cardinal Health 110, LLC is registered with the Texas Secretary of State (Filing No. 7758106) to transact business in the State of Texas. Cardinal Health 110, LLC is licensed in the State of Texas as a wholesale prescription drug distributor and prescription drug manufacturer. Cardinal Health 110, LLC may be served with process through its registered agent, CT Corporation System, 1999 Bryan Street, Ste. 900, Dallas, Texas 75201.

92.     At all times relevant hereto, Cardinal Health, Inc. and Cardinal Health 110, LLC have been unified in ownership and interest and have acted jointly and in concert regarding the activities at issue in this case. Cardinal Health, Inc. and Cardinal Health 110, LLC are agents of each other or work in concert with each other with respect to the distribution, marketing, and sale of opioid products throughout the U.S., including the Eastern District of Texas and in Plaintiffs' geographic areas. Cardinal Health, Inc. controls the business operations and strategies of Cardinal Health 110, LLC and Cardinal Health 110, LLC's profits ultimately inure to Cardinal Health, Inc.'s benefit. These entities are alter-egos of each other, and they have collectively been

run as a single business enterprise without regard for corporate formalities. Thus, these entities are jointly and severally liable for their tortious conduct set forth herein. Cardinal Health, Inc. and Cardinal Health 110, LLC hereafter are referred to together as "Cardinal."

93.     Cardinal distributes pharmaceuticals to dispensaries and other customers across the U.S., and does substantial business in Texas, including the Eastern District of Texas and in Plaintiffs' geographic areas. In 2008, Cardinal paid a $34 million fine for filling "blatantly suspicious" opioid shipments from online pharmacies. In October of 2011, Cardinal was reprimanded again, stating the company "posed an imminent danger to the public health and safety." In December 2016, Cardinal agreed to pay $44 million to settle allegations that—again—it had filled suspicious shipments of prescription opioids. *See* U.S. DEP'T OF JUSTICE, *Cardinal Health Agrees to $44 Million Settlement for Alleged Violations of Controlled Substances Act*, Dec. 23, 2016, https://www.justice.gov/usao-md/pr/cardinal-health-agrees-44-million-settlement-allegedviolations-controlled-substances-act. In January 2017, Cardinal agreed to pay $20 million to settle a lawsuit brought by West Virginia's attorney general. However, a separate lawsuit remains pending brought by commissioners of McDowell County, West Virginia, which has the state's highest rate of death from prescription drug abuse. Cardinal and other wholesale distributors in a six-year period sent 780 million hydrocodone and oxycodone pills to West Virginia—433 per state resident. In that time, there were 1,728 fatal overdoses from the addictive painkillers.

*"McKesson"*

94.     Defendant McKesson Corporation is a Delaware corporation with its principal place of business in Irving, Texas. McKesson Corporation is the largest pharmaceutical distributor in the United States and delivers one-third of the pharmaceuticals used in North

America. McKesson Corporation and its subsidiaries and affiliates distribute pharmaceuticals to retail pharmacies and institutional providers in the United States, including the Eastern District of Texas and in Plaintiffs' geographic areas. McKesson Corporation is registered with the Texas Secretary of State (Filing No. 10131506) to transact business in the State of Texas. McKesson Corporation is also licensed in the State of Texas as a wholesale prescription drug distributor and has facilities throughout the State of Texas. McKesson Corporation may be served with process through its registered agent, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, 211 East 7th Street, Suite 620, Austin, Texas 78701-3218.

95.     Defendant McKesson Medical-Surgical, Inc. is a Virginia corporation with its principal place of business in Richmond, Virginia. McKesson Medical-Surgical, Inc. is registered with the Texas Secretary of State (Filing No. 4770906) to transact business in the State of Texas. McKesson Medical-Surgical, Inc. is also licensed in the State of Texas as a prescription drug distributor with facilities and offices throughout the State of Texas. McKesson Medical-Surgical, Inc. may be served with process through its registered agent, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, 211 East 7th Street, Suite 620, Austin, Texas 78701-3218.

96.     At all times relevant hereto, McKesson Corporation and McKesson Medical-Surgical, Inc. have been unified in ownership and interest and have acted jointly and in concert regarding the activities at issue in this case.  McKesson Corporation and McKesson Medical-Surgical, Inc. are agents of each other or work in concert with each other with respect to the distribution, marketing, and sale of opioid products throughout the U.S., including the Eastern District of Texas and in Plaintiffs' geographic areas. McKesson Corporation controls the business operations and strategies of McKesson Medical-Surgical, Inc. and McKesson Medical-

Surgical, Inc.'s profits ultimately inure to McKesson Corporation's benefit. These entities are alter-egos of each other, and they have collectively been run as a single business enterprise without regard for corporate formalities. Thus, these entities are jointly and severally liable for their tortious conduct set forth herein. McKesson Corporation and McKesson Medical-Surgical, Inc. hereafter are referred to together as "McKesson."

97.     McKesson is the largest pharmaceutical distributor in the United States and fifth largest corporation in the nation. McKesson distributes pharmaceuticals to dispensaries and other customers across the U.S. and does substantial business in Texas, including the Eastern District of Texas and in Plaintiffs' geographic areas. The company delivers one-third of all pharmaceuticals used in North America. In 2007, McKesson agreed to a $13.25 million civil penalty and designed a new compliance program pursuant to an administrative agreement with the government. However, McKesson did not fully implement or adhere to its own compliance program. In Colorado, for example, McKesson processed more than 1.6 million shipments for controlled substances from June 2008 through May 2013 but reported just 16 as suspicious. In January of 2017, McKesson agreed to pay a record $150 million civil penalty for its failure to report suspicious sales of pharmaceutical drugs. *See* U.S. DEP'T OF JUSTICE, *McKesson Agrees to Pay Record $150 Million Settlement for Failure to Report Suspicious Orders of Pharmaceutical Drugs*, Jan. 17, 2017 https://www.justice.gov/opa/pr/mckesson-agrees-pay-record-150-millionsettlement-failure-report-suspicious-orders. As part of the settlement, McKesson was required to suspend sales of controlled substances from distribution centers in Colorado, Ohio, Michigan, and Florida for multiple years, which are among the most severe sanctions ever agreed to by a pharmaceutical distributor.

98.     "Distributor Defendants" hereafter refers collectively to McKesson, Cardinal, and AmerisourceBergen. Each of the Manufacturer Defendants identified herein as a distributor of prescription drugs.

## FACTS

### I.     The nationwide opioid epidemic.

99.     The opioid epidemic is a national catastrophe.  Never before has one type of prescription drug been so overprescribed and overused, resulting in an epidemic plaguing our country with no end in sight. CDC epidemiologists report that the annual economic burden caused by opioid abuse in the United States is at least $78.5 billion, including lost productivity and increased costs related to health care, social services, law enforcement, criminal justice, substance abuse and rehabilitation services.

100.     The statistics are alarming. The CDC reports that from 1999 to 2017, more than 399,000 people died from overdoses related to opioids. CDC, *Opioid Analysis and Resources*, May. 7, 2019 https://www.cdc.gov/drugoverdose/data/analysis.html. In 2017, there were more than 47,600 opioid-related deaths in the United States, 6 times higher than in 1999. CDC, *Opioid Overdose, Understanding the Epidemic*, Dec. 19, 2018, https://www.cdc.gov/drugoverdose/epidemic/index.html.

101.     In an open letter dated August 2016, U.S. Surgeon General Vivek Murthy asked doctors across the nation for help in solving "the urgent health crisis facing America: the opioid epidemic." *U.S. Surgeon General Turn the Tide Announcement*, AM. ACAD. OF FAMILY PHYSICIANS, https://www. aafp.org/patient-care/public-health/pain-opioids/turn_the_tide.html. Dr. Murthy's letter noted that for two decades doctors have been incorrectly taught to "be more aggressive about treating pain" and that this correlated with the "heavy marketing of opioids to

44

doctors." *Id*. That same year, U.S. prescribers wrote 66.5 opioid prescriptions for every 100 Americans. CDC, *Annual Surveillance Report of Drug-Related Risks and Outcomes — United States, 2017*, Aug. 31, 2017 https://www.cdc.gov/ drugoverdose/pdf/pubs/2017-cdc-drug-surveillance-report.pdf.

102. The Substance Abuse and Mental Health Services Administration reports that at least 2 million people had an opioid use disorder in 2018. *See* SUBSTANCE ABUSE AND MENTAL HEALTH SERVS. ADMIN., *Key Substance Use and Mental Health Indicators in the United States: Results from the 2017 National Survey on Drugs and Health*, HHS Publication No. SMA 18-5068, NSDUH Series H-53 (September 2018), https://store.samhsa.gov/system/files/sma18-5068.pdf.

103. Defendants affirmatively sought to dramatically change the public's understanding of opioids through a well-funded deceptive marketing scheme. As described herein, Defendants used direct marketing and unbranded marketing to falsely and deceptively communicate about the risk and benefits of long-term opioid use.

104. As of 2018, the CDC reports that:

    i      Two out of three drug overdose deaths in the U.S. involve an opioid.

    ii     On average, 130 Americans die every day from an opioid overdose.

    iii    More than 191 million opioid prescriptions were dispensed to American patients in 2017. CDC, *Opioid Basics*, Aug. 2017, https://www.cdc.gov/drugoverdose/opioids/prescribed.html.

    iv    Among people presenting for treatment for addiction to opioids, and who initiated use of an opioid in 2015, about two out of three started with prescription opioids. CDC, *Heroin,* Dec. 2018, https://www.cdc.gov/drugoverdose/opioids/heroin.html.

    v     Between 2010 and 2017, the rate of heroin-related overdose deaths increased by almost 400 percent. *Id*.

105.     These statistics paint a stark picture of spiraling addiction epidemic.  Addiction is a disease, not a choice.  It is a "primary, chronic disease of brain reward, motivation, memory and related circuitry." *Public Policy Statement: Definition of Addiction*, AM. SOCIETY OF ADDICTION MEDICINE, Aug. 15, 2011, https://www.asam.org/docs/default-source/public-policy-statements/1definition_of_addiction_long_411.pdf?sfvrsn=a8f64512_4.  "Like other chronic diseases, addiction often involves cycles of relapse and remission.  Without treatment or engagement in recovery activities, addiction is progressive and can result in disability or premature death." *Id*. No one is immune to this disease and its effects. While this epidemic affects all Americans, usage and overdose deaths vary drastically from state to state and county to county.

## II.     Defendants' unlawful, false, and deceptive marketing practices.

106.     As indicated above, before the 1990s, opioids were predominantly prescribed for acute, short-term pain, such as trauma or cancer-related pain. Accepted standards of medical practice discouraged the use of opioids to treat chronic pain due to a lack of evidence that opioids improved function and were effective for everyday pain management. Instead, the evidence demonstrated that patients developed tolerance to opioids, which increased the risk of addiction and death.

107.     Through a well-funded and deceptive marketing campaign, Defendants altered this consensus on the danger of opioids. Defendants used multiple vehicles to spread their false, deceptive, and misleading statements about opioids, using, among other means: (i) aggressive and unethical branded marketing directed at physicians and patients in the Eastern District of Texas and in Plaintiffs' geographic areas; (ii) dispatching supposedly independent and unbiased third-parties to the Eastern District of Texas and Plaintiffs' geographic areas to disseminate false

46

and deceptive statements concerning the risks and benefits of opioids; (iii) knowingly and intentionally misrepresenting the risks, benefits, and superiority of opioids; and, (iv) engaging in other unlawful, unfair, and fraudulent misconduct, including targeting susceptible prescribers and vulnerable patient populations.

     **A.**     **Defendants aggressively and unethically engaged in direct marketing of their branded opioid products.**

     **108.**     Defendants implemented their direct marketing campaign in a variety of ways, but generally along three tracks, including (i) direct-to-consumer advertising campaigns, (ii) direct sales contacts with healthcare providers, and (iii) physician speaker programs

     **109.**     Defendants conducted advertising campaigns touting the purported benefits of their branded drugs, utilizing print media, television, radio, and the internet.

     **110.**     Defendants' branded ads deceptively portrayed the benefits of opioids for chronic pain. For example, Endo distributed and made available on its website, www.opana.com, a pamphlet promoting Opana® ER with photographs depicting patients with physically demanding jobs like a construction worker and chef, implying that the drug would provide long-term pain relief and functional improvement.

     **111.**     Endo's advertising campaign positioned Opana ER—a powerful opioid drug 10 times more potent than morphine—as an appropriate treatment option for a wide market of individuals with moderate chronic pain. Endo's website included "Patient Profiles," which were descriptions of individuals with various chronic conditions, including Mike, a "53 year old accountant who developed a degenerative disc disease from playing football during [his] younger days," Bill, a "40 year old construction worker who developed low back pain," Stella, a "68 year old school secretary" with "osteoarthritis in the hip and spine," and Wanda, a "46 year old teacher" who stopped taking morphine because "the side effects were intolerable." Through its

series of relatable "Patient Profiles," Endo marketed Opana® ER as the solution to a broad spectrum of chronic pain issues.

112.    Pursuant to a settlement agreement, Endo agreed in late 2015 and 2016 to halt these misleading representations in New York, but they continue to disseminate them elsewhere, including in the Eastern District of Texas and in Plaintiffs' geographic areas. Defendants' advertising efforts have been particularly instrumental in proliferating the widespread use of hydrocodone-based medications in the Eastern District of Texas and in Plaintiffs' geographic areas.

113.    Defendant AbbVie successfully boosted sales of Vicodin through its targeted use of toys and other light-hearted marketing items that downplayed the risks and misrepresented the benefits of the drug. AbbVie took advantage of the fact that, for a number of years, Vicodin was not regulated as a Schedule II controlled substance. Starting in the early 1990s, AbbVie marketed Vicodin in the Eastern District of Texas and in Plaintiffs' geographic areas as "[t]ablet for tablet, the most potent analgesic you can phone in" and as a drug that offered "Freedom from pain! Extra strength pain relief free of extra prescribing restrictions."

114.    To Plaintiffs' detriment, AbbVie's reckless marketing of Vicodin caused Plaintiffs' physicians and consumers to believe Vicodin was safer than it was. By 2010, the U.S. consumed 90 percent of the world's hydrocodone.

115.    Defendants promoted the use of opioids for chronic pain through sales representatives who visited hospitals, individual doctors, and medical staff in their offices. Defendants devoted massive resources to direct sales contacts with doctors. In 2014, Defendants spent more than $168 million on efforts to sell their branded opioid products to doctors. This amount is twice as much as Defendants spent on pharmaceutical representative contacts with physicians in 2000. Defendants distributed promotional items like fanny packs, coffee mugs,

48

water bottles, fishing hats, plush toys, and music CDs was literally unprecedented for opiates and other narcotic drugs to hospitals and prescribing physicians. See *Prescription Drugs: OxyContin Abuse and Diversion and Efforts to Address the Problem*, General Accounting Office, December 2003, Publication GAO-04-110. *See Prescription Drugs: OxyContin Abuse and Diversion and Efforts to Address the Problem*, General Accounting Office, December 2003, Publication GAO-04-110.

116.    J&J aggressively promoted Ultracet® for "chronic neuropathic pain," even though the drug was approved by the FDA for treatment of short-term pain only. *See* Temple, John, *American Pain: How a Young Felon and His Ring of Doctors Unleashed America's Deadliest Drug Epidemic*, ROWMAN & LITTLEFIELD (2015), at p. 49. In 2014, J&J spent $34 million promoting its branded opioid products directly to doctors and their patients.

117.    Teva promoted its narcotic lollipop, Actiq (fentanyl) for migraine pain instead of the cancer pain for which it had received FDA approval. *Id*. In 2008, Teva pleaded guilty to a criminal violation of the Federal Food, Drug and Cosmetic Act (FDCA) for its misleading promotion of Actiq and two other drugs and agreed to pay $425 million in fines, damages, and penalties.

118.    While payments from opioid pharmaceutical companies to individual prescribing physicians are typically small in value, the impact on prescribing habits is quite large. A 2018 study published in *JAMA Internal Medicine* shows the significant impact that even a meal or two paid for by a pharmaceutical company can have on physician prescribing rates. *See* Hadland, Scott, et al., *Association of Pharmaceutical Industry Marketing of Opioid Products to Physicians With Subsequent Opioid Prescribing*, 178(6) JAMA INTERNAL MED. 861 (2018), https://jamanetwork.com/journals/ jamainternalmedicine/article-abstract/2681059. Researchers from Boston Medical Center examined pharmaceutical company payments made to physicians in

2014, ranging from consulting fees to meals, and found that doctors who received any opioid pharmaceutical marketing increased their prescribing in 2015, writing nine percent more opioid prescriptions than doctors who received no marketing. *Id.*

119.　In addition to the above efforts, Defendants promoted their products by:

a　Training their sales representatives to misrepresent to individual prescribers the risk of addiction;

b　Rewarding their sales representatives for high sales with luxury trips, lucrative annual bonuses and incentive programs;

c　Compiling profiles of doctors and their prescribing habits into databases to pinpoint the doctors prescribing the most pain medication and targeting them for a marketing offensive;

d　Sponsoring the publication of false medical literature that stated prescription opioid addiction is rare;

e　Garnering the favor of doctors in private practice with gifts, free trips, and paid speaking engagements;

f　Launching websites that promote the safety of opioids for chronic use;

g　Disseminating pamphlets and patient education brochures that downplay the risks of addiction;

h　Targeting children as young as 6 as potential opioid users, including through organizational policy guides;

i　Sponsoring webinars that claimed screening tools, urine tests, and patient agreements would prevent overuse of prescriptions and overdose deaths; and

j　Blaming "bad apple patients"—not opioids—for the addiction crisis and positing that once the "bad apple patients" are identified, doctors can freely prescribe without risk of addiction.

120.　Defendants marketed their products by utilizing doctors as promotional speakers. Defendants would pay doctors "speaker" fees and other honoraria to serve on their speakers' bureaus. These physicians offered credibility and validation to Defendants' messages. They also gave the false impression that they were providing unbiased and medically accurate presentations

when they were, in fact, presenting a script prepared by Defendants. These presentations conveyed misleading information, omitted material information, and failed to correct Defendants' prior misrepresentations about the risks and benefits of opioids.

121. An effective marketing strategy for Defendants was to directly target those who control opioid prescriptions through so-called educational conferences sponsored by the company in destination locations. These so-called promotional speaker payments were merely a pretext through which Defendants could line the pockets of certain high-prescribing doctors and pill mills and thereby increase sales of their opioid products.

122. Defendants received new information concerning addiction and the long-term use of opioids, which, if acted upon, would have strengthened instructions about dosing and administration of the drugs. However, Defendants continued to market their opioid products without providing such information to consumers and by making statements that were contrary to newly acquired scientific information. Many studies published since the FDA's approval of Defendants' opioid products directly contradict Defendants' promotional statements and materials. At all relevant times, Defendants were aware of such studies.

123. Defendants suppressed, downplayed, or indirectly attempted to suppress the dissemination of newly acquired information about the risks and efficacy of their opioid products. Defendant's assertion that the risk of opioid addiction is low is not supported by science. In fact, physical withdrawal symptoms may occur in patients who have had a little more than two weeks of opioid therapy. Early physical symptoms (also known as the "acute withdrawal phase") include muscle aches, anxiety, restlessness, and excessive sweating. Acute withdrawal symptoms may start as early as 12 hours after the last opioid use and can last up to four weeks. Later symptoms (also known as the "post-acute withdrawal phase") include diarrhea,

cramping, nausea, blurry vision, high blood pressure and rapid heartbeat. Post-acute withdrawal symptoms can last up to two years.

124.    Following market approvals for their opioid products and prior to 2013, Defendants obtained information regarding the grave risks associated with opioid use. Instead of educating physicians and the public that opioids should only be used as a last resort, after non-opioid treatments and therapies fail, Defendants encouraged medical professionals to prescribe higher dosages of opioids as a first response to chronic pain issues. Defendants also continued to encourage the use of opioids for the treatment of chronic, noncancer pain in patients with a known history of opioid addiction.

125.    Defendants employed and continue to employ the above direct marketing plans, strategies, and messages in and around the Eastern District of Texas and in Plaintiffs' geographic areas. These sustained and ongoing marketing efforts have naturally and predictably resulted in unnecessary and unwanted opioid addiction, abuse, diversion, and death.

126.    As a direct and foreseeable consequence of Defendants' conduct, including their fraudulent marketing campaign, Plaintiffs have committed (and continue to commit) substantial resources to provide and pay for health care, social services, public assistance, and other services that have become necessary for its residents.

B.      **Defendants used superficial independent third parties to engage in the false and deceptive unbranded marketing of prescription opioids.**

127.    Defendants deceptively marketed opioids to Plaintiffs through unbranded advertising, which is advertising that promotes opioid use generally but does not name a specific opioid product. This type of marketing is meant to grow Defendants' consumer base and profits by allaying fears of opioid addiction and death as overblown obstacles to the compassionate treatment of patients.

128.    Unbranded advertising was created by Defendants and disseminated by seemingly independent third parties. By funding, directing, reviewing, editing, and distributing this unbranded advertising, Defendants controlled the deceptive messages and acted in concert with these third parties to falsely and misleadingly promote opioids for treating chronic pain to hospitals and physicians.

129.    Unlike branded advertisements that name a specific drug, unbranded advertisements are not required to disclose risks and side effects. Unbranded advertising also avoids regulatory scrutiny because Defendants do not have to submit it to the FDA; consequently, it is not reviewed or regulated by the FDA.

130.    Defendants' deceptive unbranded marketing often contradicted and undercut their branded materials. For example, Endo's unbranded advertising stated that "[p]eople who take opioids as prescribed usually do not become addicted." *See Pain: Opioid Therapy*, Patient Education Handout, PAINKNOWLEDGE.ORG (May 13, 2013), http://web.archive.org/ web/20101007083722/http:// painknowledge.org/patiented/pdf/B697_%20Patient%20Handout _FINAL .pdf; *see also Persistent Pain in Older People*, PAINKNOWLEDGE.ORG (Oct. 7, 2010) http://web.archive.org/web/ 20101007090344/http://painknowledge.org/patiented/ pdf/B718_PF_PE_paintreatment---FINAL%20072909.pdf ("Fact: Medicines that are used to treat pain usually do not cause addiction if they are prescribed and taken correctly.").

131.    This message contradicted its concurrent, branded advertising for Opana® ER, which cautioned that "[a]ll patients treated with opioids require careful monitoring for signs of abuse and addiction, since use of opioid analgesic products carries the risk of addiction even under appropriate medical use." *See OPANA® ER oxymorphone hydrochloride tablet, extended release*, ENDO PHARMACEUTICALS, INC. (Oct. 12, 2013), http://web.archive.org/web/

20131012133700/ http://endo.com/File%20Library/Products/Prescribing%20Information/

OpanaE R_Biconcave__prescribing_information-html.html.

132.     Defendants knew that their own marketing and messages would be viewed more skeptically by hospitals and patients than messaging by apparently independent third-party physicians and healthcare organizations. Therefore, Defendants set out to manipulate the stream of information provided to hospitals, the medical community, and their patients.

### C.     Defendants deployed "Key Opinion Leaders" to perpetuate widespread acceptance of opioids for treating chronic pain.

133.     It was Defendants' mission to change the definition of "addiction." Prominent doctors, paid by Defendants, were some of the most prolific spokespeople in the continuous and ongoing pro-opioid marketing campaigns described herein. Defendants used these prominent doctors by funding, assisting, and encouraging them to promote widespread opioid use to treat chronic conditions.

134.     Defendants employed Key Opinion Leaders (KOLs) to promote and lend legitimacy to their campaign of misinformation. Defendants identified, recruited, trained, and paid KOLs to publicly endorse opioid use to treat chronic pain. Specifically, KOLs perpetuated false statements about:

      a      the safety of opioids for long-term use or chronic, noncancer-related use;

      b      the effectiveness of opioid drugs in providing pain relief and increased functioning;

      c      the risk of addiction, overdose, and death associated with opioid use;

      d      the prevalence of untreated or undertreated pain in the U.S.;

      e      the efficacy of so-called "abuse-deterrent" reformulations of oxycodone and hydrocodone;

      f      the underlying causes of opioid-related overdose deaths;

54

g       the appropriateness of opioids for the treatment of noncancer pain in patients with a known history of opioid addiction; and

h       the safety of near-limitless dosage escalations.

135.    Because of their respected positions in the industry and the funding provided them by Manufacturer and Distributor Defendants, KOLs were in an advantageous position to convince other physicians, hospitals, and researchers to believe false and misleading statements about prescription opioids.

136.    Manufacturer and Distributor Defendants paid KOLs to deliver continuing medical education (CME) content, give talks to specialists and other important physician groups, make presentations at workshops and conferences, and even give training sessions for their physician peers. Support from Manufacturer and Distributor Defendants helped KOLs become respected industry experts. As they rose to prominence, KOLs touted the benefits of opioids to treat chronic pain and advanced Defendants' collective pro-opioid agenda. KOL's professional reputations became dependent on continuing to promote a pro-opioid message, even in activities that were not directly funded by Manufacturer and Distributor Defendants.

137.    KOLs wrote, consulted on, edited, and lent their names to books and articles on opioids. They also gave speeches and CMEs supportive of chronic opioid therapy. Manufacturer and Distributor Defendants created opportunities for KOLs to participate in research studies, sponsoring and funding numerous studies that promoted opioid use in a more expansive patient population.

138.    KOLs also served on committees that developed treatment guidelines strongly encouraging the use of opioids to treat chronic pain and on the boards of pro-opioid advocacy groups and professional societies that produced and presented CMEs. Manufacturer and Distributor Defendants directed and exerted control over these activities through KOLs.

139.    At all relevant times, Defendants knew that doctors rely heavily on their peers for guidance and that doctors are less likely to challenge opinions or advice if given by a medical peer. The recruitment and use of KOLs provided the false appearance of unbiased and reliable support for chronic opioid therapy to deceive hospitals and physicians.

140.    Defendants routinely utilized many of the same KOLs, including Dr. Russell Portenoy, Dr. Lynn Webster, Dr. Perry Fine, and Dr. Scott Fishman. These physicians received massive funding from pharmaceutical companies to give legitimacy to the idea that chronic use of opioids was safe. Highly influential in their field, these doctors were an integral part of Defendants' unbranded marketing campaign.

141.    KOLs are readily distinguishable from other physicians who prescribe opioids because KOLs knew or should have known that the research, data, and opinions they disseminated to the public and to the medical community regarding the risks of opioid use were misleading or false. Further, KOLs were generously compensated for their marketing efforts by Manufacturer and Distributor Defendants in a concerted action to sell more opioid drugs to as many hospitals and doctors as possible.

142.    At all relevant times, Defendants knew that doctors rely heavily on their peers for guidance and that doctors are less likely to challenge opinions or advice if given by a medical peer. The recruitment and use of KOLs provided the false appearance of unbiased and reliable support for chronic opioid therapy.

### *Dr. Russell Portenoy*

143.    Dr. Russell Portenoy, former Chairman of the Department of Pain Medicine and Palliative Care at Beth Israel Medical Center in New York is one example of a KOL who Defendants identified and promoted to further their marketing campaign. While advocating for chronic opioid therapy, Dr. Portenoy received research support, consulting fees, and honoraria

from Endo, Teva, Mallinckrodt,[4] and J&J, among others. *See* Catan, Thomas, et al., *A Pain-Drug Champion Has Second Thoughts*, WALL STREET J., Dec. 17, 2012

https://www.wsj.com/articles/SB10001424127887324478304578173342657044604.

144.     Dr. Portenoy was instrumental in opening the door for the regular use of opioids to treat chronic pain. He served on the American Pain Society ("APS") and American Academy of Pain Medicine ("AAPM") Guidelines Committees, which endorsed the use of opioids to treat chronic pain, first in 1997 and again in 2009. He was also a member of the board of the American Pain Foundation ("APF"), an advocacy organization almost entirely funded by Defendants.

145.     Dr. Portenoy was instrumental in the proliferation of Defendants' pro-opioid messaging. Dr. Portenoy was one of the first physicians to actively promote the false assertion that fewer than 1 percent of opioid users became addicted. Dr. Portenoy often cited a poorly supported 1980 *New England Journal of Medicine* ("NEJM") letter-to-the-editor.

146.     The study summarized the analysis of a database of hospitalized patients who were given as little as a single small dose of opioids in a controlled setting for a short period of time to ease acute pain. Although the study had nothing to do with prescribing opioids for the treatment of chronic, non-cancer pain, it was cited over 608 times in the next 20 years by KOLs, including Dr. Portenoy and others, to provide support for Defendants' message that that untreated pain was an "epidemic" and that opioids must be liberally prescribed.

147.     The authors of the 1980 NEJM study have stated that their findings were grossly misused: "I'm essentially mortified that that letter to the editor was used as an excuse to do what

---

4     As used herein, the term "Mallinckrodt" collectively means Mallinckrodt PLC, Mallinckrodt, LLC, and SpecGx, LLC.

these drug companies did." *See* Zhang, Sarah, *The One-Paragraph Letter from 1980 That Fueled the Opioid Crisis*, THE ATLANTIC, Jun. 2, 2017. But the damage had been done. These ideas quickly reached mainstream medicine. As planned and intended, opioid prescriptions for common ailments like back pain, arthritis and headaches surged.

148.    In 1996, the American Pain Society (APS), of which Dr. Portenoy was also president, infamously endorsed the concept of pain as "the Fifth Vital Sign" that doctors should monitor alongside blood pressure, temperature, heartbeat and breathing.[95] Dr. Portenoy's efforts ensured that it would become common practice for healthcare providers such as hospital emergency departments to ask about pain when conducting evaluations. U.S. GOV'T ACCOUNTABILITY OFFICE, *supra.*

149.    From this, the idea took hold that America was needlessly undertreating pain. Dr. Portenoy later admitted that the claim was not based on sound scientific evidence. "I gave innumerable lectures in the late 1980s and '90s about addiction that weren't true," Dr. Portenoy said in a 2010 videotaped interview with a fellow doctor. *Id.*

150.    Dr. Portenoy, with funding and sponsorship from other Defendants, authored and contributed to numerous medical journal articles that touted the benefits of "abuse-deterrent" reformulated oxycodone for the treatment of chronic noncancer pain. *See, e.g.*, Portenoy, Russell K., et al., *Long-Term Use of Controlled-Release Oxycodone for Noncancer Pain: Results of a 3-Year Registry Study*, 23(4) CLINICAL J. PAIN 287 (2007) (finding that the "most common adverse events [of controlledrelease oxycodone] were constipation and nausea, and the incidence of these events declined over time on treatment" and that "[i]nvestigators reported 6 cases (2.6%) of possible drug misuse but no evidence of de novo addiction was observed"). Without supporting evidence, Dr. Portenoy perpetuated the idea that "abuse-deterrent" reformulations of oxycodone and hydrocodone were safer and less addictive.

151.    In July of 2017, NEJM published a retraction of the one-paragraph 1980 letter-to-theeditor, noting the "sizable increase" in citation to the study "after the introduction of OxyContin." See Leund, Pamela, et al., *A 1980 Letter on the Risk of Opioid Addiction*, 22 N. ENG. J. MED. 376 (2017). The author observes that the opioid epidemic in America "arose in part because physicians were told that the risk of addiction was low when opioids were prescribed for chronic pain" and that "[a] one-paragraph letter that was published in the *Journal* in 1980 was widely invoked in support of this claim, even though **no evidence** was provided by the correspondents." *Id.* (emphasis added). Importantly, the author concludes:

> [W]e found that a five-sentence letter published in the *Journal* in 1980 was heavily and uncritically cited as evidence that addiction was rare with longterm opioid therapy. We believe that this citation pattern contributed to the North American opioid crisis by helping to shape a narrative that allayed prescribers' concerns about the risk of addiction associated with long-term opioid therapy.

*Id.*

### Dr. Lynn Webster

152.    Another KOL, Dr. Lynn Webster, was the co-founder and Chief Medical Director of Lifetree Clinical Research, a pain clinic in Salt Lake City, Utah. Dr. Webster was President in 2013 and is a current board member of AAPM, a front group that ardently supports chronic opioid therapy. He is a Senior Editor of Pain Medicine, the same journal that published special advertising supplements touting Endo's Opana® ER. Dr. Webster authored numerous CMEs sponsored by Endo while he was receiving significant funding from Defendants.

153.    In 2011, Dr. Webster presented a program via webinar titled, "Managing Patients' Opioid Use: Balancing the Need and the Risk." Dr. Webster recommended using risk-screening tools, such as urine testing and patient agreements, as a way to prevent "overuse of prescriptions" and "overdose deaths," which was available to and was, on information and belief, intended to reach hospitals and doctors treating Plaintiffs' residents.

**154.** Dr. Webster was also a leading proponent of the concept of "pseudoaddiction," the notion that addictive behaviors should be seen not as warnings, but as indications of undertreated pain. In Dr. Webster's description, the only way to differentiate the two was to increase the patient's dose of opioids. As he and his co-author wrote in a book that is still available on-line, when faced with signs of aberrant behavior, increasing the dose "in most cases . . . should be the clinician's first response." Endo distributed this book to hospitals and doctors. Years later, Dr. Webster reversed himself, acknowledging that "[pseudoaddiction] obviously became too much of an excuse to give patients more medication."

### Dr. Perry Fine

**155.** KOL Dr. Perry Fine, a professor of anesthesiology at the University of Utah School of Medicine, has also served as president of the AAPM, a board member for APF, and chair of the National Initiative on Pain Control through APF. See Fine, Perry, *Incomplete Financial Disclosures in a Letter on Reducing Opioid Abuse and Diversion*, 306(13) JAMA 1445 (Oct. 5, 2011), https://jamanetwork. com/journals/jama/article-abstract/1709738. Dr. Fine has authored numerous articles on the AAPM's website. He has served on advisory boards and provided medical legal consulting for Teva and J&J, received research grants from Teva, served as an expert witness for J&J, participated in CMEs for Endo and J&J, and served on speakers' bureaus for J&J. *Id.*

**156.** Dr. Fine perpetuated the concept of undertreated pain as an epidemic. "Chronic pain is sort of the modern-day leprosy," he said. "It's been sort of hidden away. There are a lot of people affected." *See* Weber, Tracy and Charles Ornstein, *Two Leaders in Pain Treatment Have Long Ties to Drug Industry*, PROPUBLICA (Dec. 23, 2011), https://www.propublica.org/article/two-leaders-in-pain-treatment-have-long-ties-to-drugindustry.

157.    Dr. Fine authored, edited, and appeared in many Defendant-funded CMEs, including *Path of the Patient, Managing Chronic Pain in Younger Adults at Risk for Abuse*. *Path of the Patient* was targeted at primary care doctors and directed them to manage chronic pain with opioids. In fact, the presentation is devoted entirely to opioid prescribing and presents no other potential treatments for patients known to be at risk for abuse. *Path of the Patient* promotes opioid therapy as the only pain solution, even for common ailments like back pain.

158.    From 2009 to 2016, Dr. Fine received several payments from Teva, J&J, Endo, and Depomed for consulting and speaking services, as well as meals and travel payments.[105] He authored and contributed to a number of medical journal publications that advocated more widespread use of opioids for the treatment of chronic, noncancer pain. *See, e.g.,* Fine, Perry, et al., *Long-Acting Opioids and Short-Acting Opioids: Appropriate Use in Chronic Pain Management*, 10(Supp. 2) PAIN MED. S79 (2009) ("In recent years, opioid therapy for the management of chronic noncancer pain has become more widely accepted following the publication of data demonstrating the efficacy of this class of drugs in a variety of pain conditions, including osteoarthritis, neuropathic pain, and low back pain. . . . [B]oth short-acting and long-acting opioids should be considered in the overall pharmacotherapeutic treatment of patients with chronic noncancer pain."), https://academic.oup.com/painmedicine/article/10/suppl_2/S79/1837727. He also advocated for greater use of opioids in treating chronic pain in the elderly, concluding that "opioid analgesics can greatly improve the quality of life and functional capacities of older patients" and that opioids are "underused in this population." Perry G. Fine, *Opioid Analgesic Drugs in Older People*, 17(3) CLINICS GERIATRIC MED. 479 (2001), https://www. geriatric. theclinics.com/article/S0749-0690(05)70081-1/fulltext.

*Dr. Scott Fishman*

**159.** KOL Dr. Scott Fishman served as president and chair of the board of directors of APF and president of AAPM. He authored Responsible Opioid Prescribing: A Physician's Guide (2007), which was financed and distributed by Defendants. Dr. Fishman also served as a consultant for Teva, Endo, J&J, and Purdue, received research support from Teva, and received fees for teaching CME courses funded by Teva.

**160.** Dr. Fishman authored and contributed to several medical journal publications that downplayed the risks of opioids. He argued that patient fears about the safety of opioids were often unjustified and interfered with patient care. *See* Fishman, Scott, *Opioid Side Efffects, Addiction, and Anti-Inflammatory Medications*, 19(1) J. PAIN & PALLIATIVE CARE PHARMACOTHERAPY 51 (2005) ("Patients in pain often fear medications prescribed or recommend [sic] to them by their clinicians. Fear of side effects can contribute greatly to medication non-adherence (noncompliance).).

**161.** Dr. Fishman collaborated with other KOLs, including Dr. Fine and Dr. Portenoy, on several pro-opioid "expert" panels. These physician panel groups often advocated against attempts by state and federal legislators to impose limits or other controls on opioid prescriptions. For example, in 2009, Dr. Fishman advocated against opioid prescribing guidelines proposed by the Washington State Agency Medical Directors Group that suggested doses above 120-mg oral morphine equivalents per day should rarely be given and only after pain management consultation. Fishman, Scott & Lynn R. Webster, *Unintended Harm from Opioid Prescribing Guidelines*, 10(2) PAIN MED. 285 (2009), https://academic.oup.com/painmedicine/article/10/2/285/1832362. In a medical journal article, Dr. Fishman calls the guideline "arbitrary" and states that limiting opioid dosages "could hurt patient care, particularly if this state guideline spurs a national trend." *Id*.

162. In 2011, Dr. Fishman, Dr. Fine and other physicians with financial relationships with Defendants "convened to examine root causes and risk factors for opioid-related poisoning deaths." See Webster, Lynn, et al., *An Analysis of the Root Causes for Opioid-Related Overdose Deaths in the United States*, 12(Supp. 2) PAIN MED. S26 (2011), https://academic.oup.com/ painmedicine/article/12/ suppl_2/S26/1917917?searchresult=1. Conveniently, they concluded that opioid-related deaths were not caused by any misconduct on the part of Defendants but by "physician error," patient error, unanticipated patient medical issues, and insurance policies that "mandate methadone as first-line therapy." *Id*. It is important, Dr. Fishman and Fine argued, that efforts to reduce opioid-related deaths "should not reduce access to needed therapies." *Id*.

163. By recruiting trusted physicians to be key opinion leaders, Defendants exploited the faith that society places in doctors to promote good medical care. KOLs were instrumental in Defendants' efforts to frame opioids as safe for chronic use. KOLs helped produce new pro-opioid clinical practice guidelines and enlist accrediting organizations to endorse Defendants' pro-opioid agenda.

**D.    Defendants funded and controlled industry "front groups" to legitimize their false and deceptive messages.**

164. With substantial assets and a global network of corporate alliances, pharmaceutical companies coordinated their marketing efforts through "Front Groups" and aggressively lobbied against any legislation that might limit opioid prescribing.

165. Congressional inquiries, investigative reporting, and lawsuits around the country have exposed organizations like the Pain Care Forum (PCF), the American Pain Foundation (APF), the American Pain Society (APS) and the American Academy of Pain Medicine (AAPM) as "Front Groups" for the pharmaceutical industry. *See, e.g.,* Ornstein, Charles, et al., *American Pain Foundation Shuts Down as Senators Launch Investigation of Prescription Narcotics*,

PROPUBLICA, May 8, 2012 https://www.propublica.org/article/senate-panel-investigates-drugcompany-ties-to-pain-groups. These front organizations present themselves as legitimate scientific and patient advocacy organizations when in fact they promote false information and are paid for by Defendants to create a vast market for the use of opioids for chronic pain.

166.    With funding and direction from drug makers, these groups organized physician conferences, CME seminars, and published patient guides that called pain "the fifth vital sign" and described the under-treatment of pain as an "epidemic." Catan, Thomas, et al., *A Pain-Drug Champion Has Second Thoughts*, WALL ST. J., Dec. 17, 2012 https://www.wsj.com/articles/SB1000142412788 732447830457817334257044604. They worked to promote misleading information about the safety of prescription opioids through public relations efforts and grassroots campaigns and were wildly successful in doing so.

167.    Under Defendants' direction and control, these "Front Groups" generated treatment guidelines, unbranded materials, and programs that favored chronic opioid therapy. They also assisted Defendants by responding to negative articles, by advocating against regulatory changes that would limit prescribing opioids in accordance with the scientific evidence, and by conducting outreach to vulnerable patient populations targeted by Defendants.

168.    Front Groups depended on Defendants for funding. Defendants exercised control over programs and materials created by Front Groups by collaborating on, editing, and approving their content and by sponsoring their dissemination. In doing so, Defendants made sure these Front Groups would generate only the messages Defendants wanted to distribute. Even so, the Front Groups held themselves out to hospitals, medical professionals, and the public at large as independent, unbiased patient and physician advocates.

169.    According to the Associated Press and the Center for Public Integrity, opioid manufacturers, including Defendants, spent more than $880 million nationwide on lobbying and

campaign contributions from 2006 through 2015—more than 200 times what those advocating for stricter opioid policies spent. Defendants utilized many of the same Front Groups, the most prominent of which are described below.

### *American Pain Foundation ("APF")*

170.     The American Pain Foundation (APF) received more than $10 million in funding from opioid manufacturers from 2007 until it closed its doors in May of 2012. Endo alone provided more than half of that funding.

171.     In 2009 and 2010, more than 80 percent of APF's operating budget came from pharmaceutical industry sources. By 2011, APF was entirely dependent on funds from Defendants, to avoid using its line of credit. As explained by Dr. Portenoy, one of APF's board members, the lack of funding diversity was a major problem at APF.

172.     APF issued education guides for patients, reporters, and policymakers that touted the benefits of opioids for chronic pain and trivialized their risks, particularly the risk of addiction. APF also engaged in a significant multimedia campaign—through radio, television, and the internet—to educate patients about their "right" to pain treatment, namely opioids.

173.     In 2012, APF dissolved after Senate investigators began asking about the nonprofit receiving nearly 90 percent of its funding from pharmaceutical companies. *See* Ornstein, Charles, et al., *American Pain Foundation Shuts Down as Senators Launch Investigation of Prescription Narcotics*, PROPUBLICA, May 8, 2012 https://www.propublica. org/article/senate-panel-investigates-drug-company-ties-topain-groups.

174.     All APF programs and materials were available nationally and were, on information and belief, intended to reach physicians, patients, pharmacy benefits managers, distributors, pharmacies, and consumers in the Eastern District of Texas and in Plaintiffs' geographic areas.

*American Academy of Pain Medicine ("AAPM")*

**175.**    The American Academy of Pain Medicine (AAPM), with the assistance, prompting, involvement, and funding of Defendants, sponsored the publication of opioid prescribing and pain treatment guidelines and continuing medical education programs. AAPM gave Defendants' unbranded marketing messages legitimacy and credibility in the medical community.

**176.**    From 2012 to 2017, AAPM received $1.2 million in funding from opioid manufacturers, including Defendants. AAPM maintained a corporate relations council whose members were paid $25,000 per year on top of other funding to participate. Membership in the corporate relations council allowed drug company executives and marketing staff to meet with AAPM executive committee members in small settings. Defendants, including Endo, Teva, and Actavis, were members of the council and presented deceptive programs to doctors who attended AAPM's annual meetings and events. The conferences sponsored by AAPM heavily emphasized sessions on opioids.

**177.**    AAPM's presidents have included top industry supported KOLs Drs. Lynn Webster, Scott Fishman, Perry Fine, and Russell Portenoy.  Past AAPM president, Dr. Scott Fishman, stated that he would place the organization "at the forefront" of teaching that "the risks of addiction are … small and can be managed." *See* Interview by Paula Moyer with Scott M. Fishman, M.D., Professor of Anesthesiology and Pain Medicine, Chief of the Division of Pain Medicine, Univ. of Cal., Davis (2005) http://www.mescape.org/ viewarticle/500829. Past AAPM president, Dr. Perry Fine of Utah, has admitted to serving on the advisory board of Actavis and to serving as a paid consultant to J&J and Mylan. Fine, Perry and Lynn Webster, *American Academy of Pain Medicine Response to PROP Petition to the FDA that Seeks to Limit Pain*

*Medications for Legitimate Noncancer Pain Sufferers*, PAIN MED (2012). Dr. Webster admits that he has served on an advisory board for Mallinckrodt. *Id.*

178.    AAPM understood that it and its industry funders were engaged in a common task. Defendants were able to influence AAPM through both their significant and regular funding and the leadership of pro-opioid KOLs within the organization. AAPM's website quickly became a hub for pro-opioid articles and the latest in "Pain News."

179.    In 1997, AAPM and the American Pain Society (APS) jointly issued a consensus statement, *The Use of Opioids for the Treatment of Chronic Pain*, which endorsed opioids to treat chronic pain and claimed there was a low risk that patients would become addicted to opioids. *See The Use of Opioids for the Treatment of Chronic Pain, A Consensus Statement from the American Academy of Pain Medicine and the American Pain Society*, 6(1) J. PAIN 77 (1997), https://www.jpain.org/article/ S1082-3174(97)800220/pdf. Dr. Portenoy was the sole consultant. The consensus statement remained on AAPM's website until 2011 and was taken down from AAPM's website only after a physician complained.

180.    AAPM and APS issued their own guidelines in 2009 ("AAPM/APS Guidelines") and continued to recommend using opioids to treat chronic pain. Fourteen of the twenty-one panel members who drafted the Guidelines (including KOLs Dr. Portenoy and Dr. Fine) received financial support from J&J and Endo. Despite limited or no supporting evidence, the AAPM/APS Guidelines promote opioids as "safe and effective" for treating chronic pain and conclude that the risk of addiction is manageable for patients regardless of past abuse histories.

181.    The AAPM/APS Guidelines were a particularly effective channel of deception and influenced not only treating physicians, but also the body of scientific evidence on opioids. The AAPM/APS Guidelines have been cited hundreds of times in academic literature. The

67

Guidelines were disseminated in and around the Eastern District of Texas and in Plaintiffs'

geographic areas during the relevant time period, are still available on-line, and were reprinted in

the *Journal of Pain*.

> **E.** **Defendants infiltrated accrediting institutions to create a new standard of care for the treatment of pain and prescribing of opioid drugs.**

**182.** The laundry list of underhanded tactics utilized by industry Front Groups is

extensive and continues to grow. Defendants utilized Front Groups and recruited physicians to

promote widespread opioid use by changing opioid prescribing guidelines and how doctors treat

pain. In doing so, Defendants successfully created a culture of eliminating pain at all costs.

**183.** In 2001, the Joint Commission, which accredits U.S. hospitals, issued new

standards telling hospitals to regularly ask patients about pain and to make treating it a priority.

*See* Baker, David W., *The Joint Commission's Pain Standards: Origins and Evolution*, THE

JOINT COMMISSION (May 5, 2017), https://www.jointcommission.org/assets/ 1/6/Pain_

Std_History_Web_Version_05122017.pdf. The Joint Commission's standards made hospitals

responsible for pain control and highlighted the need to conduct pain assessments and use

quantitative measures of pain consistent with the Defendants' position. The now familiar pain

scale—promoted by Defendants—was introduced in many hospitals, with patients being asked to

rate their pain from 1 to 10 and circle a smiling or frowning face. *See Pain Assessment,*

PARTNERS AGAINST PAIN,  https://web.archive.org/web/20070107131655/ http://www.

partnersagainstpain.com:80/index-mp.aspx?sid=3&aid=7693.

**184.** Hospitals in the Eastern District of Texas and in Plaintiffs' geographic areas were

expected to incorporate and utilize these new standards and prioritize the treatment of pain. If

hospitals failed to do so, they ran the risk of losing their Joint Commission accreditation.

185.     In 2004, the Federation of State Medical Boards (FSMB) modified its opioid prescribing guidelines to make physicians who under-treat pain subject to disciplinary action by state medical boards—that policy was drafted by several members of the pharmaceutical industry. 126 Catan, *supra.*

186.     Additionally, Defendants undertook to assure prescribing physicians that they would not face criminal liability or administrative sanctioning for over-prescribing opioid medications. *See, e.g.*, Goldenbaum, Donald M., et al., *Physicians Charged with Opioid Analgesic-Prescribing Offenses*, 9(6) PAIN MED. 737 (2008) (A physician panel, which included Dr. Fishman, issued a report concluding that "[c]riminal or administrative charges and sanctions for prescribing opioid analgesics are rare. In addition, there appears to be little objective basis for concern that pain specialists have been 'singled out' for prosecution or administrative sanctioning for such offenses."), https://academic.oup. com/painmedicine/ article/9/6/737/1909323.

187.     In 2005, AAPM, APS, and the American Society of Addiction Medicine (ASAM) created and officially adopted a consensus document, *Public Policy Statement on the Rights and Responsibilities of Health Care Professionals in the Use of Opioids for the Treatment of Pain*. The document was published by the FSMB and was authored and funded by pharmaceutical companies, including Endo and others, with proceeds going to the FSMB. *Id.*

188.     Defendants continue to spend far more than any other industry to influence politicians. In 2016 alone, the pharmaceutical industry—which has about two lobbyists for every member of Congress— spent $152 million on influencing legislation. The pharmaceutical industry also contributed more than $20 million directly to political campaigns in 2016. Meanwhile, opioid sales reached $9.6 billion in 2016.

189.    Defendants employed and continue to employ unbranded marketing plans, strategies, and messages in and around the Eastern District of Texas and in Plaintiffs' geographic areas, and have directed them at Plaintiffs' physicians and residents. These sustained and ongoing marketing efforts have naturally and predictably resulted in unnecessary and unwanted opioid addiction, abuse, diversion, and death in the Eastern District of Texas and in Plaintiffs' geographic areas and surrounding communities. As a direct and foreseeable consequence of Defendants' conduct, Plaintiffs have suffered tremendous injury and damages.

**F.    Defendants targeted vulnerable patient populations.**

190.    As part of their deceptive marketing scheme, Defendants identified and targeted susceptible prescribers and vulnerable patient populations in the U.S. and in and around the Eastern District of Texas and in Plaintiffs' geographic areas. Defendants focused their deceptive marketing on primary care doctors, who were more likely to treat chronic pain patients and prescribe opioids but were less likely to be educated about treating pain and the risks and benefits of opioids.

191.    Under the guise of addressing "legitimate cause of undertreated pain," Defendants tailored opioid marketing campaigns to affect children and the elderly.  Defendants made significant efforts to promote more opioid prescribing for "untreated or undertreated pain in children, older patients, and in all other vulnerable patient populations." Fishman, Scott M., *Responsible Opioid Prescribing, A Physician's Guide*, FSMB Foundation (2009), at 8.

192.    Defendants exploited the elderly population and offered opioids as the solution to myriad ailments associated with aging. For example, Defendants directed their false marketing messages to elderly patients through Arthritis Foundation literature, who published Defendants' *Guide to Pain Management* in 2003. *See* Bernstein, Susan, The Arthritis Foundation's Guide to

Pain Management, Arthritis Foundation (2003). Existing scientific evidence shows that elderly patients taking opioids suffer from elevated fall and fracture risks, greater risk of hospitalization, and increased vulnerability to adverse drug effects and interactions.

193. Defendants' strategy of exploiting vulnerable patient populations for their own gain caused considerable injury to Plaintiffs.

III. **Defendants misrepresented the safety and effectiveness of opioid drugs.**

   A. **Defendants repeatedly misrepresented the risks, benefits, and superiority of prescription opioids for chronic pain.**

194. Defendants engaged in false and misleading conduct which grossly and intentionally misrepresented the risks, benefits, and superiority of opioids.

195. Defendants targeted the medical community and the public with false information and convinced them that opioids were non-addictive and safe for long-term use for the treatment of non-cancer related pain at high dosages.

196. Defendants successfully convinced doctors and patients that opioids are *not* addictive drugs, that opioids are *safe* for long-term use, and that the compassionate treatment of pain *requires* opioids. In so doing, Defendants knowingly and purposefully made claims about the risks and benefits of long-term opioid use that were not supported by, or were contrary to, the scientific evidence.

197. Despite conflicting evidence generated by Defendants' own research studies, a growing body of scientific and medical literature, and findings from the FDA and the CDC, Defendants have not corrected their claims about opioids and continue to spread them today.

198. There is overwhelming evidence that non-opioid pain relievers are just as (if not more) effective than opioids for chronic noncancer pain. In March of 2018, the *Journal of the American Medical Association* (JAMA) published the results of its 12-month investigation into

71

whether over-the-counter drugs like acetaminophen, ibuprofen and other nonsteroidal anti-inflammatory drugs (NSAIDs) are better than opioids at treating chronic pain in the back, knees or hips. See Krebs, Erin, et al., *Effect of Opioid vs Nonopioid Medications on Pain-Related Function in Patients with Chronic Back Pain or Hip or Knee Osteoarthritis Pain*, 319(9) JAMA 872-882 (2018). According to the study, opioids are no better than NSAIDs in treating chronic noncancer pain and the results of the study "do not support initiation of opioid therapy for moderate to severe chronic back pain or hip or knee osteoarthritis pain." *Id.* It is only recently that the public has become aware of what Defendants have known for decades: the extra risk of death and addiction that comes with opioids does not come with any extra benefit.

**B. Defendants downplayed and trivialized the risks of long-term opioid use.**

199.     To convince doctors, insurance groups, Plaintiffs, and their residents that opioids are safe, Defendants downplayed, obscured, or trivialized the risks of long-term opioid use, particularly the risk of addiction through a series of misrepresentations that Defendants knew to be untrue. These misrepresentations—which are described below—reinforced each other and created the dangerously misleading impression that:

    a    Starting patients on opioids was low risk because most patients would not become addicted and because those who were at the greatest risk of addiction could be readily identified and managed;

    b    Patients who displayed signs of addiction probably were not addicted and, in any event, could easily be weaned from the drugs;

    c    Use of higher opioid doses, which many patients need to sustain pain relief as they develop tolerance to the drugs, do not pose special risks; and

    d    Abuse-deterrent opioids both prevent overdose and are inherently less addictive.

200.     Defendants have not only failed to correct these misrepresentations, but upon information and belief, continue to make them today, including to Plaintiffs' physicians and residents.

201.    Defendants falsely claimed the risk of addiction was low and unlikely to develop when opioids are prescribed, as opposed to obtained illicitly, and did not publicize the greater risk of addiction with prolonged use of opioids.

### *Teva*

202.    Teva sponsored a 2003 CME presentation titled *Pharmacologic Management of Breakthrough or Incident Pain* which aggressively presented the idea that pain was an undertreated condition and pushed back against the stigmatization of opioids also known as "opioidphobia." Through this CME, Teva taught:

> Chronic pain is often undertreated, particularly in the noncancer patient population . . . the continued stigmatization of opioids and their prescription, coupled with often unfounded and self-imposed physician fear of dealing with the highly regulated distribution system for opioid analgesics, remains a barrier to effective pain management and must be addressed. Clinicians intimately involved with the treatment of patients with chronic pain recognize that the majority of suffering patients lack interest in substance abuse. In fact, patient fears of developing substance abuse behaviors such as addiction often lead to undertreatment of pain. The concern about patients with chronic pain become addicted to opioids during long term opioid therapy may stem from confusion between physical dependence (tolerance) and psychological dependence (addiction) that manifests as drug abuse.

*See* Brennan, Michael J., et al., *Pharmacologic Management of Breakthrough or Incident Pain*, MEDSCAPE, http://www.medscape.org/viewarticle/449803.

203.    Teva and others funded the American Pain Foundation's publication *Treatment Options: A Guide for People Living with Pain* (2007) ("*Treatment Options*"), which explained that physical dependence on opioids is normal and cavalierly equated the physical dependence risk of opioids to caffeine. *Treatment Options: A Guide for People Living with Pain*, 14 AMERICAN PAIN FOUNDATION (2007), https://ce4less.com/Tests/Materials/E019Materials. pdf. *Treatment Options* also instructed that addiction is limited to extreme cases of unauthorized dose escalations, obtaining duplicative opioid prescriptions from multiple sources, or theft. *Id.*

The publication romantically portrayed opioids as providing patients "a quality of life we deserve" and trivialized the risk of abuse by stating opioid agreements can "ensure that you take the opioid as prescribed."  Moreover, while stating that the risk of NSAIDs abuse increases if "taken for more than a period of months," the *Treatment Options* omitted the fact that the same is true of opioids. In addition, the publication incorrectly attributed between 10,000 to 20,000 deaths annually to NSAID overdose, when in reality the number is much lower. *See* Tarone, Robert E., et al., *Nonselective Nonaspirin Nonsteroidal Anti-Inflammatory Drugs and Gastrointestinal Bleeding: Relative and Absolute Risk Estimates from Recent Epidemiologic Studies*, 11 Am. J. of Therapeutics 17-25 (2004), https://www.ncbi.nlm.nih.gov/pubmed/ 14704592. Teva also sponsored *Optimizing Opioid Treatment for Breakthrough Pain*, a CME written by KOL Dr. Lynn Webster, which falsely misrepresents the benefits of opioid therapy. In this CME Teva's Actiq and Fentora—when taken in conjunction with a regular opioid therapy regime—were represented to improve patient's quality of life by allowing them to participate in more activities like they did before the onset of their chronic pain.

204.    Defendants repeatedly used such deceptive marketing messages to trivialize the risk posed by opioids. This was the first step in pushing back against "opioidphobia" and reshaping the culture around opioid use.

### *Endo*

205.    Endo likewise downplayed the risks presented by opioids in its marketing material. Endo's former website www.painknowledge.org claimed that "[p]eople who have no history of drug abuse, including tobacco, and use their opioid medication as directed will probably not become addicted." *Pain: Opioid Facts*, Patient Education Handout, PAINKNOWLEDGE.ORG (Jan. 12, 2012), http://web.archive.org/web/20120112051109/http:// www.painknowledge.org/patiented/pdf/Patient Education b380_b385 pf opiod.pdf ("In general,

74

people who have no history of drug abuse, including tobacco, and use their opioid medication as directed will probably not become addicted.").

206.     Endo distributed a patient pamphlet, *Living with Someone with Chronic Pain*, which stated that "[m]ost health care providers who treat people with pain agree that most people do not develop an addiction problem." *Living with Someone with Chronic Pain: A Caregiver's Guide*, ENDO PHARMACEUTICALS, INC. (Jan. 19, 2010), http://web.archive.org/web /20100119231927/http: //www.opana.com:80/ pdf/ caregiver_eng.pdf. A similar statement appeared on the Endo website www.opana.com. See *About Opioids*, OPANA® ER, ENDO PHARMACEUTICALS, INC. (Oct. 8, 2014) http://web.archive.org/web/20141008052725/ http://www.opana.com:80/ patient/about-opioids/about-opioids.aspx. ("Most doctors who treat patients with pain agree that patients treated with prolonged opioid medicines usually do not become addicted.").

207.     To further its agenda, Endo continued its push to trivialize the known risks of long-term opioid abuse by sponsoring a 2007 article, the target audience being prescribing doctors and their staff. *Case Challenges in Pain Management: Opioid Therapy for Chronic Pain*, published in Pain Medicine News, asserts:

> Opioids represent a highly effective but controversial and often misunderstood class of analgesic medications for controlling both chronic and acute pain. The phenomenon of tolerance to opioids – the gradual waning of relief at a given dose – and fears of abuse, diversion, and misuse of these medications by patients have led many clinicians to be wary of prescribing these drugs, and/or to restrict dosages to levels that may be insufficient to provide meaningful relief.

See Argoff, Charles E., *Case Challenges in Pain Management: Opioid Therapy for Chronic Pain*, Pain Med. News, http://www.painmedicinenews.com/download/ BtoB_Opana_WM.pdf.

208.     To relieve doctors' and physicians' concerns with prescribing opioids, Endo attempted to inflate the risk of NSAIDs. *Case Challenges in Pain Management: Opioid Therapy*

*for Chronic Pain* included an example where the patient was hospitalized for extreme upper gastrointestinal bleeding as a result of heavy NSAID use. However, the article omits details concerning the serious side effects associated with opioids. In this way, Endo falsely portrayed opioids as the lesser of two evils when compared to other drug alternatives.

209.    In 2009, Endo targeted Plaintiffs directly by funding *Pain: Opioid Therapy* and posting it to its affiliate website www.painknowledge.org.  Endo's publication omitted addiction from the "common risks" of opioids.

210.    Additionally, Endo, acting with other drug manufactures, sponsored a CME titled *Overview of Management Options* which taught that NSAIDs and other drugs were unsafe at high doses but misleadingly left opioids off this list. This CME was repeatedly published by the American Medical Association (reapproved and republished in (1) 2003, (2) 2007, (2) 2010, and (4) 2013).

### J&J

211.    J&J sponsored a patient education guide called *Finding Relief: Pain Management for Older Adults* (2009). *Finding Relief: Pain Management for Older Adults*, PRICARA®, DIVISION OF ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. (2009) http://web.archive.org/web/ 20091210233932/ http://www.painmed.org:80/pdf/pain_mgmt_ older.pdf. The guide described opioid addiction as a "myth" and stated "[m]any studies show that opioids are rarely addictive, when used properly for the management of chronic pain." *Id*. at 17.

212.    J&J's website, www.prescriberesponsibly.com, states that concerns about opioid addiction are "overestimated."

213.    Defendants funded and "made possible" APF's *Policymaker's Guide to Understanding Pain & Its Management*, which states that it is a "myth" that children can easily become addicted to pain medications and that "less than 1 percent of children treated with

76

opioids become addicted." See *A Policymaker's Guide to Understanding Pain & Its Management*, AM. PAIN FOUND. (Oct. 2011), https://www.documentcloud. org/documents /277603-apf-policymakers-guide.

### *Actavis*

214.  Actavis manufactures, markets, promotes, sells, and distributes the branded drugs Kadian® (morphine sulfate extended release) and Norco® (hydrocodone bitartrate and acetaminophen).

215.  Through its "Kadian Learning System" doctors could educate themselves further on Kadian's customized pain control. Actavis claimed that while it is possible to become addicted to morphine-based drugs like Kadian it is "less likely" to happen in those who "have never had an addiction problem." The material goes on to explain that a need for a "dose adjustment" is the result of tolerance and not addiction.

216.  According to 2010 sales training documents, Actavis trained its sales force to instruct prescribers that "most chronic benign pain patients do have markedly improved ability to function when maintained on chronic opioid therapy."

217.  These documents also indicated that Actavis trained its sales force to push the idea that increasing and restoring function is an expected outcome of chronic Kadian therapy, including physical, social, vocational, and recreational functions.

218.  The foregoing materials and messages were disseminated to Plaintiffs or otherwise made available to residents and physicians, with the intent that such be relied upon as truthful statements.

219.     Many of Defendants' branded and unbranded materials instruct patients to discuss opioids with their prescribing physicians, but Defendants made it difficult, if not impossible, for prescribing physicians to get reliable, unbiased information about opioids.

220.     On information and belief, in their communications and direct interactions with physicians in and around the Eastern District of Texas and in Plaintiffs' geographic areas, sales representatives for Teva, J&J, Endo, AbbVie, Depomed, Actavis, Mylan, and Mission Pharmacal, minimized or misrepresented the risk of addiction, misrepresented the abuse potential of purportedly abuse-deterrent formulations, and routinely failed to correct their misrepresentations when new, conflicting information became available.

221.     Defendants' claims contradict scientific evidence. As noted in the 2016 CDC Guideline, there is "extensive evidence" of the "possible harms of opioids (including opioid use disorder)." CDC Guidelines for Prescribing Opioids for Chronic Pain – United States 2016, Centers for Disease Control and Prevention (Mar. 18, 2016).

222.     According to the FDA, because of the risks associated with long-term opioid use, including "the serious risk of addiction, abuse, misuse, overdose, and death (*id.*)," opioids should be "reserved for pain severe enough to require opioid treatment and for which alternative treatment options (e.g., non-opioid analgesics or opioid combination products, as appropriate) are inadequate or not tolerated." *Id.* The FDA discussed the risks related to opioid use and stated that instant release ("IR") opioids are associated with "persistent abuse, addiction, overdose mortality, and risk of NOWS [neonatal opioid withdrawal syndrome, now also referred to as NAS]." *See* FDA Announcement of Enhanced Warnings for Immediate-Release Opioid Pain Medications Related to Risks of Misuse, Abuse, Addiction, Overdose and Death, Federal Drug Administration (Mar. 22, 2016).

Case: 1:21-op-45080-DAP  Doc #: 1  Filed:  05/24/21  79 of 138.  PageID #: 79

223.    Defendants' own drug labels caution that opioids "expose[] patients and other users to the risks of opioid addiction, abuse, and misuse, which can lead to overdose and death" *See, e.g.*, OxyContin label and insert at OxyContin.com and that addiction "can occur in patients appropriately prescribed" opioids. *Id.* These notices are severely undermined and diminished by Defendants' assurances that opioids are appropriate and safe for chronic use.

### C.    Defendants promoted the term "pseudoaddiction" and pushed prescribers to treat addiction with more opioids.

224.    Defendants falsely claimed that the signs of opioid addiction were actually signs of untreated pain, and they described this condition as "pseudoaddiction." To keep doctors prescribing their products, Defendants told physicians to treat this "pseudoaddiction" with more opioids. Each Defendant perpetuated this fake affliction through a variety of means.

*Teva*

225.    Teva and Endo sponsored the Federation of State Medical Boards' *Responsible Opioid Prescribing* (2007), which attempted to educate doctors on the differences between genuinely addicted patients and patients with "pseudoaddiction."

226.    *Responsible Opioid Prescribing*, written by KOL Dr. Scott Fishman, misleadingly taught the following behaviors were a sign of "pseudoaddiction:" (i) requesting drugs by name, (ii) exhibiting demanding or manipulative behavior when seeking drugs, (iii) seeing more than one doctor to obtain opioids, and (iv) hoarding opioids.

*Endo*

227.    Endo's 2009 National Initiative on Pain Control CME program, *Chronic Opioid Therapy: Understanding Risk While Maximizing Analgesia*, characterized a patient's aberrant behavior as untreated pain.

79

228.    Endo publicly promoted the concept of "pseudoaddiction" as part of its education for opioids. Endo's website www.painknowledge.org defined "pseudoaddiction" in its "Pain Glossary."

229.    Internal sales documents reveal that Endo trained its sales force to promote the concept of "pseudoaddiction." An Endo training module taught its reps that addiction and "pseudoaddiction" were commonly confused, but the "physician can differentiate addiction from pseudoaddiction by speaking to the patient about his/her pain and increasing the patient's opioid dose to increase pain relief."

230.    In selecting which CME's to fund, Endo explained that the "differentiation among states of physical dependence, tolerance, pseudoaddiction, and addiction" were key factors in its consideration. Notably, Endo sponsored *Chronic Opioid Therapy: Understanding Risk While Maximizing Analgesia*, a 2009 National Initiative on Pain Control ("NIPC") CME program, which discussed the topic of  "pseudoaddiction."

231.    Endo only agreed to stop promoting "pseudoaddiction" after the New York Attorney General found that "the pseudoaddiction concept has never been empirically validated and in fact has been abandoned" and acknowledged that "Endo's Vice President for Pharmacovigilance and Risk Management testified to [the New York Attorney General] that he was not aware of any research validating the 'pseudoaddiction' concept." *See* Attorney General of the State of New York, *In the Matter of Endo Health Solutions Inc. & Endo Pharmaceuticals Inc.*, Assurance No.:15-228, Assurance of Discontinuance Under Executive Law Section 63. Subdivision 15 at 7.

### *J&J*

232.    J&J also ran a website, www.Prescriberesponsibly.com, which claimed that concerns about opioid addiction are "overestimated," and described "pseudoaddiction" as "a

80

syndrome that causes patients to seek additional medications due to inadequate pharmacotherapy being prescribed" and advised that "[t]ypically, when the pain is treated appropriately the inappropriate behavior ceases." See Howard Heit, MD, FACP, FASAM, & Douglas Gourlay, MD, MSc, FRCPC, FASAM, *What a Prescriber Should Know Before Writing the First Prescription*, Prescribe Responsibly, http://www.prescriberesponsibly.com/articles/ beforeprescribing-opioids.

233.    In addition, J&J sponsored, funded, and provided content for its *Let's Talk Pain* website, which stated in part: "Pseudoaddiction . . . refers to patient behaviors that may occur when pain is under-treated . . . Pseudoaddiction is different from true addiction because such behaviors can be resolved with effective pain management."

234.    *Let's Talk Pain* also pushed the concept of "pseudoaddiction" by framing patient behavior such as "drug seeking," "clock watching," and "even illicit drug use or deception" as signs of undertreated pain" which, again, could be treated with "effective pain management." Clearly these informational websites were simply fronts to promote J&J's misleading marketing.

### *Actavis*

235.    Actavis likewise engaged in promotion of "pseudoaddiction" in order to further its sales.

236.    A strategy and pattern of deceptive marketing is evident in Actavis's internal training materials. A sales education module, entitled *Kadian Learning System,* trained Actavis sales representatives on marketing messages. These messages include deceptive claims regarding "pseudoaddiction," opioid patients' improved functioning, the low risk of addiction, and opioid withdrawal. The marketing messages all trivialized or downplayed the risks of opioids.

237.    Actavis sales force training documents instructed sales reps on how to teach physicians that certain abnormal behaviors—such as self-escalating doses—were not signs of

81

addiction but rather of "pseudoaddiction." In the case of an opioid patient, such behavior was likely a sign of undertreated pain requiring more opioids.

### D. Defendants misrepresented the safety of using opioids to treat patients predisposed to addiction.

238. Defendants falsely instructed prescribing doctors and patients that addiction risk screening tools, patient contracts, urine drug screens, and similar strategies allow them to reliably identify and safely prescribe opioids to patients predisposed to addiction. These misrepresentations were especially insidious because Defendants aimed them at general practitioners and family doctors who lack the time and expertise to closely manage higher-risk patients. Defendants' misrepresentations made these doctors feel more comfortable prescribing opioids to their patients and patients more comfortable starting opioid therapy for chronic pain, even if the patient had a history of opioid abuse.

239. Defendants continue to represent in scientific conferences that "bad apple patients" and not opioids are the source of the addiction crisis and that once those "bad apples" are identified, doctors can safely prescribe opioids without causing addiction. Patient risk and pain assessment tools, questionnaires, and other screening methods were positioned by Defendants as effective means of rooting out "bad apples."

240. There is no scientific basis for Defendants' assertions. In fact, the 2016 CDC Guidelines note that there are no studies assessing the effectiveness of risk mitigation strategies—such as screening tools, patient contracts, urine drug testing, or pill counts—widely believed by doctors to detect and deter outcomes related to addiction and overdose. CDC Guidelines for Prescribing Opioids for Chronic Pain, *supra*.

241. To this end, Teva sponsored the American Pain Foundation's *Treatment Options: A Guide for Living with Pain*, which misleadingly informed patients and providers that addiction

is rare and limited to extreme cases of unauthorized dose escalations or obtaining opioids from multiple sources.

242.     Similarly, J&J's unbranded website, www.PrescribeResponsibly.com, addresses public concerns about opioid addiction by claiming they are "overestimated" and that "true addiction only occurs in a small percentage of patients." *See* Keith Candiotti, M.D., *Use of Opioid Analgesics in Pain Management*, Prescribe Responsibly, http://www. prescriberesponsibly.com/articles/opioid-pain-management.

243.     In addition, Endo paid for a Journal of Family Practice supplement in 2007 titled *Pain Management Dilemmas in Primary Care: Use of Opioids*. This publication suggested that high risk patients could safely receive chronic opioid therapy by using a "maximally structured approach" which called for toxicology screening and routine pill counting. The supplement also advocated for the use of screening tools like the Opioid Risk Tool (ORT), created by KOL Dr. Webster and J&J, or the Screener and Opioid Assessment for Patients with Pain to reassure doctors that it was okay to prescribe a highly addictive drug to a patient with a high risk of drug addiction.

**E.     Defendants misrepresented that opioid addiction is easily avoided and treated.**

244.     Defendants assured physicians that the risk of starting patients on opioids was minimal by claiming that opioid dependence was not common and usually did not occur under proper physician supervision via regular visits. Defendants went further by reassuring the physicians that, in the rare instances where dependence did occur, it could be resolved easily by adjusting the dosage or tapering. Thus, Defendants affirmatively represented that opioid withdrawal was not a problem, while concealing the increased difficulty of stopping opioids after long-term use.

*Endo*

245.     Endo endlessly echoed a similar deceptive message. Endo's CME *Persistent Pain in the Older Patient* claimed that withdrawal symptoms can be avoided simply by tapering a patient's opioid dose by 10 to 20 percent for 10 days. This claim is simply untrue. Most patients experiencing a reduction in their opioid medication start to experience withdrawal as early as 12 hours. This is a physiological response to the reduction. Early physical symptoms include muscle aches, anxiety, restlessness, and excessive sweating.  Later symptoms include diarrhea, cramping, nausea, blurry vision, high blood pressure and rapid heartbeat.

246.     Endo distributed an education pamphlet titled *Living with Someone with Chronic Pain*, which inaccurately minimized the risk of addiction; stating "[m]ost health care providers who treat people with pain agree that most people do not develop an addiction problem."

247.     In another patient education pamphlet, titled "*Understanding Your Pain: Taking Oral Opioid Analgesics*" and edited by KOL Dr. Russell Portenoy, Endo attempts to frame addiction as a rare "chronic brain disease" and attempts to normalize addictive behavior such as persistence in obtaining opioids. In addition, the pamphlet attempts to minimize the risk of addiction by reassuring patients that "taking opioids as prescribed for pain relief is not addiction" and explaining that "[a]ddicts take opioids for other reasons, such as unbearable emotional problems." *See* Margo McCaffery, RN MS, FAAN and Chris Pasero, RN, MS FAAN, *Understanding Your Pain, Taking Oral Opioid Analgesics*, available at http://www.thblack. com/links/rsd/understand_pain_opioid _analgesics.pdf.

248.     In addition to this educational pamphlet, Endo's website for Opana, www.opana.com, stated until April 2012 that "[m]ost healthcare providers who treat patients

with pain agree that patients treated with prolonged opioid medicines usually do not become addicted."

249.    Another Endo website, www.PainAction.com, stated: "Did you know? Most chronic pain patients do not become addicted to the opioid medications that are prescribed for them." Furthermore, an Endo-sponsored NIPC brochure available on www.painknowledge.org titled "*Pain: Opioid Facts*," stated "people who have no history of drug abuse, including tobacco, and use their opioid medication as directed will probably not become addicted."

250.    One of the Front Groups with which Endo worked most closely was the American Pain Foundation ("APF"). APF conveyed through its National Initiative on Pain Control and its website www.painknowledge.org, that "[p]eople who take opioids as prescribed usually do not become addicted."

### *J&J and Actavis*

251.    J&J and Actavis similarly engaged in false misrepresentations that opioid addiction is easily avoided or treated.

252.    Through its website, www.PrescribeResponsibly.com, J&J misleadingly states the risk of opioid addiction "can usually be managed" through a "four question screener" on the website. The website also suggests addiction can be easily avoided by the doctor and patient by entering into an "opioid agreement" and provides screening tools for prescribers to use in patient risk assessments.

253.    Actavis distributed patient brochures in 2007 claiming addiction is possible but is "less likely if you have never had an addiction problem before." The suggestion made by this brochure is that the risk of addiction is so minimal it should not be a cause for concern.

254.    In an unbranded patient pamphlet, Actavis attempted to allay patients' fears of opioid use and risk of addiction by suggesting an opioid prescription is standard procedure for

pain lasting more than a few days. In other words, Actavis was priming the public to expect and accept an opioid prescription even when other less addictive medication was available.

255.    In the unbranded patient pamphlet, Actavis trivializes concerns of addiction by claiming people only get "hooked" when they have had problems with drug addiction in the past and thus it is unlikely a patient without such a history would become addicted by chronic opioid therapy. Actavis attempts to hedge its claim by reframing what it means to be addicted. In an attempt to normalize addictive behavior, Actavis explained that a patient's body will become tolerant, but this is normal and simply requires a periodic dose adjustment. Actavis, *What You Need To Know About Managing Chronic Back Pain,* KADIAN, http://web.archive.org/web/20060512105218/http://www.kadian.com/ pages/getfile.aspx?id=8AF9A8CE-75B8-4FFF-A9FEF0E7F526556A.

256.    Defendants deceptively minimized the significant symptoms of opioid withdrawal and grossly understated the difficulty of tapering, particularly after long-term opioid use.

**E.    Defendants misrepresented that physicians and patients could increase opioid dosages indefinitely without added risk.**

257.    With patients quickly building tolerances for opioids, lower doses of opioids failed to provide relief. In such cases, the prescribing doctors would traditionally have abandoned opioids as a treatment but for Defendants' claims that opioid dosages could be indefinitely increased without added risk.

*Teva*

258.    Teva's *Treatment Options: A Guide for People Living with Pain,* reviewed by Dr. Fishman and Dr. Portenoy, claimed that some patients need a larger dose of opioids, regardless of the dose currently prescribed and that opioids have "no ceiling dose." *Treatment Options: A*

*Guide for People Living with Pain*, 12 AM. PAIN FOUND. (2007), https://ce4less.com/ Tests/Materials/ E019Materials.pdf.

259.     The *Treatment Options: A Guide for People Living with Pain* claims that some patients "need" a larger dose of an opioid regardless of the dose currently prescribed. The guide stated that opioids have "no ceiling dose" and are therefore the most appropriate treatment for severe pain. This guide is still available for sale on-line.

260.     The American Pain Foundation, which is closely associated with Teva, produced *A Policymaker's Guide to Understanding Pain & Its Management*, which taught that dosage escalations are "sometimes necessary," but did not disclose the risks from high opioid dosages.

### *Endo*

261.     Endo instructed physicians and patients that "when patients become tolerant to a medication, it means that they need increasing amounts of the medication to give the same effect that occurred when they first started taking it" and that "once you are on the right dose of medication for your pain, tolerance usually does not occur." *Pain: Opioid Therapy*, *Patient Education Handout*, PAINKNOWLEDGE.ORG (May 13, 2013), http://web.archive.org/web/ 20101007083722/ http://painknowledge.org/patiented/pdf/B697_%20Patient %20Handout_ FINAL.pdf; *see also Persistent Pain in Older People*, PAINKNOWLEDGE.ORG (Oct. 7, 2010).

262.     To further this message, Endo sponsored a website, www.painknowledge.org, which claimed opioids may be increased until "you are on the right dose of medication for your pain."

263.     In addition, Endo's pamphlet *Understanding Your Pain: Taking Oral Opioid Analgesics*, edited by KOL Dr. Portenoy, includes the following:

Q: If I take the opioid now, will it work later when I really need it?

> A: Some patients with chronic pain worry about this, but it is not a problem.
> The dose can be increased . . . . You won't "run out" of pain relief.

*See* ENDO PHARMACEUTICALS, UNDERSTANDING YOUR PAIN: TAKING ORAL

OPIOID ANALGESICS, (Russell K. Portenoy ed. 2004), https://www.yumpu.com/en/document/

view/35479278/understanding-your-pain-taking-oral-opioid-analgesics.

### *J&J*

**264.** In 2009, J&J provided funding for *Finding Relief: Pain Management for Older Adults*. This publication listed dose limitations as "disadvantages" of other pain medicines but omitted any discussion of risks from increased doses of opioids.

**265.** In addition, *Finding Relief* described the advantages and disadvantages of NSAIDs on one page, and the "myths/facts" of opioids on the immediately opposite page, therefore simulating a "side by side" comparison. However, this presentation was misleading. The disadvantages of NSAIDs are described as involving "bleeding," "kidney or liver damage if taken at high doses or for a long time," "adverse reactions in people with asthma," and "can increase the risk of heart attack and stroke." The only adverse effects of opioids listed are "upset stomach or sleepiness," which the brochure claims will go away.

**266.** Clearly, there was an intent to emphasize the risks of nonopioid medication options while at the same time minimizing the similarly severe risks from chronic opioid use.

### *Actavis*

**267.** Actavis's patient brochure for Kadian stated: "You can become addicted to morphinebased drugs. But it's less likely if you've never had an addiction problem. Over time, your body may get used to your current dose. You may require a dose adjustment to get the right

amount of pain relief. This is not addiction. It is just your body getting used to the drug." *What is*

*KADIAN? Patient and Caregivers*, ALPHARMA BRANDED PRODUCTS DIVISION, INC.

(May 15, 2006) http://web.archive.org/web/20060515091348/http://www.kadian.com:80/pages/

getpage.aspx?id= 67D849A5-368C-4566A785-942010A46963.

268.    In fact, in Kadian's factual packet, Actavis claims that "[f]ull agonists have no

ceiling on their analgesia. Analgesia increases as the dose is raised, until adequate pain control is

achieved, or dose limiting adverse effects occur." In other words, Kadian can be increased

indefinitely until the side effects become so intolerable the patient cannot handle a higher dose.

269.    Actavis trained its sales force to sell the idea that "individualization" of opioid

therapy for each pain patient depended on increasing doses "until [the] patient reports adequate

analgesia" and to "set dose levels on [the] basis of patient['s] need not on [a] predetermined

maximal dose."

270.    As part of its strategy, Actavis justified its aggressive marketing to its sales reps

by reassuring them that a physician's hesitation to indefinitely increasing doses was simply an

issue of "comfort level" which should be overcome by the sales representative or used as a tool

by the representative to induce the physician to switch to Kadian as a safer opioid alternative.

271.    Internal training documents indicate Actavis instructed its sales force to promote

Kadian's ability to escalate doses during long term opioid therapy, without hitting a dose ceiling,

made them safer than acetaminophen or NSAIDs, which have a defined maximum dose.

272.    Furthermore, Actavis instructed its sales force that opioid "doses are titrated to

pain relief, and so no ceiling dose can be given as to the recommended maximal dose." However,

Actavis failed to explain the greater risks associated with opioids at higher doses.

273.    These claims conflict with the scientific evidence and Defendants' own research

and knowledge. The benefits of high-dose opioids for chronic pain have never been established.

89

However, the risks of serious harms related to opioid therapy are clear, and increase at higher opioid dosages.

274.    The CDC explains that "overdose risk is increased at higher opioid dosages." Howell, Deborah, et al., *CDC Guideline for Prescribing Opioids for Chronic Pain—United States, 2016*, 65(1) MMWR RECOMM. REP. 1-49 (2016), https://www.cdc.gov/mmwr/volumes/65/rr/rr6501e1.htm. Similarly, there is an "increased risk for opioid use disorder, respiratory depression, and death at higher doses." *Id*.

**F.    Defendants misrepresented the effectiveness of abuse-deterrent properties of opioid products.**

275.    Defendants deceptively marketed the so-called "abuse-deterrent" properties of some of their opioids and created the false impression that these opioids could curb addiction and abuse. Defendants seized upon the business opportunity presented by the rapidly growing number of overdose deaths each year by marketing a new generation of so-called "tamper-resistant" and "abuse-deterrent" opioid pills. These reformulated opioid pills were purportedly more difficult to crush and therefore less likely to be abused by injecting or snorting. Defendants hold multiple patents on these reformulated drugs, shielding them from competition for years— in some cases decades. *See* Perrone, Matthew, *Drugmakers Push Profitable, but Unproven, Opioid Solution*, CTR. FOR PUB. INTEGRITY, Dec. 15, 2016 https://www.publicintegrity.org/2016/12/15/20544/drugmakers-push-profitable-unproven-opioid-solution.

276.    Despite reformulation, next generation opioid pills are just as addictive and there is little— if *any*—proof they reduce rates of overdoses or deaths. Hwang, Catherine, et al., *Primary Care Physicians' Knowledge and Attitudes Regarding Prescription Opioid Abuse and Diversion*, 32(4) CLIN. J. OF PAIN 279-284 (2016). That has not stopped pharmaceutical

90

companies and their sales representatives from promoting their reformulated opioid products as less addictive. Alarmingly, 2016 survey results published in the *Clinical Journal of Pain* showed nearly half of U.S. physicians incorrectly believed that reformulated opioids are less addictive than their predecessors. *Id*.

### Endo

277.     Endo's advertisements for the 2012 reformulation of Opana ER claimed that it was safer, designed to be crush-resistant and more difficult to abuse. This claim was false.

278.     In fact, Endo conducted their own studies which showed that Opana ER was not crush resistant or more difficult to abuse—the reformulated drug could still be ground and chewed.  Further, Endo's study determined that its reformulated opioid had a higher rate of abuse via intravenous injection than the old formulation—64 percent of abusers of Opana ER abused the drug by injection, compared with 36 percent for the old formulation. *See* Cassidy, Theresa, et al., *The Changing Abuse Ecology: Implications for Evaluating the Abuse Pattern of ExtendedRelease Oxymorphone and Abuse-Deterrent Opioid Formulations* (2014), https://www. inflexxion.com/wpcontent/uploads/2017/11/PainWeek_ 2014_AbuseEcology_FINAL.pdf (last accessed Oct. 30, 2019). Not only was Opana ER just as if not more dangerous and addictive than the original formulation, its introduction to the public directly resulted in increased cases of needle-borne diseases, like HIV and Hepatitis C.  Endo intentionally concealed the findings of its study from the public and from the medical community.

279.     According to Endo's internal documents, Endo's promotional materials tripled a prescriber's ability to recall key sales messages and doubled a prescriber's willingness to prescribe Opana ER. Endo determined that up to 10 percent of physicians were able to recall, without assistance, the concept that Opana ER had "minimal/less abuse/misuse" potential than

other drugs. Endo continued to provide prescribing physicians with false and misleading information because it benefited from these deceptive statements.

280.     As Endo intended, U.S. prescribers regarded Opana ER as having "low abuse potential." This false marketing message was cited by 15 percent of doctors as a benefit of Opana ER.

281.     In 2013, the FDA announced that there is no evidence to support Endo's claim that Opana ER reduces or deters abuse. *See* FDA Statement: Original Opana ER Relisting Determination (May 10, 2013).

282.     The State of New York found Endo's statements false and deceptive because there was no difference in the ability to extract the narcotic from Opana ER. Ultimately, Endo agreed to a 2016 settlement with the State of New York to no longer make statements that Opana ER was designed to be or is crush resistant.

### *Actavis*

283.     Actavis trained its sales force to promote long-acting opioids, like Kadian, as less likely to produce addiction than other short acting opioids. Actavis instructed its sales representatives to tell prescribers that Kadian's extended-release formula was less likely to be abused as a recreational drug because it did not produce an initial euphoric rush and could not be dissolved in water.

284.     There is no evidence that long-acting opioids are less addictive or can be taken long term without any risk of addiction.

### G.     Defendants misrepresented the benefits of chronic opioid therapy.

285.     Defendants misrepresented the benefits of pain relief provided by long-term prescription opioid use by falsely stating that:

a  Long-term opioid use would result in pain reduction and an increased quality of life for patients;

b  The use of their products for chronic pain would allow patients to perform demanding tasks like construction work;

c  Opioids make it easier for people to live normally and improve quality of life;

d  Chronic opioid therapy has been shown to reduce pain and improve depressive symptoms and cognitive functioning; and

e  Multiple clinical studies have shown that opioids are effective in improving daily function, psychological health, and health related quality of life for chronic pain patients.

286. As intended by Defendants, hospitals, and medical professionals in the U.S., including the Eastern District of Texas and in Plaintiffs' geographic areas were steered toward the over-treatment of acute and chronic pain with opioids by Defendants' misrepresentations. As a result, long-term opioid prescriptions flourished nationwide, including the Eastern District of Texas and in Plaintiffs' geographic areas. The unchecked escalation of prescription opioid use resulted in abuse, addiction, overdose, injury, and death.

287. But for Defendants' misleading and false information, such abuse, addiction, overdose, injury, death, and their attendant costs would not have occurred.

288. Defendants had to persuade doctors that there was a significant benefit to long-term opioid use to convince doctors and patients that opioids should be used to treat chronic pain. However, there is not—nor has there ever been—evidence of long-term benefits of opioid therapy for chronic pain.

289. In 2013, the FDA stated that it was unaware of any studies demonstrating the safety and efficacy of opioids for long-term use. *See* Letter from Janet Woodcock, M.D, Dir., Ctr. For Drug Eval. & Res., to Andrew Kolodny, M.D., President, Physicians for Responsible Opioid Prescribing, Re: Docket No. FDA-2012-P-0818 (Sep. 10, 2013). Despite the lack of

studies, Defendants falsely and misleadingly touted the benefits of long-term use and repeatedly affirmed that these benefits were supported by scientific evidence. Not only have Defendants failed to correct these false and deceptive claims, they continue to make them today. Examples are below.

### Teva

290.    Teva's *Treatment Options: A Guide for People Living with Pain* (2007) counseled patients that opioids "give all of us a quality of life we deserve." *See Treatment Options: A Guide for People Living with Pain*, 15 AM. PAIN FOUND. (2007), https://ce4less.com/Tests/ Materials/ E019Materials.pdf.

291.    There is no evidence that opioids improve function or increase quality of life.  In fact, as described herein, there is clear evidence to the contrary. Teva continued to make the false assertion that opioids improved quality of life to lessen the "opioidphobia" and stigma for both prescribing physicians and patients, which resulted in increased opioid sales and profits.

### Endo

292.    Endo's website, www.painknowledge.org, claimed that with opioids "your level of function should improve; you may find you are now able to participate in activities of daily living, such as work and hobbies, that you were not able to enjoy when your pain was worse." See *Pain: Opioid Therapy*, Patient Handout, PAINKNOWLEDGE.ORG (2009), https://web.archive.org/web/ 20101007083722/http://painknowledge.org/patiented/pdf/B697_ %20Patient%20Handout_FINA L.pdf.

293.    Elsewhere, the website boasted improved quality of life in addition to "improved function" as benefits of opioid therapy. The funding request Endo approved for this website

project specifically indicated NIPC's intent to make claims about patient function, and Endo closely monitored traffic to the website.

294.    Claims of improved functionality were a key part of Endo's marketing push. In fact, Endo's website is peppered with "patient profiles" in which patients give testimonials alleging improved functioning and pain relief after only a few days of opioid therapy. Endo showcased patients with physically demanding jobs. Each patient alluded to the notion that Opana ER allows them to function without pain in the long term and has dramatically improved their day to day lives.

295.    Moreover, Endo falsely advertised on its website that its Opana ER formula has a "true 12hour dosing that lasts." There is no scientific evidence to support such a claim, and Endo had no reasonable basis to make this assertion.

296.    Endo attempted to tip the scales in its product's favor by distributing a "case study" to prescribers titled *Case Challenges in Pain Management: Opioid Therapy for Chronic Pain*. With this study Endo attempted to cast doubt upon opioid alternatives. The study justified its recommendation that opioid treatment be used by citing an example where a patient developed "a massive upper gastrointestinal bleed believed to be related to his protracted use of NSAIDs." The major takeaway of this misleading publication was if opioid alternatives also carry significant risks, then rolling the dice on opioids was the better option. Endo framed opioid therapy as the more effective method of treating pain and improving patients' lives. These claims are flat out misrepresentations.

### *J&J*

297.    J&J promoted its opioid patch, Duragesic, by implying it allowed patients to return to a life uninterrupted by pain. Its marketing campaign reinforced this idea by repeating tag lines such as "[w]ork, uninterrupted;" "[l]ife, uninterrupted;" "[g]ame, uninterrupted;"

"[c]hronic pain relief that supports functionality;" and "[i]mprove[s] . . . physical and social functioning."

298.     J&J's *Let's Talk Pain* website featured video interviews which claim that opioids allowed a patient to "continue to function," and falsely set up the video series to appear representative of the majority of opioid patients.

299.     Similarly, J&J's patient education guide *Finding Relief: Pain Management for Older Adults* (2009) states as "a fact" that opioids make it "easier for people to live 'normally.'" *See Finding Relief: Pain Management for Older Adults*, PRICARA DIVISION OF ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. (2009) http://web.archive.org/web/20091210233932/http://www. painmed.org:80/pdf/pain_mgmt_older.pdf. This guide portrays a man playing golf and lists sleeping through the night, returning to work, recreation, walking, climbing stairs, and sex as examples of expected functional improvement from opioids.

300.     Finally, it assures patients that, "[u]sed properly, opioid medications can make it possible for people with chronic pain to 'return to normal.'"  *Id.*

### *Actavis*

301.     Actavis's Co-Pay Assistance Program Brochure claimed the use of Kadian for the treatment of chronic pain would positively impact a patient's work, daily functioning, and enjoyment of life by relieving "stress on your body and your mental health." *Warning letter from Thomas Abrams, Dir., FDA Div. of Mktg., Adver., & Comm's, to Doug Boothe, CEO, Actavis US* (Feb. 18, 2010).

302.     In addition, Actavis's website for Kadian makes similar claims of improved quality of life and mentions only mild to moderate side effects.

303.     Moreover, Actavis promoted Kadian to physicians as providing "patients with up to 24 hours of smooth, consistent pain control." Kadian was marketed as having "polyer-coated

96

shell technology" which was designed to consistently release the drug into the gastrointestinal tract. Actavis doubled down on its claim to 24-hour relief on its *Patients and Caregivers* website. In support of its claim, Actavis cited a study involving terminal cancer patients—not the chronic pain patients to whom Actavis was targeting its marketing materials. *See Patient and Caregivers*, OPANA ER, http:// web.archive.org/web/ 20060512104525/http://www.kadian.com/pages/getpage.aspx?id=AC421954-83AD-4B0F-9FEBD77C3821BB0F.

304.    Defendants' sales representatives conveyed the message that opioids improve patient function and intended that the recipients rely on their statements as truthful.

305.    Defendants' claims find no support in scientific or medical literature.

306.    In fact, the CDC states that: (a) "[n]o evidence shows a long-term benefit of opioids in pain and function versus no opioids for chronic pain with outcomes examined at least 1 year later"; (b) "[a]lthough opioids can reduce pain during short-term use, the clinical evidence review found insufficient evidence to determine whether pain relief is sustained and whether function or quality of life improves with long-term opioid therapy"; and (c) "evidence is limited or insufficient for improved pain or function with long-term use of opioids for several chronic pain conditions for which opioids are commonly prescribed, such as low back pain, headache, and fibromyalgia." *CDC Guideline for Prescribing Opioids for Chronic Pain – United States 2016*, CTRS. FOR DISEASE CONTROL & PREVENTION (Mar. 18, 2016), https://www.cdc.gov/mmwr/volumes/65/rr/rr6501e1.htm.

307.    The CDC has also noted that the risks of addiction and death "can cause distress and inability to fulfill major role obligations." As a matter of common sense and medical evidence, drugs that can kill patients or commit them to a life of addiction or recovery do not improve their function and quality of life.

308.    In 2010, the FDA informed Actavis that it was "not aware of substantial evidence or substantial clinical experience demonstrating that the magnitude of the effect of the drug [Kadian] has in alleviating pain, taken together with any drug-related side effects patients may experience . . . results in any overall positive impact on a patient's work, physical and mental functioning, daily activities, or enjoyment of life." *See Warning letter from Thomas Abrams, Dir., FDA Div. of Mktg., Adver., & Comm's, to Doug Boothe, CEO, Actavis LLC* (Feb. 18, 2010).

309.    Defendants falsely emphasized or exaggerated the risks of competing products like NSAIDs so that doctors and patients would look to opioids first for treating chronic pain. Once again, Defendants' misrepresentations contravene the scientific evidence.

310.    Defendants have employed, and continue to employ, the above false and misleading representations in and around the Eastern District of Texas and in Plaintiffs' geographic areas, and have directed them at Plaintiffs, including its physicians and residents. These sustained and ongoing marketing efforts have naturally and predictably resulted in unnecessary and unwanted opioid addiction, abuse, diversion, and death in the Eastern District of Texas and in Plaintiffs' geographic areas and their surrounding communities. As a direct and foreseeable consequence of Defendants' wrongful conduct, Plaintiffs have suffered (and continue to suffer) extensive injuries and damages.

## IV.    Defendants flooded Plaintiffs with opioid drugs.

311.    Distributor Defendants[5] unlawfully distributed tens of millions of prescription opioid pills into Plaintiffs which resulted in widespread diversion into illicit channels.

---

[5]    As noted above, Manufacturer Defendants are also licensed prescription drug distributors and engage in the wholesale distribution of opioid drugs in and around the Eastern District of

Defendants systematically undermined institutional controls and breached their duty of ordinary care to Plaintiffs for the purpose of increasing their market share and profits. Defendants' conduct was a direct and proximate cause of a serious public health and safety crisis in the Eastern District of Texas and in Plaintiffs' geographic areas.

312.    Distributor Defendants owe a duty to Plaintiffs to monitor, detect, investigate, refuse to fill, and report atypical orders of prescription opioids originating from the Eastern District of Texas and in Plaintiffs' geographic areas as well as those orders which Defendants knew or should have known were likely to be diverted into the Eastern District of Texas and in Plaintiffs' geographic areas. Distributor Defendants repeatedly and purposefully breached their duties, which foreseeably and directly resulted in the widespread diversion of prescription opioids for nonmedical purposes. This diversion and epidemic are direct causes of harms incurred by Plaintiffs. The opioid epidemic in the Eastern District of Texas and in Plaintiffs' geographic areas remains an immediate hazard to public health and safety.

### A.    Defendants admit they are the gatekeepers of the opioid supply chain.

313.    Defendants Cardinal Health, McKesson, and AmerisourceBergen are all among the fifteen largest American companies by revenue. Together, they distribute more than 90% of the nation's drug and medical supplies.

314.    Distributor Defendants admit that they are the gatekeepers and the last line of defense for preventing opioid abuse. In testimony before Congress, industry leaders represented that the distributors of opioids "have not only statutory and regulatory responsibilities to detect and prevent diversion of controlled prescription drugs, but to undertake such efforts as

---

Texas and in Plaintiffs' geographic areas. That said, Plaintiffs' allegations against Distributor Defendants also apply equally to Manufacturer Defendants as distributors of opioid drugs.

responsible members of society." *See Prescription Drug Diversion: Combating the Scourge: Hearing Before the Subcomm. on Commerce, Mfg., and Trade of the H. Comm. on Energy and Commerce*, 112th Cong. 105 (2d Sess. 2012) (statement of John M. Gray, President and CEO, Healthcare Distribution Management Assoc.).

315.    Industry Compliance Guidelines (ICGs) established by the Healthcare Distribution Alliance[6] (HDA), the trade association of pharmaceutical distributors, explain that distributors are "[a]t the center of a sophisticated supply chain" and therefore "are uniquely situated to perform due diligence in order to help support the security of the controlled substances they deliver to their customers." *Id.*

316.    "The guidelines emphasize the concept of 'Know Your Customer'—that is, obtaining and reviewing thorough background information about a prospective healthcare provider prior to doing business, thereby, in many cases, avoiding potential problems even before an order is placed." *See Prescription Drug Diversion: Combating the Scourge,* supra.

317.    Prescription opioids are regulated for the purpose of providing a "closed" system of distribution, intended to reduce the widespread diversion of these drugs out of legitimate channels into the illicit market. Distributor Defendants knew they were required to monitor, detect, report, and refuse to fill orders of unusual size, quantities, frequency or dosages. Because Distributor Defendants handle such large volumes of controlled substances and are the first major line of defense in the movement of legal pharmaceutical controlled substances from legitimate channels into the illicit market, Distributor Defendants have a duty to maintain

---

[6]    On information and belief, current HDA members include Defendants AbbVie, Allergan, Depomed, Endo, J&J, Mylan, McKesson, AmerisourceBergen, and Cardinal Health, among other manufacturers and distributors. *See Membership*, HEALTHCARE DISTRIBUTION ALLIANCE (2018), https://www.hda.org/about/membership (last visited June 3, 2020).

effective controls to prevent diversion of controlled substances. Should a distributor breach its

duty of ordinary care by deviating from these checks and balances, the closed system collapses.

*See* Declaration of Joseph Rannazzisi, Deputy Assistant Administrator, Office of Diversion

Control, Drug Enforcement Agency, United States Department of Justice, ¶10, *Cardinal Health,*

*Inc. v. Holder*, No. 1:12-cv-00185-RBW, Doc. 14-2 (filed in U.S. D.C. on Feb. 20, 2012).

318.    Newly released data demonstrates the extent to which Distributor Defendants paid

no attention to laws, regulations, or industry standards.  In fact, Distributor Defendants saturated

the country with 76 billion oxycodone and hydrocodone pain pills from 2006 through 2012 as

the nation's deadliest drug epidemic spun out of control. *See* Higham, Scott, et al., *76 billion*

*opioid pills: Newly released federal data unmasks the epidemic*, WASH. POST, Jul. 16, 2019,

https://www.washingtonpost. com/ investigations/76-billion-opioid-pills-newly-released-federal-

data-unmasks-theepidemic/ 2019/07/16/5f29fd62-a73e-11e9-86dd-d7f0e60391e9_story.html.

The volume of the pills handled by Distributor Defendants skyrocketed as the epidemic surged,

increasing about 51 percent from 8.4 billion in 2006 to 12.6 billion in 2012. *Id*. Within 7 years,

Defendants distributed enough pills to supply every adult and child in the country with 36 pills

each year. *Id*.

### B.    Defendants worked in concert to maximize profits from the sale and distribution of opioid drugs.

319.    The sheer volume of prescription opioids distributed to pharmacies and retailers

in the Eastern District of Texas and in Plaintiffs' geographic areas was excessive for the medical

need of the community. Distributor Defendants ignored red flags that were so obvious that no

one who engages in the legitimate distribution of controlled substances could reasonably claim

ignorance of them.

320.    Distributor Defendants considered the Manufacturing Defendants "trusted partners" in the drug supply chain. In fact, AmerisourceBergen, McKesson, and Cardinal all openly claim as much:

a    AmerisourceBergen's website claims it works directly with manufacturers as a "trusted partner in the commercialization journey." *Brand and Specialty Manufacturer Solutions*, AMERISOURCEBERGEN, https://www. amerisourcebergen.com/solutions-manufacturers/brand-and-specialty (last accessed Oct. 28, 2019).

b    McKesson similarly claims that it "partners with pharmaceutical manufacturers at all stages of the product lifecycle." *Pharmacy Awareness and Education Programs for Pharmaceutical Manufacturers*, MCKESSON, https://www.mckesson.com/ Biopharma/ Pharmacy-Education/ (last accessed Oct. 29, 2019).

c    Cardinal positioned itself as a "manufacturing and pharmacy solutions" consultant to "help manufacturers bring products to market." *Services*, CARDINALHEALTH, https://www.cardinalhealth.com/en/services.html (last accessed Oct. 29, 2019).

321.    Distributor Defendants knew opioids were being falsely marketed by the Manufacturing Defendants as part of their aggressive growth strategy. Distributor Defendants knew that opioids were being marketed and prescribed for seemingly every complaint of chronic pain and promoted as a safer alternative to other pain management therapy. However, because such marketing was to their benefit and came with increased profit margins, the Distributor Defendants intentionally turned a blind eye and allowed opioids to flood communities.

322.    Defendants worked in concert to distribute increasing volumes of prescription opioids Distributor Defendants purchased drugs from Manufacturer Defendants at an established wholesale cost, often receiving discounts, rebates and chargebacks from the cost based on increased market share and volume. *See* KAISER FAMILY FOUND., FOLLOW THE PILL: UNDERSTANDING THE U.S. COMMERCIAL PHARMACEUTICAL SUPPLY CHAIN 1, 19 (2006), *available at* https:// avalere.com/research/docs/Follow_the_Pill.pdf (lasted accessed Oct.

30, 2019). Manufacturer Defendants engaged in this practice to increase sales while giving Distributor Defendants a way to offer more competitive prices due to the discounted rates received for high volume orders and to take the difference from the original price of the pharmaceuticals as an additional profit.

<strong>C.    Defendants failed to maintain adequate controls against the diversion of opioid drugs into illicit channels.</strong>

323.    Distributor Defendants contributed to the dangerous oversupply of opioids in the Eastern District of Texas and in Plaintiffs' geographic areas by not maintaining adequate controls against diversion. Distributor Defendants failed to provide proper compliance training and staffing, failed to investigate customers suspected to be filling medically unnecessary prescriptions, and failed to detect, flag, block, and report unusual purchases of opioid drugs.

324.    Defendants failed to provide their employees with qualified personnel to train them on compliance functions to prevent the oversupply of dangerous prescription drugs. Front-line compliance tasks were often assigned to employees who possessed no experience with anti-diversion compliance.

325.    Distributor Defendants had no uniform procedure for scrutinizing unusual or out of the ordinary customer requests. It was common practice for flagged orders to be waived through upon cursory review or to bring on new customers before a full vetting was completed. There was also little incentive for Defendants to follow up on unusually large purchases with further investigation.

326.    Distributor Defendants' practices were so lax, their sales forces would habitually assist their customers in avoiding compliance reviews. Often, Distributor Defendants' customers were able to place multiple bulk orders within the same month, or even the same week. Distributor Defendants alerted their customers when they were at risk of triggering a compliance

103

review and actively manipulate the timing and volume of shipments to slide around compliance safeguards.

327.    Distributor Defendants knowingly allowed the oversupply of opioids. On rare occasions a customer was temporarily blocked due to excessive violations of monthly threshold amounts, Defendants permitted the same customers to simply resume their previous order volume the following month without any further investigation or corrective action.

328.    Distributor Defendants failed in their duty under state statutory and common law to detect, block, and report sales that were of an unusually high volume, frequency, and dosage. Distributor Defendants failed to report sales when they knew they were likely to be diverted to illicit channels.

329.    Distributor Defendants filled purchases that they knew were of unusual size, pattern, frequency, or were being shipped into known high diversion areas. Distributor Defendants breached their duty under state law to maintain effective controls against diversion of opioids into areas other than legitimate health care services, research, or commercial use.

**D.    Defendants misrepresented their commitment to anti-diversion efforts and monitoring the supply of opioids**.

330.    Rather than take minimal measures to protect the public from a known harm, Defendants, individually and collectively, repeatedly distributed—and continue to distribute—prescription opioids without fulfilling their duty under state common and statutory law to stop the diversion of these dangerous drugs for non-medical purposes.

331.    Defendants also misrepresented material facts regarding the existence of their internal policies and practices to protect the health and safety Plaintiffs' residents. Defendants concealed the fact they failed to implement an effective opioid supply chain monitoring or tracking system to guard against diversion of highly addictive opioid products for non-medical

use, despite representing to the public that they would. Defendants affirmatively portray themselves as committed to maintaining adequate controls to prevent diversion, complying with its anti-diversion obligations, and monitoring its opioid supply chain. These representations were, and are, false.

332.    Defendants misleadingly held themselves out as taking affirmative steps to prevent diversion into illicit channels and monitoring or blocking orders that raised warning signs of opioid misuse. Defendants' deceptive messages lulled doctors, patients, and the public into a false sense of security when it came to prescribing opioids and the pain management culture.

### *Cardinal*

333.    Cardinal acknowledges the public health crisis and admits the epidemic is a "serious and complex problem." Cardinal is well aware of the epidemic's magnitude because it tracks and reports CDC opioid prescription and overdose death data. Cardinal claims to "best utilize [its] assets, expertise and influence to make our communities stronger, our world more sustainable, while governing [its] activities as a good corporate citizen and with a belief that doing 'the right thing' serves everyone." *See Corporate Citizenship*, CARDINAL HEALTH, https://www.cardinalhealth.com/en/about-us/corporate-citizenship.html (last accessed Oct. 22, 2019). Cardinal additionally claims it "operates a strict and uncompromising system to spot, stop, and report to regulators" all irregular or suspect shipments of prescription opioids. *See Combating Opioid Misuse*, CARDINAL HEALTH, https://www. cardinalhealth.com/en/about-us/corporatecitizenship/combating-opioid-misuse.html (last accessed June 3, 2020).

334.    Cardinal misrepresented that it "lead[s] [the] industry in anti-diversion strategies to help prevent opioids from being diverted for misuse and abuse" and claims to "maintain a

sophisticated, state of the art program" to monitor and stop orders that do not meet its high standards. In fact, an executive boasted that Cardinal uses "advanced analytics" to be "as effective and efficient as possible in constantly monitoring, identifying, and eliminating any outside criminal activity."

335.    Cardinal undertook the duty to provide safe and secure channels of distribution for its medications.  Cardinal's *Opioid Action Program: Reclaiming Our Communities* highlights this belief since it operates a "state-of-the-art, constantly adaptive system to combat opioid diversion." *See Opioid Action Program: Reclaiming our Communities*, CARDINAL HEALTH, www.cardinalhealth.com (last accessed June 3, 2020). In fact, Cardinal states it scrutinizes its customers using a "multifactor process to evaluate pharmacies." Additionally, Cardinal claims to "engage directly with pharmacists to understand their business, their purchasing patterns, the ration of controlled to non-controlled substances ordered and the demographics of their customers." *Id.* Cardinal had the ability to view and use industry information to see "whether the order deviates from historic ordering patterns" and would tag suspicious purchases for additional "scrutiny and evaluation." *Id.*

336.    However, Cardinal acted in a manner that runs counter to all its claims. Although it had the ability to prevent the influx of opioids into the Eastern District of Texas and in Plaintiffs' geographic areas, instead, Cardinal directly caused it. Cardinal continued to supply opioids to pharmacies and providers in the Eastern District of Texas and in Plaintiffs' geographic areas despite reviewing voluminous data and reports containing glaring signs of diversion and misuse.

337.    Cardinal knew it had a duty to monitor opioid purchases.  Cardinal had superior knowledge of the volume, dosage, frequency and destination of opioid shipments that were not

available to anyone else.  Cardinal claimed to have successfully carried out this duty year after year. However, Cardinal repeatedly violated its gatekeeping duties.

338.    On December 23, 2016, Cardinal agreed to a $44 million civil penalty with the Department of Justice for failing to report unlawful purchases of controlled substances, including oxycodone, in Florida, Maryland, and New York. *See* Lenny Bernstein & Scott Higham, *Cardinal Health Fined $44 Million for Opioid Reporting Violations*, WASH. POST. (Jan. 11, 2017), https://www.washingtonpost.com/national/health-science/cardinal-health-fined-44-million-for-opioidreporting-violations/2017/01/11/4f217c44-d82c-11e6-9a36-1d296534b31e_story.html.

### *McKesson*

339.    McKesson openly recognized its critical role in monitoring and curbing opioid distribution levels. John H. Hammergren, chairman and CEO of McKesson, has stated: "pharmaceutical distributors play an important role in identifying and combatting prescription drug diversion and abuse . . . McKesson, as the nation's largest distributors, takes our role seriously." *See* Charles Ornstein, *Drug Distributors Penalized for Turning Blind Eye in Opioid Epidemic*, APR, Health News, Jan. 27, 2017; Letter from Pete Slone, Senior Vice President, Public Affairs, of McKesson, to The Honorable Chris Christie dated October 31, 2017.

340.    McKesson acknowledged its critical role in preventing diversion, but misrepresented actions it has taken to fulfill its duties.  McKesson claims it is "deeply passionate about curing the opioid epidemic in our country" and uses "customized analytic solutions [to] track pharmaceutical product storage, handling and dispensing in real time at every step of the supply chain process." McKesson further claims to have a "best in class-controlled substance monitoring program" to help identify suspicious shipments. While these statements are intended

to put the public's mind at ease, they were clearly simple marketing messages at odds with McKesson's actual activity and true goal of profiting from the epidemic.

341.    McKesson executives admit the opioid epidemic is the "public health crisis of our time" and that both manufacturers and distributors should be active in redressing the fallout. *See* Letter from Pete Slone, Senior Vice President, Public Affairs, of McKesson, to The Honorable Chris Christie dated October 31, 2017.

342.    McKesson knew that their opioids were flooding markets and being distributed in quantities that far exceeded the medical need of the local population. McKesson had access to detailed industry information and closely tracked its product through the supply chain. The data McKesson had at their fingertips should have spurred them to better perform their gatekeeping duties. Instead, McKesson turned a blind eye and continued to profit from widespread distribution of medically unnecessary opioids.

343.    McKesson's alleged commitment to anti-diversion efforts and opioid supply monitoring were quickly shown to be false. In 2008, McKesson was fined $13.25 million as part of a claim regarding suspicious shipments to internet pharmacies. *See* Eric Eyre, *"Suspicious" Drug Order Rules Never Enforced by State*, CHARLESTON GAZETTE MAIL (Dec. 18, 2016), https://www. wvgazettemail.com/news/health/suspicious-drug-order-rules-never-enforced-by-state/article_3c9f1983-90445e97-87ff-df5ed5e55418.html. Remarkably, McKesson continued to seek higher distribution volumes, even after it agreed to comply with its legal obligations in the 2008 settlement. Sadly, McKesson and the other Distributor Defendants' greed could not be satiated. The profits gained through distributing higher volumes of prescription drugs, including opioids, proved to be worth continuing to violate the law at the expense of the public's health.

344.    Despite its statements, McKesson has not changed its negligent practices and continues to misrepresent its efforts to curb opioid diversion and abuse. On January 5, 2017,

108

McKesson agreed to pay a $150 million civil penalty, admitting that "it did not identify or report…certain [sales] placed by certain pharmacies which should have been detected . . . as suspicious." See DEP'T OF JUSTICE, ADMINISTRATIVE MEMORANDUM OF AGREEMENT 3 (2017), https://www.justice.gov/ opa/pressrelease/file/928476/download.

### *AmerisourceBergen*

345.    AmerisourceBergen has a duty to monitor, report, and prevent excessive, unusual, and illegal opioid shipments. AmerisourceBergen freely admits it is responsible for maintaining a "supply chain that is safe and secure." *See* Steve Collis, *The Surprising Morality of Opioid Distribution*, Amerisource Bergen, (Sept. 18, 2017), https://www.amerisourcebergen.com/ fighting-the-opioid-epidemic. AmerisourceBergen claims it maintains an effective and closed supply chain using "complex algorithms to identify and stop orders that are deemed to be suspicious." *Id*.

346.    In fact, AmerisourceBergen CEO, Steven Collis, has publicly stated that distributors, such as AmerisourceBergen, have a "unique perspective on how the supply chain works" and are therefore in a better position to safeguard against diversion. Recognizing that AmerisourceBergen contributed to the opioid crisis, Mr. Collis explains that "nearly every prescription in the United States moves through distributors who purchase drugs from pharmaceutical manufacturers and sell them to pharmacies . . . ." However, Mr. Collis has also admitted that generally, so long as opioid treatments were prescribed, more opioids would be distributed because, as a global healthcare solutions leader, AmerisourceBergen is a "link between manufacturers and healthcare providers to help patients have access to medications they need, when they need them." *See* AmerisourceBergen Foundation, *AmerisourceBergen Foundation Launches Municipal Support Program to Help Combat Opioid Abuse*, Dec. 14, 2017 press release.

347.    A spokesperson for AmerisourceBergen commented that: "At AmerisourceBergen, we are committed to the safe and efficient delivery of controlled substances to meet the medical needs of patients." In fact, AmerisourceBergen has taken the position that it will "work diligently to combat diversion" by coordinating with its pharmaceutical and healthcare partners to curb misuse.

348.    AmerisourceBergen failed to prevent diversion of its product and safeguard the supply chain. In 2017 AmerisourceBergen agreed to pay $16 million to the State of West Virginia to resolve claims of grossly oversupplying opioids and for failing to report suspicious sales. *See* Eric Erye, *2 Drug Distributors Pay $36M to Settle WV lawsuits*, Charleston Gazette-Mail (Jan. 9, 2017), https://www. wvgazettemail.com/news/health/drug-distributors-to-pay-m-to-settle-wv-painkiller-lawsuits/article_ b43534bdb020-5f56-b9f3-f74270a54c07.html.

349.    Defendants continue to conduct business with reckless disregard for the rights and safety of Plaintiffs' residents because it is in their financial interests to do so. In fact, McKesson continues to pay lucrative incentive awards to senior executives based on high sales of opioid drugs. See *Teamsters push back on McKesson CEO's pay at Irving shareholders meeting*, DALLAS MORNING NEWS, Jul. 26, 2017 https://www.dallasnews.com/business/ceo-pay/2017/07/26/teamsters-push-back-mckesson-ceos-pay-irvingshareholders-meeting. Defendants have benefitted monetarily from each other's unlawful conduct which has directly resulted in an inordinately large volume of prescription opioids flowing into Plaintiffs and their surrounding local communities.

350.    Defendants' failures to maintain effective controls against the known diversion of prescription opioids have naturally and foreseeably created an overabundance of these narcotics

in local communities, fueling addiction, overdose and death in the Eastern District of Texas and in Plaintiffs' geographic areas.

351.    Distributor Defendants knew or should have known the Manufacturer Defendants misrepresented material facts about, among other things, the use of opioids to treat chronic pain and the risk of addiction to opioids.

352.    Plaintiffs have been harmed as a direct and proximate result of Defendants' knowing, reckless, false, deceptive, and misleading conduct described herein.

**V.    Defendants' wrongful conduct fueled the opioid epidemic and devastated Plaintiffs' communities by increasing medically unnecessary opioid prescriptions and use.**

353.    The opioid crisis has been declared a nationwide emergency, but unlike other emergencies, this one was manmade.  It was caused by Defendants' fraudulent marketing, sales, and distribution of prescription opioids. Addiction, crime, and death are the foreseeable culmination of Defendants' deceitful campaign to push massive amounts of dangerously addictive drugs into local communities for their corporate profit. The relationship between Defendants' well-orchestrated falsification of medical knowledge and the current national emergency is proven by documentary evidence and peer-reviewed literature.

**A.    Plaintiffs' allegations are further supported by peer-reviewed medical literature.**

354.    Medical literature attributes the opioid epidemic to "aggressive marketing by the pharmaceutical industry . . . based on unsound science and blatant misinformation, accompanied by dangerous assumptions that opioids are highly effective and safe, devoid of adverse events when prescribed by physicians." *See* Manchikanti *et al.*, *Opioid Epidemic in the United States,* 15 PAIN PHYSICIAN J. ES9, ES10 (2012). Defendants made concerted efforts to shape physicians' "knowledge" to diminish their fear of opioids' side effects. Defendants falsely

111

marketed these dangerous drugs as less addictive, less subject to abuse, less prone to overdose, and more therapeutic for perpetual use than they genuinely are. Defendants advocated the widespread use of opioids for chronic pain even though this contravened the "cardinal principles of medical intervention – that there be compelling evidence of the benefit of a therapy prior to its large-scale use." *Id.*

355.    Studies show that Defendants' marketing efforts were the proximate cause of increased overdose deaths across the country and in the Eastern District of Texas and in Plaintiffs' geographic areas. In early 2019, the *Journal of American Medical Association* published a study of pharmaceutical company dollars spent at the county level on direct-to-physician opioid marketing. *See* Hadland, Scott, E., et al., *Association of Pharmaceutical Industry Marketing of Opioid Products with Mortality from Opioid-Related Overdoses*, JAMA NETWORK OPEN (2019). The study concluded that "the marketing of opioid products to physicians was associated with increased prescribing and, subsequently, with elevated mortality from overdoses." *Id.*

356.    There is no question that Defendants' misrepresentations deceived prescribing doctors and patients about the risks and benefits of long-term opioid use. Surveys reveal that many prescribing doctors and patients remain unaware of or do not understand the risks or benefits of opioids to this day. As reported in January 2016, a 2015 survey of more than 1,000 opioid patients found that "patients claimed they were only told painkillers could be addictive six out of 10 times." *See Missed Questions, Missed Opportunities*, HAZELDEN BETTY FORD FOUNDATION (Jan. 27, 2016), https://www. hazeldenbettyford.org/about-us/news-media/press-release/2016-doctors-missing-questions-that-could-preventopioid-addiction.

357.    Defendants' deceptive marketing scheme has also detrimentally impacted children who are residents of Plaintiffs. *See, e.g.*, Vincent J. Felitti, et al., *Relationship of Childhood*

*Abuse and Household Dysfunction to Many of the Leading Causes of Death in Adults: The Adverse Childhood Experiences (ACE) Study*, AM. J. PREV. MED., 14(4) (1998), https://www.ajpmonline.org/ article/S0749-3797(98)00017-8/fulltext. A prominent study on Adverse Childhood Experiences (ACE Study) found a strong relationship between the breadth of exposure to household dysfunction during childhood and multiple risk factors for several of the leading causes of death in adults, including ischemic heart disease, cancer, chronic lung disease, skeletal fractures, and liver disease, as well as poor self-rated health. *Id.* at 251. One of the seven categories of adverse childhood experiences studied was children living with household members who were substance abusers. *Id.* at 245. The study found that the "seven categories of adverse childhood experiences were strongly interrelated and persons with multiple categories of childhood exposure were likely to have multiple health risk factors later in life." *Id.*

358.    The ACE Study found that when a child is exposed to adverse childhood experiences, they can experience social, emotional, and cognitive impairment which can lead to the adoption of health-risk behaviors. This leads to disease, disability, and social problems, which results in early death. *Id.* at 256.  The effects on children of drug abuse in the home are obvious and devastating. Overprescribing opioids for chronic pain have made the drugs more accessible to parents of school-aged children, and the effects of the opioid crisis on these children will certainly continue into future generations.

**B.    Defendants' wrongful conduct resulted in direct harm to Plaintiffs**

359.    Defendants employed a sophisticated campaign to convince the medical community and the public that opioids were safe—essentially, that high doses of pharmaceutical-grade heroin could treat run-of-the-mill, chronic pain, without significant risk of addiction. Their deceptive messages tainted virtually every source that prescribing physicians could rely on for

information and prevented them from making informed treatment decisions. Defendants, through their multi-pronged campaign—which included sales representatives, and respected pain specialists and organizations serving as paid mouthpieces for Defendants—callously manipulated what doctors wanted to believe—namely, that opioids represented a means of relieving their patients' suffering and of practicing medicine more compassionately. Without Defendants' conduct, which caused prescribing of opioids to skyrocket, the opioid epidemic would not have occurred, and would not have become the crisis it is today.

360.     The acts and omissions of Defendants contributed to cause the opioid epidemic and Plaintiffs' resulting damages, which are extensive and ongoing.

361.      Defendants had extensive knowledge concerning the risks created by over-promotion and increased prescribing of their drugs, the effectiveness of their marketing efforts, and the rising opioid epidemic, including criminal diversion of the drugs, that resulted. Plaintiffs' damages are the natural and probable result of Defendants' bad acts.

362.     Defendants' deceptive marketing scheme caused and continues to cause doctors in and around the Eastern District of Texas and in Plaintiffs' geographic areas to prescribe opioids for chronic pain conditions such as back pain, headaches, arthritis, and fibromyalgia without appropriate consideration of other non-opioid therapies. Defendants' deceptive marketing scheme also caused and continues to cause patients to purchase and use opioids for chronic pain believing they are safe and effective. Absent Defendants' deceptive marketing scheme, Plaintiffs' physicians would not have prescribed opioid drugs for the treatment of moderate chronic pain ailments and fewer patients would be using opioids long-term to treat their pain.

363.     Defendants knowingly and recklessly saturated the market with opioid drugs that could not have had a legitimate medical purpose to increase their own profits.

364.    Defendants' deceptive marketing has caused and continues to cause the prescribing and use of opioids to explode. Indeed, this dramatic increase in opioid prescriptions and use corresponds with the dramatic increase in Defendants' spending on their deceptive marketing scheme. The escalating number of opioid prescriptions written by doctors who were deceived by Defendants' deceptive marketing scheme has caused a correspondingly dramatic increase in opioid addiction, overdoses, or death throughout the U.S., including the Eastern District of Texas and in Plaintiffs' geographic areas.

365.    Due to the increase in opioid overdoses, first responders such as emergency medical technicians and other emergency county personnel have been and will continue to play a critical role in assisting people experiencing opioid-related overdoses.

366.    Defendants' creation, through false and deceptive advertising and other unlawful and unfair conduct, of a limitless opioid market has significantly harmed Plaintiffs. Defendants' success in extending the market for opioids to new patients and chronic pain conditions has foreseeably created an abundance of drugs available for non-medical and criminal use and fueled a new wave of addiction and injury. It has been estimated that 60 to 80 percent of the opioids to which people are addicted come, directly or indirectly, through doctors' prescriptions. But for Defendants' false and deceptive misrepresentations and other unlawful and unfair conduct, such addictions would not have occurred.

367.    The rise in opioid addiction caused by Defendants' deceptive marketing schemes has also resulted in an explosion of heroin use. For example, heroin use has more than doubled in the past decade among adults aged 18 to 25 years. *See* CDC, Vital Signs: Today's Heroin Epidemic – More People at Risk, Multiple Drugs Abused, https://www.cdc.gov/vitalsigns/heroin/index.html (last accessed Oct. 30, 2019). Moreover, heroin-related overdoses in the U.S. have more than quadrupled between 2002 and 2013. *Id*. But for Defendants' false and deceptive

115

misrepresentations and other unlawful and unfair conduct, such heroin use would not have occurred.

368.    The costs and consequences of opioid addiction are staggering. But for Defendants' false and deceptive misrepresentations and other unlawful and unfair conduct, such costs would not have been incurred.

369.    As a result of reliance on the various misrepresentations regarding the safety, utility, and benefits of opioids, in addition to the direct effects of misuse of opioids which was foreseeable by Defendants, Plaintiffs have also suffered loss of productive and healthy workers due to addiction, overdose, or death. Plaintiffs have been destabilized by broken families, physical and mental health problems, homelessness, and incarceration. This results in increased demand on services funded by Plaintiffs, such as medical treatment, emergency services, community outreach, and assistance to law enforcement and child protective services. But for Defendants' false and deceptive misrepresentations and other unlawful, willful, malicious, and unfair conduct, such losses would not have occurred.

370.    Consequently, prescription opioid addiction and overdose have an enormous impact on the health and safety of individuals, as well as communities at large, because the consequences of this epidemic reach far beyond the addicted individual.

371.    Defendants knew or reasonably should have known about the harms that their deceptive marketing has caused and continues to cause Plaintiffs. The extent of the damage will continue to affect the future of Plaintiffs and their residents.

372.    Defendants closely monitored their sales and the habits of prescribing doctors. Their sales representatives, who visited doctors and attended CMEs, knew which doctors were receiving their messages and how they were responding.

373.     Defendants also had access to and carefully watched government databases and other data sources that tracked the explosive rise in opioid use, addiction, injury, and death. Defendants not only knew, but also *intended* that their misrepresentations would persuade doctors to prescribe and encourage patients to use their opioids for chronic pain.

374.     Defendants' actions are neither permitted nor excused by the fact that their drug labels may have allowed, or did not exclude, the use of opioids for chronic pain. FDA approval of opioids for certain uses did not give Defendants license to misrepresent the risks and benefits of opioids.

375.     Nor is Defendants' causal role broken by the involvement of doctors. Defendants' marketing efforts were ubiquitous and highly persuasive. Their deceptive messages and use of KOLs tainted virtually every source that prescribing doctors could rely on for information and prevented them from making informed treatment decisions. Defendants convinced America that compassionate care required doctors to prescribe more opioids.

376.     Defendants' actions and omissions were each a cause-in-fact of Plaintiffs' past and future damages. On information and belief, Defendants' wrongful, willful, and malicious conduct is the direct and/or proximate cause of Plaintiffs' past, present, and future injuries and damages.

377.     Such future damages include, but are not limited to, costs to assess the opioid crisis and costs associated with addiction treatment and detoxification, counseling and medication-assisted treatment of addicts, outpatient recovery programs, education programs for patients, community outreach to vulnerable patient populations, and lost productivity.

**C.     While Plaintiffs and their residents suffer Defendants profit.**

117

378.    While the opioid epidemic has taken its toll on Plaintiffs and their residents, Defendants have realized blockbuster profits. In 2014 alone, opioids generated more than $11 billion in revenue for drug companies like Defendants.

379.    Indeed, financial information indicates that each Defendant experienced a material increase in sales, revenue, and profits from the false and deceptive advertising and other unlawful and unfair conduct described herein.

### D.    Defendants knew their conduct was false and deceptive and fraudulently concealed the truth from Plaintiffs.

380.    Defendants, both individually and collectively, made, promoted, and profited from their misrepresentations about the risks and benefits of opioids for chronic pain even though they knew their misrepresentations were false and deceptive. The history of opioids, as well as research and clinical experience over the last 20 years, established that opioids were highly addictive and responsible for a long list of very serious adverse outcomes.

381.    Defendants manipulated their promotional materials and the scientific literature to make it appear these items were accurate, truthful, and supported by objective evidence when they were not.

382.    Defendants took steps to avoid detection of, and fraudulently conceal, their deceptive marketing and unlawful, unfair, and fraudulent conduct. Defendants disguised their role in the deceptive marketing of chronic opioid therapy by funding and working through Front Groups and KOLs.

383.    Defendants successfully concealed facts from patients and the medical community that are sufficient to arouse suspicion of the claims Plaintiffs now assert. Plaintiffs

were unable to detect the existence or scope of Defendants' industry-wide fraud and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

384.    Plaintiffs do not allege that opioid drugs are inherently defective or that the FDA-approved warning labels are inadequate. Plaintiffs also do not seek a remedy under theories of product defect or failure to warn. Rather, the focus of Plaintiffs' allegations is that Defendants intentionally and negligently engaged in harmful, misleading drug promotion and advertising, as well as false commitments to reduce opioid diversion, in order to reap profits from an over-supply of opioid drugs.  Defendants' conduct was a direct cause of the proliferation of these drugs, the source of massive profits realized by Defendants from the sale of opioids, and the economic harm for which Plaintiffs seek relief.

## CLAIMS AND CAUSES OF ACTION

### COUNT I
### PUBLIC NUISANCE
### (AGAINST ALL DEFENDANTS)

385.    The preceding factual statements and allegations are incorporated by reference.

386.    Defendants, individually and in concert with each other, intentionally, recklessly, or negligently created, perpetuated, and maintained a public nuisance in the Eastern District of Texas and in Plaintiffs' geographic areas.  Defendants intentionally, recklessly, or negligently unreasonably interfered with the public rights in the Eastern District of Texas and in Plaintiffs' geographic areas.

387.    Manufacturer Defendants, through their conduct, knowingly and wantonly directed and encouraged physicians in the Eastern District of Texas and in Plaintiffs' geographic areas and surrounding communities to prescribe, and residents to use, highly addictive opioids for chronic pain; Manufacturer Defendants engaged in such conduct despite knowing that the use of these drugs came with a high risk of addiction and reduced quality of life.

119

388.     Distributor Defendants knew or should have known that many of those opioid prescription orders were not for a valid medical purpose, but rather for diversionary purposes; yet Distributor Defendants continued to distribute opioids in the Eastern District of Texas and in Plaintiffs' geographic areas despite such knowledge. Through their unlawful production, promotion, marketing, and distribution of opioids in the Eastern District of Texas and in Plaintiffs' geographic areas, Defendants have caused a condition that is harmful to the public health, safety, peace, comfort, and convenience of countless Plaintiffs' residents. Defendants' conduct has had far-reaching adverse effects on Plaintiffs, with harm far outweighing any benefit.

389.     Widespread opioid use resulting from Defendants' conduct has interfered, and continues to interfere, with the public rights of Plaintiffs citizens. The Plaintiffs communities have suffered various injuries as a result of Defendants' unlawful conduct, including but not limited to:

a        Loss of life caused by overdose and addiction;

b        Addiction to and dependence on opioids;

c        Increased incidence of NAS in newborns, where children are born with addiction and withdrawal symptoms;

d        Diversion of opioids into secondary criminal markets, as Defendants' acts have knowingly caused an abundance of opioids to be available for non-medical and criminal use in the Eastern District of Texas and in Plaintiffs' geographic areas;

e        Disruption of peace through increased crime. Law enforcement agencies have increasingly associated prescription drug addiction with violent crimes, and the opioid epidemic has prompted a growing trend of prostitution and property crimes including robbery and burglary;

f        Job loss, loss of custody of children, physical and mental health problems, homelessness, and incarceration, which results in instability in communities often already in economic crisis and contributes to increased

demand on community services such as hospitals, courts, child services, treatment centers, and law enforcement;

g    Depletion of Plaintiffs' financial resources. Plaintiffs' have expended funds for: medical care, various treatments and programs for individuals suffering from opioid-related addiction or diseases—including overdose and death, treatment, counseling and rehabilitation services, treatment of infants with opioid-related medical conditions, and public safety relating to or resulting from the opioid epidemic.

390.    Defendants' conduct is ongoing and has produced permanent or long-lasting effects that Defendants knew or should have known would affect a public right. Defendants' unlawful conduct has transpired over an extended period of time and continues to this day. It has caused death, serious injury, addiction, and a substantial interference with the public peace, order, and safety in the Eastern District of Texas and in Plaintiffs' geographic areas.

391.    The effects of Defendants' conduct have been so substantial and widespread, that the nuisance perpetuated by their conduct is now commonly referred to as an "epidemic" or "crisis" in the United States and in the Eastern District of Texas and in Plaintiffs' geographic areas. Defendants knew or should have known their conduct would affect a public right. Defendants knew that opioids posed great risks for addiction, abuse, dependence, and diversion, but nonetheless produced, promoted, distributed, and marketed opioids for broad use in the Eastern District of Texas and in Plaintiffs' geographic areas.

392.    Defendants knew or should have known their conduct would produce permanent or long-lasting adverse effects on the Plaintiffs community in the following ways:

a    On information and belief, Defendants promoted, distributed, and marketed outlandish quantities of opioids for use in the Eastern District of Texas and in Plaintiffs' geographic areas;

b    Defendants promoted and enabled the wide use of opioids to treat chronic pain by committing the various acts described above and incorporated fully herein, including but not limited to: making countless misrepresentations and  omissions regarding the uses, risks, and benefits of opioids through branded and unbranded marketing, as well as distorting

121

scientific studies, tainting the sources of medical information that doctors and the public relied upon with misleading information in support of chronic opioid use;

c      Defendants made opioids readily available and present in the Eastern District of Texas and in Plaintiffs' geographic areas for illegitimate use by supplying and distributing more opioids than could serve a therapeutic purpose;

d      Defendants knew or should have known opioids were inappropriate for treating chronic pain, and involved high risks of abuse, misuse, and diversion. Defendants knew or should have known there was limited or insufficient evidence to support the use of opioids to treat chronic pain, and were privy to long standing scientific evidence as well as clinical evidence that contradicted the notion;

e      Defendants knew or should have known that making mass quantities of opioids available for non-therapeutic or diversionary purposes would produce permanent or long-lasting effects on a public right, as the public health and safety would be directly jeopardized by such acts.

393.      But for Defendants' conduct, opioid use in the Eastern District of Texas and in Plaintiffs' geographic areas would not have become so widespread, nor would the tremendous public health crisis of opioid addiction exist. The health and safety of the residents of Plaintiffs, including those who use, have used, or will use opioids, as well as those affected by opioid users, is a matter of great public interest and legitimate concern to Plaintiffs' residents.

394.      At all times relevant hereto, it was foreseeable to Defendants that the burden of the opioid crisis in the Eastern District of Texas and in Plaintiffs' the Eastern District of Texas and in Plaintiffs' geographic areas resulting from their conduct would fall to Plaintiffs; specifically, it was foreseeable that Plaintiffs would sustain substantial damages as a local government entity required to provide public services to its residents.

395.      Defendants' unlawful conduct described herein has substantially and unreasonably interfered with the public health, safety, and peace in the Eastern District of Texas and in Plaintiffs' geographic areas, constituting a public nuisance under common law. Pursuant

122

to applicable law and its inherent police powers, Plaintiffs are entitled to abate the public nuisance and obtain damages occasioned by the public nuisance.

396.    Defendants created or assisted in creating the opioid epidemic in the Eastern District of Texas and in Plaintiffs' geographic areas, and Defendants are jointly and severally liable for its abatement. Plaintiffs seek to enjoin Defendants from creating, perpetuating, or maintain the above-described public nuisance in the Eastern District of Texas and in Plaintiffs' geographic areas.

397.    Plaintiffs also seek recovery for their injuries flowing from the ongoing and persistent public nuisance, and actual damages including expenses for police, emergency, health, criminal justice, corrections, child services, treatment centers, outreach programs, ambulatory services, and other expenses directly and proximately caused by Defendants' conduct.

### COUNT II
### NEGLIGENCE
### (AGAINST ALL DEFENDANTS)

398.    The preceding factual statements and allegations are incorporated by reference.

399.    Defendants owed Plaintiffs a duty and breached that duty, which directly and proximately caused damages to Plaintiffs. Thus, Defendants are liable to Plaintiffs for common law negligence.

400.    Each Defendant owes a duty to exercise reasonable care to Plaintiffs.

401.    Defendants are required to use ordinary care in the conduct of their business operations and in making representations and ascertaining the accuracy of information given to others, including Plaintiffs and their residents.

402.     Defendants herein owed a duty to Plaintiffs because injury to Plaintiffs and their resident populations was reasonably foreseeable based on Defendants' conduct, as were the injuries suffered.

403.     Manufacturer Defendants have a duty to exercise reasonable care in marketing their opioids to physicians treating Plaintiffs' residents. As described above in language expressly incorporated herein, Manufacturer Defendants breached their duties owed to Plaintiffs and their residents by committing several unreasonable acts, including but not limited to: falsely minimizing the risk of addiction, producing and disseminating misleading branded and unbranded literature touting the benefits of opioids, providing false and misleading information to patients, physicians and prescribers regarding the benefits and risks of opioids for chronic pain, deceptively marketing "abusedeterrent" technology, and claiming that people with signs of "pseudoaddiction" just need more opioids.

404.     Reasonably prudent drug manufacturers would know that aggressive marketing and promotion of highly addictive opioids for chronic pain treatment would result in the severe harms of over-prescription, misuse, diversion, addiction and dependence, and would foreseeably cause patients to seek increasing levels of opioids and turn to the illegal drug market as a result of addiction.

405.     Distributor Defendants have a duty to exercise ordinary care in distributing opioids. As described above in language expressly incorporated herein, the Distributor Defendants breached their duty owed to Plaintiffs and their residents by failing to prevent or reduce the distribution of opioids despite the existence of suspicion for diversionary purposes and routinely and knowingly filling shipments of opioids too large for any valid medical purpose.

406.    Reasonably prudent wholesale drug distributors would have anticipated that their unfettered distribution of millions of prescription opioids would devastate Plaintiffs' residents. As described above, wholesale distributors act as gatekeepers between manufacturer companies and the public to control and regulate dangerous drugs like opioids. Distributor Defendants are well aware of the important role they play in maintaining a closed system for opioids, and reasonably should have anticipated the harms their actions described herein would cause. Nonetheless, the Distributor Defendants committed the unreasonable acts and omissions discussed herein, which posed an unreasonable risk of harm to others.

407.    As a foreseeable and proximate result of Defendants' breach of their duties, Plaintiffs' citizens became addicted to opioid products, sustained opioid-related injuries and required medical care, rehabilitation, and related services provided by Plaintiffs, causing Plaintiffs to incur grossly excessive costs related to the diagnosis, treatment, and cure of addiction or risk of addiction to opioids, among other damages referenced herein. But for Defendants' negligent acts and omissions, highly addictive opioids would not have saturated Plaintiffs' communities, causing widespread addiction, injury, and death.

408.    Under the TCSA, Distributor Defendants have statutorily defined duties to maintain effective controls against diversion of prescription opioids into illegitimate medical, scientific, and industrial channels.

409.    Distributor Defendants knowingly diverted to the unlawful use or benefit of another person-controlled substances, which Defendants had access to by virtue of their profession or employment in violation of Section 481.1285 of the TCSA, and knowingly distributed or delivered, controlled substances under their direction and supervision with no valid medical purpose in violation of Section 481.128(a)(1) of the TCSA. *Id.* at §§ 481.128(a)(1); 481.1285; 481.071.

410. Defendants' acts of supplying and distributing countless prescription opioid pills to treat chronic pain ailments and conditions without any valid medical purpose were therefore done in negligent violation of the TCSA.

411. Plaintiffs have no knowledge of, nor reason to know of any excuse for Defendants' acts in violation of the TCSA; on information and belief, Defendants' acts in violation of the TCSA were committed without excuse.

412. Injuries suffered by Plaintiffs and their residents were the proximate and foreseeable result of Defendants' acts or omissions in violation of the TCSA. Absent Distributor Defendants' acts of distributing and dispersing countless opioids into for no valid medical purpose, and knowingly diverting opioids to illegitimate channels, Plaintiffs and/or their residents would not have suffered the injuries described herein. Defendants' acts fostered opioid abuse and addiction in Plaintiffs' residents, and Plaintiffs incurred substantial injury and expense as a foreseeable result.

413. Accordingly, Plaintiffs seek to recover all legal and equitable relief permitted by law, including actual damages, exemplary damages, prejudgment and post judgment interest, and court costs.

**COUNT III**
**GROSS NEGLIGENCE**
**(AGAINST ALL DEFENDANTS)**

414. The preceding factual statements and allegations are incorporated by reference.

415. Defendants are liable to the Plaintiffs for common law gross negligence. Defendants acts and/or omissions, when viewed objectively from the actor's standpoint involved an extreme degree of risk, considering the probability and magnitude of the potential harm to

others. Defendants had actual, subjective awareness of the risk involved, but nevertheless proceeded in conscious indifference to the rights, safety, or welfare of others.

416.     When viewed from the Defendants' standpoint, their acts of falsely minimizing the risk of addiction, deceptively marketing opioids, and distributing opioids to Plaintiffs in amounts far too large for any valid medical purpose, plainly involved an extremely high degree of risk, and posed substantial harm to Plaintiffs and their residents. Defendants' conduct posed risks that were substantially likely to occur because their acts where not supported by and, in fact, were contrary to reliable scientific evidence.

417.     Defendants' conduct posed potential harm of immense magnitude as they sought to generate as much opioid use as possible, and potential harm was exponentially greater with increased opioid use. Far reaching harm could be anticipated as a result of the aggressive measures Defendants took to attain widespread acceptance and use of opioids for chronic pain, their sky-high sales goals, record sales, and the sheer volume of drugs they sought to supply and distribute.

418.     As described above in language expressly incorporated herein, Defendants were well aware of the risks involved with their fraudulent and highly reprehensible conduct, yet proceeded with conscious indifference to the rights, safety, and welfare of those who would be affected, including Plaintiffs and their residents.

419.     Plaintiffs are entitled to recover exemplary damages for the harm resulting from the Defendants' gross negligence. At all relevant times, Defendants knew, or should have known, that their conduct would create an unreasonable risk of harm to others, including Plaintiffs and their residents, and should be held liable for punitive and exemplary damages.

**COUNT IV**
**<u>COMMON LAW FRAUD</u>**
**(AGAINST ALL DEFENDANTS)**

420.    The preceding factual statements and allegations are incorporated by reference.

421.    Defendants made (i) material misrepresentations, (ii) which were false, (iii) which were either known to be false when made or were asserted without knowledge of the truth, (iv) which were intended to be acted upon, (v) which were relied upon, and (vi) which caused injury. As described more fully herein, Defendants, individually and acting through their employees, agents, and third parties, and in concert with each other, fraudulently made deceptive, false, incomplete, misleading and untrue statements and representations to promote the sale and use of opioids. Defendants directly or indirectly communicated these misrepresentations to Plaintiffs.

422.    Defendants made numerous fraudulent misrepresentations and omissions regarding the use of opioids for chronic pain, including, but not limited to:

a       Routinely misrepresenting the safety, risks, benefits and efficacy of long-term opioid use. Defendants systematically misrepresented that opioids were nonaddictive and safe for long-term use at high dosages;

b       Making false or misleading representations to individual prescribers and patients about the risks and addictive nature of opioids. Defendants persuaded doctors and patients that opioids are not addictive drugs, that opioids are safe for long-term use, and that the compassionate treatment of pain required opioids;

c       Sponsoring the publication of false medical literature that stated prescription opioid addiction is rare. Defendants systematically communicated and made public the idea that opioid addiction is rare and limited to extreme cases of unauthorized dose escalations, or patients obtaining opioids unlawfully.

d       Minimizing and downplaying the risk of addiction in branded and unbranded marketing materials, including but not limited to: claiming the risk of addiction was low and unlikely to develop, and failing to disclose the greater likelihood of addiction with prolonged use of opioids;

e       Making false or misleading claims that opioid addiction is easily treated, including but not limited to: assuring physicians the risk of addiction for patients starting on opioids was minimal; claiming that in the rare instance where it occurred, addiction could be resolved through tapering; and concealing the increased difficulty of stopping opioids after long-term use;

128

f  Making false or misleading claims that opioid dosages could be increased indefinitely without added risks;

g  Making false or misleading claims that screening tools, urine tests, and patient agreements were effective tools that would prevent overuse of prescriptions and overdose deaths;

h  Making false or misleading claims that "bad apple patients" and not opioids, are to blame for the addiction crisis, and positing that once the "bad apple patients" are identified, doctors can freely prescribe without risk of addiction;

i  Making false or misleading claims that opioids are more effective than traditional or other pain killers for chronic pain, or that opioids are effective at all, and/or omitting material information showing that opioids are not more effective than other drugs or treatments for chronic pain;

j  Issuing false, inadequate, incomplete, or misleading information concerning the risks and dangers associated with opioid use;

k  Knowingly omitting underlying facts and evidence about the risks and benefits of opioids that rendered Defendants' assertions false and misleading;

l  Misrepresenting and omitting material facts regarding Defendants' compliance with applicable law;

m  Making false or misleading claims regarding Defendants' commitment to preventing diversion and monitoring the supply of opioids available to the public.

**423.** Defendants' misrepresentations were material. A reasonable person would attach importance to, and be induced to act upon Defendants' misrepresentations, because the misrepresentations concerned the safety and risks of using opioids for chronic pain and other purposes and would be an integral consideration made in deciding whether to use the drugs.

**424.** Defendants' representations were false. As alleged above, Defendants' statements regarding the uses, benefits, and risks of opioids, including their use to treat chronic pain, were not supported by, and/or were contrary to scientific evidence. In fact, Defendants' statements were not supported by their own internal product research.

129

425.    On information and belief, at the time Defendants made their fraudulent representations, each Defendant knew the representations where false, or made the representations recklessly, as positive assertions, without knowledge of their truth.

426.    Defendants knowingly made their false representations. Defendants were privy to information that directly contradicted their representations, including but not limited to, scientific evidence and their own research and knowledge. Defendants also obtained, and carefully followed information available from the government and elsewhere demonstrating rates of opioid use, addiction, injury, and death. With this wealth of knowledge at their disposal, Defendants were well aware that their representations and omissions were false, misleading, and likely to deceive the public.

427.    In the alternative, Defendants were, at minimum, willfully blind to the serious nature of the risks associated with the use of opioids, and recklessly made representations lacking sufficient support.

428.    Defendants made representations about the safety, risks, benefits, and efficacy of long-term opioid use as positive assertions of fact, even though they had no knowledge of their truth or accuracy. As described above and expressly incorporated herein, Defendants lacked reliable evidence to support their claims regarding the benefits of long-term opioid use, and many of their statements made through their branded and unbranded marketing were contrary to scientific evidence available to them.

429.    Because Defendants made the representations described herein without any support or knowledge of their truth, their misrepresentations were, at a minimum, recklessly made.

430.    Defendants' false representations were made with the intent that Plaintiffs and their residents would rely and act upon them, which they did.

**431.**     As described herein, Defendants had access to and carefully followed data detailing prescribing information for doctors. Defendants knew the rates at which opioids were being prescribed, what types of doctors where prescribing them, and what ailments the patients using opioids suffered from.

**432.**     By making the misrepresentations discussed herein, Defendants intended to broaden the market for opioid use by seeking out and convincing more doctors to prescribe, and more patients to use, opioids, and to convince doctors and patients that opioids could be used more frequently and at higher dosages. Defendants intended to alleviate Plaintiffs' concerns for public health and safety to sell more opioids.

**433.**     By misrepresenting the risks, safety, benefits, and effectiveness of opioids, Defendants intended that, or had reason to expect that, Plaintiffs and their residents would act on the representations and purchase and/or use more opioids. Additionally, by misrepresenting to the public that Defendants were monitoring excessive shipments and preventing diversion, Defendants intended for, or had reason to expect that, Plaintiffs would rely on Defendants' pronounced monitoring due to Defendant's unique position and access to shipment information. Defendants intended, or had reason to expect, that Plaintiffs would undertake the aftermath of an extreme overabundance of opioids available to the public—including through illicit channels. Defendants increased access to dangerous drugs and allowed for people to become addicted as they profited. As a result, Plaintiffs and their residents relied and acted on Defendants' representations to their detriment and suffered substantial injury.

**434.**     Plaintiffs and their citizen consumers did not know, and did not have reason to know, that Defendants' representations were false and/or misleading, and justifiably relied on them. Defendants had sole access to material facts concerning the dangers and unreasonable risks associated with their opioids, and they concealed those facts.

131

**435.**     As a direct and proximate result of Defendants' fraudulent representations and omissions about opioids, and Plaintiffs' reliance on them, Plaintiffs sustained the injuries and damages set forth herein, including, without limitation, payments for healthcare costs, medications, drug court costs, and other public services detailed herein. Plaintiffs seek actual damages and exemplary damages.

**COUNT V**
**UNJUST ENRICHMENT**
**(AGAINST ALL DEFENDANTS)**

**436.**     The preceding factual statements and allegations are incorporated by reference.

**437.**     Defendants are liable for wrongfully securing a benefit and/or passively receiving a benefit for which it would be unconscionable to retain. Defendants obtained a substantial benefit from Plaintiffs by fraud, duress, or the taking of an undue advantage. As a foreseeable consequence of their false, fraudulent, and reckless conduct set forth herein, Defendants have profited and benefited from opioid purchases made by Plaintiffs and their residents.

**438.**     When Plaintiffs and their residents purchased opioids, they trusted that Defendants had provided all necessary and accurate information regarding the risks and benefits of opioids and had not misrepresented or omitted any material facts regarding those risks and benefits. Instead, Defendants concealed and minimized known dangers and risks associated with opioids, misrepresented the benefits of opioid use, and distributed opioids even though, upon information and belief, there was suspicion for diversionary purposes.

**439.**     Defendants took undue advantage and received a benefit because Plaintiffs bore the costs resulting from Defendants' wrongful actions. Plaintiffs had no choice and were effectively required to cover these costs to Defendants' benefit.

440.     Defendants, through their wrongful conduct described above, have been unjustly enriched at Plaintiffs' expense—for which Plaintiffs are entitled to damages and restitution.

## COUNT VI
## CIVIL CONSPIRACY
## (AGAINST ALL DEFENDANTS)

441.     The preceding factual statements and allegations are incorporated by reference.

442.     Defendants participated in a civil conspiracy in their unlawful marketing and distribution of opioids into the Eastern District of Texas and in Plaintiffs' geographic areas. Defendants (i) sought to accomplish a lawful objective or course of action through unlawful means, (ii) reached a meeting of the minds on the objective or course of action, (iii) one or more unlawful, overt acts were taken in pursuance of the objective or course of action, and (iv) damages occurred as a proximate result. Defendants entered into a conspiracy to engage in the wrongful acts complained of herein and intended to benefit jointly and independently from their enterprise.

443.     At all relevant times, Defendants agreed and conspired to broaden the market for chronic opioid use by forcefully promoting and fostering an improper culture surrounding pain management. That is, the Manufacturing Defendants and Distributor Defendants coordinated their efforts and utilized front groups, Key Opinion Leaders, and their army of salesman to make self-serving misrepresentations and omissions regarding the risks and benefits of opioids under the color of authority and with an air of neutrality. The Manufacturing and Distributor Defendants did not work independently of each other in operating the drug supply chain. On the contrary, the aggressive expansion of opioids was an industry effort. Defendants worked arm in arm as a single harmonized unit to create and expand the market for opioids. Motivated by financial opportunities, Defendants committed the unlawful actions described herein, including

developing and disseminating misleading medical and promotional information intended to convince Plaintiffs and their citizens that opioids were safe and appropriate for a broader range of patients and uses, and distributing more opioid pills in the Eastern District of Texas and in Plaintiffs' geographic areas and surrounding than could be used for a valid medical purpose.

444.    Defendants had a meeting of the minds in their joint efforts to expand the market for opioid use, as is apparent from their coordinated efforts to manufacture, produce, market, distribute, mutually profit off of, and deliver opioids for, among other reasons, the treatment of chronic pain. Defendants proceeded to market and sell their opioid product as part of this conspiracy.

445.    The objective of Defendants' civil conspiracy is apparent from the conduct by which it was accomplished. In this regard, Defendants acted with malice, purposely, intentionally, unlawfully, and without a reasonable or lawful excuse.

446.    On information and belief, each Defendant committed or caused to be committed, unlawful overt acts in furtherance of their objective of expanding the market for chronic opioid use. Defendants conspired to and did accomplish their objective of expanding the market for chronic opioid use through a series of unlawful acts and omissions. These actions were not mere parallel conduct, rather the Defendants actively concealed the activity of the other. Defendants did not act in their commercial interest when they failed to report their competitors unlawful acts. Defendants operated under an agreement to not report each other, so they could maintain their unlawful schemes and enormous profits.

447.    Defendants' misleading and deceptive actions are ongoing and persistent. Defendants actions described herein were not isolated or infrequent occurrences or in response to an emergency that would reasonably be expected by a governmental unit, such as Plaintiffs. Defendants' deceptive acts could not have been reasonably anticipated or avoided. Defendants'

134

actions caused Plaintiffs to expend resources that were not part of the ordinary or foreseeable costs of local government operation.

448.     Defendants acted in concert to create a market for chronic opioid use, and ultimately profited from it. As alleged herein, the Manufacturer and Distributor Defendants created and perpetuated an environment in which opioid drugs were available in massive quantities and were subject to significant rates of diversion to illicit uses.

449.     All Defendants named herein performed acts to further the conspiracy and are jointly and severally liable for the damages, costs, and expenses associated with their conduct.

450.     Accordingly, Plaintiffs seek all legal and equitable relief allowed by law.

## AGENCY AND RESPONDEAT SUPERIOR

451.     Whenever it is alleged that any named Defendant committed any act or omission, it is meant that the Defendant itself, or its agents, officers, servants, employees, and/or representatives, committed such act or omission for the benefit of the Defendant, and the act or omission was committed with said Defendant's authorization, ratification, and/or control, or committed in the normal routine, course and scope of the agency or employment of said Defendant or its agents, officers, servants, employees, and/or representatives.

## TOLLING OF THE STATUTES OF LIMITATION

452.     The preceding factual statements and allegations are incorporated by reference.

453.     FRAUDULENT CONCEALMENT. Defendants took active steps to conceal their above-described wrongful actions, inaction, and/or omissions. The details of Defendants' efforts to conceal their unlawful conduct are in their possession, custody, and control, to the exclusion of Plaintiffs, and await further discovery. When Defendants' above-described wrongful actions, inaction, and/or omissions came to light, Plaintiffs exercised due diligence by investigating the

135

situation, retaining counsel, and pursuing their claims. Defendants fraudulently concealed their wrongful conduct. Should such be necessary, therefore, all applicable statutes of limitation (if any) are tolled under the fraudulent concealment doctrine.

454. **EQUITABLE ESTOPPEL.** Defendants took active steps to conceal their above-described wrongful actions, inaction, and/or omissions. The details of Defendants' efforts to conceal their unlawful conduct are in their possession, custody, and control, to the exclusion of Plaintiffs, and await further discovery. When Defendants' above-described wrongful actions, inaction, and/or omissions came to light, Plaintiffs exercised due diligence by investigating the situation, retaining counsel, and pursuing their claims. Defendants intentionally concealed their wrongful conduct. Should such be necessary, therefore, all applicable statutes of limitation (if any) are tolled under the doctrine of equitable estoppel.

455. **EQUITABLE TOLLING.** Defendants took active steps to conceal their above-described wrongful actions, inaction, and/or omissions. The details of Defendants' efforts to conceal their unlawful conduct are in their possession, custody, and control, to the exclusion of Plaintiffs, and await further discovery. When Defendants' above-described wrongful actions, inaction, and/or omissions came to light, Plaintiffs exercised due diligence by investigating the situation, retaining counsel, and pursuing their claims. Defendants intentionally concealed their wrongful conduct. Should such be necessary, therefore, all applicable statutes of limitation (if any) are tolled under the doctrine of equitable tolling.

## RELIEF REQUESTED

456. The preceding factual statements and allegations are incorporated by reference.

457. **ACTUAL, CONSEQUENTIAL, AND COMPENSATORY DAMAGES AND/OR RESTITUTION.** As a direct and/or proximate result of Defendants' above-described wrongful

136

actions, inaction, and/or omissions, Plaintiffs have suffered (and will continue to suffer) actual, consequential, and compensatory injury, harm, and damages as set forth herein—for which they are entitled to compensation. Plaintiffs also are entitled to the equitable relief set forth herein. All injury, harm, and damages suffered (and to be suffered) by Plaintiffs were reasonably foreseeable by Defendants. All conditions precedent to Plaintiffs' claims for relief have been performed or occurred.

458.    **PUNITIVE DAMAGES.** Defendants' above-described wrongful actions, inaction, and/or omissions were committed willfully, wantonly, and with reckless disregard for Plaintiffs' rights and interests. Accordingly, Plaintiffs also are entitled to punitive damages from Defendants as punishment and to discourage such wrongful conduct in the future. All conditions precedent to Plaintiffs' claims for relief have been performed or occurred.

459.    **ATTORNEYS' FEES, LITIGATION EXPENSES AND COURT COSTS.** Plaintiffs also are entitled to recover their attorneys' fees, litigation expenses, and court costs in prosecuting this action. All conditions precedent to Plaintiffs' claims for attorneys' fees, litigation expenses, and court costs have been performed or occurred.

**WHERFORE,** Plaintiffs respectfully request that Defendants be cited to appear and answer this action, and upon final trial or hearing, judgment be awarded against Defendants in Plaintiffs' favor for:

(i)     actual, consequential, and compensatory damages (as set forth herein and determined by the trier of fact);

(ii)    equitable relief damages (as set forth herein and determined by the trier of fact);

(iii)   punitive damages;

(iv)    pre- and post-judgment interest at the highest legal rates;

137

(v)     attorneys' fees, litigation expenses, and court costs through the trial and any appeals of this case; and

(vi)    such other and further relief the Court deems just and proper.

### JURY DEMAND

Plaintiffs, for themselves and all others similarly situated, respectfully demand a trial by jury on all claims so triable.

Date: May 24, 2021

Respectfully submitted,

By: */s/ Richard L. Coffman*
        Richard L. Coffman
        **THE COFFMAN LAW FIRM**
        3355 West Alabama, Suite 240
        Houston, TX 77098
        Telephone: (713) 528-6700
        Facsimile: (866) 835-8250
        Email: rcoffman@coffmanlawfirm.com

        Mitchell A. Toups
        **MITCHELL A. TOUPS, LTD.**
        2615 Calder Ave., Suite 400
        Beaumont, TX 77702
        Telephone: (409) 838-0101
        Facsimile: (409) 838-6780
        Email: matoups@wgttlaw.com

        **ATTORNEYS FOR PLAINTIFFS**